## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

JACKSON VOLLMER,

Plaintiff(s),

v.

UNIVERSITY OF NORTHERN COLORADO

Defendant(s).

## COMPLAINT WITH JURY DEMAND

Plaintiff, Jackson Vollmer ("Plaintiff" or "Jackson"), hereby respectfully files this action against Defendant University of Northern Colorado ("UNC" or "Defendant"), through the undersigned counsel of record Kishinevsky & Raykin, Attorneys at Law, and states on information and belief as follows. This action seeks injunctive relief and appropriate damages and costs.

### I.   JURISDICTION AND VENUE

1. The court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Federal question jurisdiction arises under the Constitution and laws of the United States of America,

2. Plaintiff Jackson is a resident of Denver County, Colorado.

3. Defendant University of Northern Colorado has its principal place of business in Weld County, Colorado.

4. Venue is proper pursuant to 28 U.S.C. § 1391(b) as the wrongful acts alleged by the plaintiff occurred in whole or in part in Colorado.

### II.   BACKGROUND FACTS

5. Plaintiff is a student at Defendant University of Northern Colorado ("UNC").

6. Plaintiff attends UNC via the Go On and Learn ("GOAL") program.

7. UNC's GOAL program is a federally designated Comprehensive Transition Program ("CTP") for students with intellectual and developmental disabilities.

8. GOAL is a four-year program. To finish the program, students must complete a minimum of 72 credit hours. University of Northern Colorado, https://www.unco.edu/unc-goal/ (last visited August 15, 2023). Students are permitted to take a maximum of 10 credits per semester. University of Northern Colorado, https://www.unco.edu/unc-goal/program/goal-academics-page.aspx (last visited August 15, 2023). Thereby, GOAL students will complete, at least, three years' worth of credits before finishing the program. Parents are advised GOAL is a four-year program.

9. The purpose of GOAL is to allow students with intellectual and developmental disabilities to attend college.

10. Attendance through GOAL is expressly limited to students with "a documented intellectual or developmental disability." University of Northern Colorado, https://www.unco.edu/unc-goal/right-for-me.aspx (last visited August 15, 2023).

11. Plaintiff is a disabled individual as defined within the Americans with Disabilities Act ("ADA"). The ADA definition provides that an individual is disabled for purposes of the Act when a person has an impairment that "substantially limits a major life activity." 42 U.S.C. 12101(1). Major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id*. at (2).

12. Plaintiff's disabilities include Autism Spectrum Disorder ("ASD") which substantially impairs major life activities such as his ability to concentrate, think, communicate, and work, among others.

13. Plaintiff possesses a language processing disorder substantially impairing his ability to communicate.

14. Plaintiff has been diagnosed with ADHD which substantially impairs his ability to concentrate.

15. Plaintiff suffers from anxiety which substantially impairs major life activities such as his ability to regulate his emotions and thoughts.

16. Plaintiff suffers from panic attacks which also substantially impair major life activities.

17. As a result of Plaintiff's disabilities, Plaintiff takes several medications including Adderall, Guanfacine, and Fluoxtine.

18. With reasonable accommodations such as additional instruction, structure, and third-party support and advocacy in complex administrative proceedings, Plaintiff's disabilities are manageable, and he meets all the requirements and qualifications of GOAL.

19. To be provided with equal access to UNC's programs, including the GOAL program, Plaintiff needs the following reasonable accommodations: additional instruction and explanation regarding UNC policies and directives, additional structure to implement UNC's policies and directives into his schedule, and third-party support and advocacy in complex administrative proceedings.

20. These reasonable accommodations can be provided to Plaintiff without requiring UNC to fundamentally alter its programs.

21. With these accommodations, Plaintiff's disabilities are managed, and he does not pose a direct threat to himself or others.

22. UNC had actual knowledge of Plaintiff's disabilities and need for reasonable accommodations.

23. Plaintiff's Parents, Annesa and Todd Volmer (collectively "Parents" or "Vollmers"), met with GOAL Director, Christina Ruffati ("Director Ruffati"), in January 2022. Director Ruffati advised Plaintiff's parents on the availability of the GOAL program and its applicability to Plaintiff's disabilities

24. Plaintiff and his Parents applied to GOAL in February 2022. When they applied, Parents and Plaintiff included Plaintiff's most recent Individualized Education Program ("IEP") and disability evaluation report.

25. Plaintiff's Parents also submitted additional IEP documents to UNC's Disability Resource Center in July 2022.

26. Moreover, UNC itself, recognizes that GOAL is a Comprehensive Transition Program ("CTP"). University of Northern Colorado, https://www.unco.edu/unc-goal/ (last accessed August 15, 2023).

27. CTPs are federally funded programs regulated by the Department of Education ("DOE"). *Accord* 20 U.S.C. 1140 *et seq.*; *see also* 34 C.F.R. § 75 *et seq.*

28. The express purpose of these programs is to "promote the successful transition of students with intellectual disabilities into higher education." 20 U.S.C. § 1140f.

29. Students with intellectual disabilities are explicitly those with "cognitive impairment[s]" constituting significant impairment of "adaptive behavior," including "conceptual, social, and practical adaptive skills." 20 U.S.C. § 1140(2)(A)(i)-(ii).

30. The program also directly applies to students who are "currently, or [] formerly, eligible for a free appropriate public education under the Individuals with Disabilities Education Act." *Id.* at (2)(B).

31. Based on his disabilities, Plaintiff was eligible for a free appropriate public education ("FAPE") and was the subject of various IEPs throughout his education

32. Plaintiff was initially diagnosed on the Autism Spectrum in 2006 and received additional diagnoses of ADHD and Anxiety in 2016.

33. Froom October 2006, throughout the remainder of his primary and secondary education, Plaintiff was subject to IEPs and provided special education with substantial support.

34. The Vollmers provided this documentation to UNC as part of Plaintiff's application.

35. Accordingly, Defendant had full knowledge of Plaintiff's disability and need for accommodations before the 2022-2023 academic year.

36. Defendant also had full knowledge that Plaintiff's disabilities required accommodations—not just through Plaintiff's documented accommodations history—but also through the functions of GOAL itself.

37. As noted, GOAL is a CTP designed to accommodate intellectually disabled individuals. University of Northern Colorado, https://www.unco.edu/unc-goal/ (last accessed August 15, 2023).

38. While GOAL receives federal funding, it is not free. The estimated cost of tuition for a state resident to attend GOAL in 2021-2022 was $6,603.30. University of Northern Colorado, https://www.unco.edu/unc-goal/costs-and-aid.aspx (last accessed August 21, 2023).

39. This does not include additional costs such as room and board, meal plans, and the GOAL fee. *Ibid.*

40. The GOAL fee "is a separate fee not associated with tuition. This fee pays for additional academic and *independent living supports* provided by GOAL." *Ibid.* (emphasis added). The estimated GOAL fee for 2021-2022 was $9,000. *Ibid.*

41. Accordingly, parents like the Vollmers are responsible for paying at least $9,000 beyond tuition and other fees to ensure UNC can accommodate their disabled children.

42. Such fees are used by other inclusive college education programs, and they are explicitly used to "provid[e] services so that students *have meaningful access* to participate in college and achieve their goals." University of Colorado, Colorado Springs, *Student & Family Handbook*, 14, https://inclusiveservices.uccs.edu/sites/default/files/2022-09/Family%20Handbook%202022.pdf (last revised July 2022)

43. UNC's own handbook directly reflects that "GOAL staff will assist and support your student in communicating with various stakeholders (roommates, RAs, instructors, etc.) about their strengths and struggles relating to . . . their disability." University of Northern Colorado, *Parent Handbook*, 20 https://www.unco.edu/unc-goal/pdf/handbook.pdf (last revised August 2020).

44. UNC has also affirmatively adopted that, while students must apply for disability accommodations, "[s]tudents are entitled to the accommodations received in high school," and GOAL "will assist in this process." *Id.* at 8.

45. Accordingly, UNC's own policies recognize that GOAL students are likely to need accommodations, and it has adopted an affirmative assistance program through GOAL to facilitate those accommodations.

46. Parents pay significant costs to UNC so that UNC will provide these services and accommodations.

47. Plaintiff met these obligations by paying UNC for admission and by attending GOAL.

48. UNC had an affirmative obligation to provide services for his disabilities and accommodations as necessary for him to participate in the benefits of UNC's programs.

49. Plaintiff entered UNC through the GOAL program in the fall of 2022. Throughout the fall semester, Plaintiff excelled and transitioned into a semi-independent life at UNC.

50. However, Plaintiff's experience changed during the spring semester due to the actions of another student in the GOAL program, Student A.

51. Throughout the winter and spring of 2022-23, Student A obsessively contacted Plaintiff to his detriment. On multiple occasions, Plaintiff requested that Student A cease contacting him, but Student A always continued.

52. As noted in Plaintiff's evaluations, he struggles with dynamic social interactions. This impairment makes it more difficult for him to understand the underlying intent or context of social situations.

53. As of his May 13, 2021, evaluation, Plaintiff's capacity to function in social situations was assessed at only the fourth percentile on the Adaptive Behavior Composite ("ABC"). This score reflected significant impairment in participating in and understanding interpersonal relationships, play and leisure activities, and cope with social situations.

54. As an intellectually disabled individual with specific diagnoses of ASD and Anxiety, Plaintiff was not equipped to independently handle the volume of communication from Student A nor its abusive content.

55. Student A's messages are full of abusive and manipulative language. She frequently criticized Plaintiff's decisions to associate with other students, including his fraternity brothers; she often threatened to withdraw from the GOAL program unless Plaintiff communicated with her or spend time with her socially; and she also repeatedly blamed Plaintiff for her emotional wellbeing, insulting his character and demeanor in the process.

56. The Vollmers became aware of Student A's actions in January 2023, due to Plaintiff's increasingly severe anxiety.

57. Plaintiff became increasingly effected by anxiety throughout the winter of 2022-2023 due to the volume and nature of Student A's persistent text messages and phone calls.

58. In January 2023, Student A sent Plaintiff approximately 1400 separate messages.

59. In February 2023, Student A sent Plaintiff approximately 1200 separate messages.

60. Student A also called Plaintiff approximately 117 times between November 19, 2022, and January 20, 2023, an average of nearly two calls per day.

61. Over the course of the semester, Student A also, initially threatened, and ultimately attempted, to disrupt Plaintiff's relationships with other GOAL students and his fraternity. Student A's actions also included threats to report Plaintiff to UNC for disciplinary infractions, which she conducted in March 2023.

62. Student A's abusive and overwhelming messages severely upset Plaintiff and caused him to have several panic attacks in January and February 2023.

63. In February 2023, the Vollmer's sought assistance from the GOAL program.

64. Director Ruffati interceded and instructed Student A to leave Plaintiff alone. Student A complied during from approximately February 4 to 9, before contacting Plaintiff again.

65. On or about February 28, 2023, Student A threatened to degrade Plaintiff's character to his fraternity and other students. After receiving this threat, Plaintiff went to Student A's room and the two had a verbal argument.

66. On or about March 1, 2023, based on reports of the argument, UNC issued a mutual No Contact Order ("Order") between Plaintiff and Student A.

67. UNC informed Plaintiff of the Order through his student email. UNC's explanation of the Order consisted of the following:

> No Contact Order: This is a mutual no-contact order, which means you are to have no contact with [Student A], nor should they have contact with you. As a reminder, contact includes, but is not limited to phone calls, emails, text messages, communication via online social networks (i.e., Facebook, Twitter, etc.) by you personally or by any persons acting on your behalf. Any of these actions may constitute retaliation. Retaliation is defined as any conduct that constitutes a reprisal with the intent of causing physical or psychological harm to the individual who is the target of the conduct. Retaliation includes, but is not limited to, unwelcome or repeated contacts by telephone, by letter, in person, or by third party; damaging or vandalizing personal property; offensive acts/gestures; overt threats, whether or not they were actually carried out; or any conduct that would instill fear and/or trepidation in the victim. Retaliation in any form can result in additional sanctions and restrictions, including university suspension or expulsion.

68. Director Ruffatti informed Plaintiff's Parents of the Order via email on March 2, 2023.

69. In her email, Director Ruffatti informed Plaintiff's Parents she would explain the Order to Plaintiff.

70. UNC did not otherwise notify Plaintiff's Parents of the Order.

71. The notification UNC sent to Plaintiff entirely failed to recognize his disability and impaired capacity to understand and implement the order, despite having full knowledge of his status as reflected by carbon copying the Order to Director Ruffatti.

72. UNC's notice did not explain the terms or conditions of the order in any way appropriate or reasonable for an intellectually disabled person to understand.

73. Despite full knowledge of Plaintiff's impaired capacity, it also did not provide Plaintiff any support or direction implementing the Order.

74. While Director Ruffatti planned to meet with Plaintiff and explain the Order on March 3, 2023, Plaintiff no supports were provided to assist Plaintiff to implement the Order.

75. Failing to provide Plaintiff assistance in implementing the Order is especially problematic because the University had full knowledge that Plaintiff and Student A lived in the same dorm and shared two classes, but apparently expected two intellectually disabled individuals to self-regulate and apply the Order to the same degree as non-disabled individuals.

76. Despite the Order, Student A continued to inundate Plaintiff with messages and calls.

77. UNC also did not explain to Plaintiff that he could violate the Order simply by replying to Student A's attempts to communicate. While Director Ruffatti planned to meet with Plaintiff concerning the Order, as an autistic individual, Plaintiff is a highly literal and black-and-white thinker, the Order's failure to address responses to Student A's attempts to communicate and the omission of replies from the list of prohibited communication left Plaintiff without a full understanding of the Order.

78. As an intellectually disabled and Autistic individual, UNC had full knowledge of the impairments to, and the style of, Plaintiff's thinking. Failing to clearly explain the terms of the order and its contours treated Plaintiff as if he were not disabled, and expected him to conduct himself as such, even though UNC had full knowledge that Plaintiff was, in fact, disabled.

79. Based on the documentation submitted with his application, UNC was also fully aware that Plaintiff struggled with social situations, but, nevertheless, required him to

understand that he should not, and could not, respond to Student A's *thousands* of messages despite their emotionally manipulative content.

80. On or about March 9, 2023, UNC informed Plaintiff that a UNC staff member reported Plaintiff for violating the Order ("Report"). UNC then scheduled a conduct hearing with Plaintiff on March 15.

81. UNC's notice of the Report did not explain that the March 15 hearing was a disciplinary hearing. In fact, the notice specifically explained the hearing was educational and its purpose was to understand the events from Plaintiff's perspective.

82. Plaintiff informed his Parents of the notice and, relying on the notice, the Vollmers believed the hearing would be investigatory at most, and certainly not a disciplinary review.

83. UNC's notice also failed to inform Plaintiff or his parents that Plaintiff would be interrogated during the hearing and was expected to serve as a self-advocate. The Vollmers were particularly unaware that they would be denied any ability to communicate with UNC on Plaintiff's behalf.

84. As a member of the GOAL program, UNC had full knowledge that Plaintiff could not communicate nor advocate as well as non-disabled students.

85. UNC also had particular notice that Plaintiff's ASD impaired his ability to communicate and understand social situations, especially those involving a high degree of stress like an interrogation.

86. According to UNC's Student Code of Conduct ("Code"), "UNC does not discriminate based on disability in the course of disciplinary proceedings under the [] Code."

University of Colorado, *Student Code of Conduct*, at 1, https://unco.edu/student-affairs/policy/ (last revised Jan. 7, 2022).

87. However, the Code does not provide any accommodations for disabled students. Instead, the students themselves must request an accommodation from the Disability Resource Center ("DRC"), which will then determine whether the student will be accommodated based on the reasonableness of the request and whether it would "be a fundamental alteration of the Code." *Ibid.*

88. The Code's disability discrimination policy does not recognize the existence of the GOAL program nor the fact that students in the program necessarily require accommodations, as evidenced by their modified curricula.

89. Instead, UNC apparently expects intellectually disabled individuals to be sufficiently competent that they can independently interpret and apply the provisions of the Code.

90. The Code is a sixteen-page document full of advanced terminology and legal jargon, beyond the capacity of intellectually disabled individuals like Plaintiff to independently understand. *See, e.g., id.* at 11 (using such terms as "Responding Party", "[J]oint Hearing", and "Preliminary Inquiry").

91. This method of providing for disabled students is a Catch-22: only those students who are sufficiently intellectually disabled are eligible for GOAL, but only those students are sufficiently *not* impaired will understand and be able to apply the University's Code.

92. The mere existence of the GOAL program, in and of itself, is sufficient to put the University on notice that GOAL students are not capable or independent to the same degree as non-GOAL students. Requiring them to act as such ignores the purpose of the program itself.

93. This exact problem is evident here, where UNC explicitly admitted Plaintiff to GOAL to accommodate for his intellectual disability, but, once he was enrolled, expected him to act as if he had no such impairment.

94. As such, at the March 15th hearing, Plaintiff was expected to act and communicate as if he were not intellectually disabled and the Vollmers were prohibited from speaking on Plaintiff's behalf despite his clear need for assistance and accommodation.

95. Instead of recognizing his impaired capacity, the hearing officers subjected Plaintiff to questioning and interrogation as if he were a non-disabled person.

96. Intellectually disabled individuals like Plaintiff are particularly susceptible to suggestion and coercion. *See United States v. Preston*, 706 F.3d 1106, 1127-28 (9th Cir. 2013) (granted rehearing en banc *United States v. Preston*, 727 F.3d 894 (9th Cir. 2013) (noting the particular inequities when a disabled person is subject to questioning and interrogation) (quoting Brandon L. Garrett, *The Substance of False Confessions*, 62 STAN. L. REV. 1051, 1064 (2010) ("Mentally disabled individuals and juveniles are both groups long known to be vulnerable to coercion and suggestion."); John B. Gould & Richard A. Leo*, One Hundred Years Later: Wrongful Convictions After a Century of Research*, 100 J. Crim. L. & Criminology 825, 849 (2010), (noting that "the developmentally disabled, cognitively impaired, juveniles—all of whom tend to be unusually suggestible and compliant"—are more likely to confess falsely); Eugene R. Milhizer, *Article: Confessions After Connelly: An Evidentiary Solution for Excluding Unreliable Confessions*, 81 Temp. L. Rev. 1, 14 (2008) ("Certain characteristics common among mentally retarded persons make them particularly prone to confess falsely. For example, mentally retarded suspects are often motivated by a strong desire to please

authority figures, even if to do so requires them to lie and confess to a crime they did not commit. They also often lack the ability to understand the nature of police questioning.")

97. Despite full knowledge of Plaintiff's impairment, he was required to respond to the hearing officers' questions and present his own case for why UNC should not take disciplinary action, actions he was plainly unequipped to do without support.

98. The hearing officers also expected him to understand legal principles such as the hearing's burden of proof, the preponderance of the evidence.

99. On or about July 17, 2023, UNC notified Plaintiff of the hearing officer's determination.

100. Based on Plaintiff's testimony and evidence—which he did not understand—UNC found that Plaintiff violated the Order.

101. The hearing officer specifically found in-person contact between Plaintiff and Student A on March 1, 20, and 28, 2023. The hearing officer based these findings off Plaintiff's alleged admissions despite the issues noted above.

102. These contacts allegedly occurred in Plaintiff's and Student A's shared class and dorm. Again, UNC provided no support for Plaintiff to extricate himself from Student A in shared classes and dorm facilities.

103. The March 1 contact occurred during a shared class when Student A contacted Plaintiff.

104. The March 20 contact occurred at Plaintiff and Student A's common dorm. It was mutual and friendly. Again, no support was provided to Plaintiff to manage shared spaces with Student A, despite the pair sharing a dorm and two classes.

105. The March 28 contact occurred through social media messages, all initiated by Student A. Student A initiated these contacts through a proxy Instagram account to avoid her parents' supervision of her public account.

106. Plaintiff did not initiate any of these contacts, nor any other throughout the pendency of the Order.

107. The hearing officer also based their finding on messages Plaintiff provided showing messages sent by Student A. The officer noted that on several of these instances Plaintiff did not respond, but cited responses to Student A on March 1, 17, and 18, 2023, where he did respond.

108. The March 1 message occurred before Plaintiff received notice of the Order.

109. The March 17 and 18 messages occurred through a student proxy, whereby Student A sent messages to Plaintiff through another GOAL student. Plaintiff believed his responses were to the other student, not Student A. Again, the contours of the Order were never sufficiently explained to Plaintiff given his disabilities. Plaintiff was required to endure Student A's constant messages and interpret them according to the Order in within his limited capacity.

110. The hearing officer also found that Student A attempted to contact Plaintiff via text on February 28 and March 9, 26, 28, and 29, 2023. Plaintiff did not respond to any of these attempts.

111. Notably, while the hearing was conducted based on Plaintiff's reported violation of the Order on March 6, the officer did not find a contact on that date.

112. Moreover, aside from her interrogation of Plaintiff, there was no other evidence such a contact ever took place.

113. Accordingly, while the hearing officer failed to address it, it is likely that Plaintiff never contacted Student A on March 6, and the report—promulgated by UNC personnel based on Student A's statements—was false.

114. Despite all of this, Plaintiff was found to have violated the Order. Plaintiff's violation was not based on his attempt to contact Student A, but through three instances where he responded to Student A. Again, UNC never explained to Plaintiff that *responding* to Student A constituted an impermissible contact.

115. According to its determination that Plaintiff violated the Order, UNC suspended Plaintiff for one (1) academic year and denied him access to UNC property during that time.

116. UNC did not explain its reasoning for selecting a suspension as the appropriate punishment for Plaintiff's alleged violation.

117. Under UNC's Code, suspension is the sixth of eleven possible outcomes for a Code violation. Less severe alternatives include a warning, probation, loss or restriction of privileges, restitution, and education or counseling. University of Colorado, *Student Code of Conduct*, at 3, https://unco.edu/student-affairs/policy/ (last revised Jan. 7, 2022).

118. More severe outcomes as relevant to individual students include expulsion, and revocation or withholding of admission or degree. *Id.* at 4.

119. The Code specifies that the determination of outcome depends on the totality of the circumstances, depending largely on "the nature and severity" of the conduct, the "prior conduct history," and UNC public safety. *Ibid.*

120. Even applying the Code, UNC's determination does not fit with the totality of the circumstances. According to UNC's own hearing officer, Plaintiff's misconduct was incidental, but mutual, contact between Plaintiff and Student A in class and in shared dorms, and three text messages replies to Student A's attempts to communicate in violation of the order. An order that was only put in place following two months of

Student A's harassing text messages targeted at Plaintiff, of which the hearing officer was fully aware.

121. Even were Plaintiff not intellectually disabled, this outcome would be startlingly severe. But here, UNC's hearing officer explicitly acknowledged that Plaintiff repeatedly requested that Student A cease communicating with him, but then blamed him for continuing to communicate with her thereafter.

122. As such, UNC entirely failed to consider Plaintiff's disability and the effect UNC is aware it has on his understanding of social relationships and his ability to communicate.

123. Plaintiff was attending UNC specifically through a disability accommodations program. UNC was fully aware of Plaintiff's disability, and yet subjected him to a disciplinary review without accommodation or even consideration of his disability.

124. UNC's decision to suspend Plaintiff will mandatorily keep him out of college for one year. This is an especially severe consequence for a four-year program. Even more so, when the individuals in that program are intellectually disabled specifically seeking a college-like experience.

125. Plaintiff's suspension will appear on his permanent transcript, meaning that he will have a record of behavioral issues in any attempt to apply to a separate inclusive education college and while seeking employment.

126. Colorado's inclusive education programs may deny admission based on behavioral issues or disruptions. *See, e.g.,* Regis University, *GLOBAL Inclusive College Certification Program,* https://www.regis.edu/academics/inclusive-education/global/index ("Students must not have any history of behavioral issues and/or disruptions.") (last accessed August 21, 2023).

127. Plaintiff's anxiety and depression have also increased substantially because of UNC's actions. Plaintiff's confusion over UNC's decision is a significant deterrent to attending UNC in 2024, as is the loss of friendships and progress from a year's suspension.

128. When UNC made its decision to deny Plaintiff access to UNC's programs for the 2023-2024 academic year, it was fully aware that Plaintiff was one year into a four-year disability accommodations program. UNC's actions have not just denied Plaintiff the opportunity to go to college this year, given his disabilities, they may have effectively foreclosed Plaintiff from ever attending college again.

### III. CLAMS AND CAUSES OF ACTION

#### A. FIRST CLAIM OF RELIEF
(*VIOLATION OF THE AMERICANS WITH DISABILITIES ACT*)

129. Plaintiff reincorporates and realleges all other paragraphs as if fully set forth herein.

130. Plaintiff's conditions alleged herein constitute disabilities protected under the Americans with Disabilities Act.

131. As explained above, Plaintiff was and is qualified to attend UNC and UNC's GOAL program.

132. UNC had knowledge of Plaintiff's disabilities.

133. UNC had knowledge of Plaintiff's need for reasonable accommodations.

134. Plaintiff was excluded from participation in, or denied the benefits of, UNC's services, programs, or activities and UNC's GOAL program.

135. That exclusion, denial of benefits, and discrimination was by reason of Plaintiff's disability. UNC's decision to deny Plaintiff admission for the 2023-2024 academic year

and to deny Plaintiff access to UNC's GOAL program for the 2023-2024 school year was because of Plaintiff's disabilities.

136. UNC also failed to provide Plaintiff reasonable accommodations during the spring 2023 school semester. By denying Plaintiff access to UNC and UNC's boarding program, UNC has failed to provide Plaintiff reasonable accommodations for the 2023-2024 school year.

137. Plaintiff's reasonable accommodations do not impose an undue hardship. Plaintiff's reasonable accommodations do not require UNC to make any fundamental changes to the nature of its programs.

138. Plaintiff poses no direct threat to himself or any others at UNC.

139. UNC's violations of Plaintiff's rights under the Americans with Disabilities Act have denied her equal access to its programs and has caused Plaintiff to suffer irreparable harm.

## IV.   REQUEST FOR RELIEF

Plaintiff requests that the Court enter judgment in his favor and against Defendant UNC as follows:

140. Granting Plaintiff injunctive relief pursuant to 42 U.S.C. § 12188(a)(2) by issuing an order:

   a. Requiring Defendant to accept Plaintiff into its programs, including the GOAL program, for the 2023-2024 school year as contemplated by Plaintiff's 2022 application and the Vollmers' tuition payments;

   b. Requiring Defendant to reasonably accommodate Plaintiff's disabilities by: ensuring UNC directives are properly explained to Plaintiff at a vocabulary level

      he can understand, coordinating with Plaintiff's schedule and room/class assignments to effectuate UNC directives, provide him with the assistance of an informed advocate in official UNC disciplinary proceedings; and

   c. Enjoining Defendant from any further violation of the ADA.

141. Awarding Plaintiff statutory and reasonable attorney fees, litigation expenses, and costs incurred in this action;

142. Awarding the Plaintiff any additional and further relief that the Court finds equitable, appropriate, or just.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

_____
Igor Raykin, Esq. #43081
Kishinevsky & Raykin, Attorneys at Law
2851 South Parker Road, Suite 150
Aurora, CO 80014
Telephone: (720) 767-1846
E-mail: igor@coloradolawteam.com
Attorney for Plaintiff

_____
Conor O'Donnell, Esq. #58077
Kishnevsky & Raykin, Attorneys at Law
2851 South Parker Road, Suite 150
Aurora, CO 80014
Telephone: (720) 767-1846
E-mail: conor@coloradolawteam.com
Attorney for Plaintiff