IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-CV-02164-PAB

JACKSON VOLLMER,

Plaintiff,

vs.

UNIVERSITY OF NORTHERN COLORADO,

Defendant.

---

REPORTER'S TRANSCRIPT
Hearing on Motion for Preliminary Injunction

---

Proceedings before the HONORABLE PHILIP A. BRIMMER, Chief Judge, United States District Court for the District of Colorado, commencing at 8:02 a.m., on the 31st day of October, 2023, in Courtroom A-701, United States Courthouse, Denver, Colorado.

Proceeding Recorded by Mechanical Stenography, Transcription Produced via Computer by Janet M. Coppock, 901 19th Street, Room A-257, Denver, Colorado, 80294, (303) 893-2835

APPEARANCES

Conor M. O'Donnell, Kishinevsky & Raykin, LLC, 2851 South Parker Road, Suite 150, Aurora, CO 80014-2722;

Igor Raykin,Colorado Law Team, 2851 South Parker Road, Suite 150, Aurora, CO 80014, appearing for the Plaintiff.

Angela R. Zippin and Robert W. Beck, Colorado Office of the Attorney General, Higher Education Unit, State Services Section, 1300 Broadway, 6th Floor, Ralph L. Carr Colorado Judicial Center, Colorado Department of Law, Denver, CO 80203, appearing for the Defendant.

* * * * *

PROCEEDINGS

*THE COURT:* The matter before the Court is Jackson Vollmer v. UNC. This is Civil Case 23-CV-2164.

I will take entries of appearances, please.

*MR. RAYKIN:* Good morning, Your Honor. Igor Raykin on behalf of the plaintiff.

*THE COURT:* All right. And joined by?

*MR. O'DONNELL:* Good morning, Your Honor. Conor O'Donnell.

*THE COURT:* And good morning to both of you.

And on behalf of the University?

*MR. BECK:* Thank you, Your Honor. Warren Beck with the Attorney General's Office.

*MS. ZIPPIN:* Angela Zippin also on behalf of the

Colorado Attorney General's Office.

*THE COURT:* And those at counsel table?

*MR. BECK:* Thank you, Judge. We have our paralegals.

*MS. DAVIS-WEISER:* Jen Davis-Weiser.

*MR. BECK:* And general counsel for UNC.

*MR. SATRIANA:* Good morning, Your Honor, Dan Satriana.

*THE COURT:* What was the last name?

*MR. SATRIANA:* Satriana.

*THE COURT:* Got it. Good morning to each of you.

We are here today for a hearing on the plaintiff's motion for a preliminary injunction. So first of all, any questions about how the clock is going to work? I will take that as a no.

The other thing is I suggest that you skip any type of opening statements or something like that. I have read all the briefs. I have read all the exhibits. So I think I am pretty familiar with things. I would suggest that we go right into it. If you want to give some type of an opening, if it's longer than two minutes, I will take it out of your closing. You each have 20 minutes at the end of the day, so I will deduct it from that.

Anyone want to do an opening?

*MR. RAYKIN:* We would like to give a brief opening, Your Honor.

*THE COURT:* Okay. Go ahead.

*MR. RAYKIN:* Would you like me to do it there or here, Your Honor?

*THE COURT:* There.

*MR. RAYKIN:* Okay. Your Honor, what's critical to understand about this case is that Jackson Vollmer is not a traditional student. He is a student with a disability. In fact, he has several disabilities. He is a highly disabled individual who has been in special needs programs his entire life.

He was on something called an IEP, an individualized education program, under the Individuals with Disabilities Education Act throughout his primary education. And then he went into what's known as a GOAL program, which is a specialized program for students at the University of Northern Colorado.

Looking at the standards here, the first standard, of course, is that we are substantially likely to succeed on the merits. I believe that is the case, Your Honor. Under Section 504 a covered entity is required to provide reasonable accommodations to an individual when it knows the individual is disabled, which UNC certainly did, and requires an accommodation of some kind to participate and/or receive the benefits of its services.

The entity is on notice that an individual needs an accommodation when it knows that an individual requires one

either because that need is obvious or because the individual requests an accommodation. In this case, Your Honor, it was both; but, of course, it was obvious.

Also there was irreparable injury here. We will get into how these -- this discrimination affected him and how it continues to affect him. There is also a balance of equities here and it favors him. We have a strong case law in this country that supports the protection of disabled individuals. And there really is no prejudice to the University here particularly because there can be no harm to the University here.

Finally, an injunction is not adverse to the public interest. The student is safe. He is ready to return to school. And right now he is suffering injury by continuing to be precluded from returning to school.

*THE COURT:* All right. Thank you, Mr. Raykin.

Anything on behalf of the University?

*MS. ZIPPIN:* Yes.

*THE COURT:* Go ahead.

*MS. ZIPPIN:* Good morning, Your Honor. The University requests that the Court deny the preliminary injunction requested by the plaintiff. In support of the argument, we are going to call four witnesses including the director of the GOAL program at UNC to discuss what that program is, the supports that were provided to Mr. Vollmer while he was enrolled, and

the impact that the University would face if the preliminary injunction were granted.

We will also hear from the assistant director of the Disability Resource Center at UNC to discuss the accommodations that were provided to Mr. Vollmer. And we'll hear from the individuals in the Student Conduct Office that worked with Mr. Vollmer throughout the disciplinary process as to how those accommodations were implemented.

And the evidence will show that the plaintiff has not met its burden as to any of the factors as to the preliminary injunction standard and particularly has not made a strong showing on the substantially likely to succeed on the merits and the balance of harms factors which are required for a preliminary injunction which alters the status quo.

Thank you.

*THE COURT:* All right. Thank you very much.

All right. Then plaintiff may call his first witness.

*MR. RAYKIN:* Your Honor, I am sorry. Just to circle back if we may, could we go over the time in this case, how the clock will work?

*THE COURT:* Yes. Once you call a witness, the clock starts. Once you are done with the direct, clock stops. Once cross starts, other side's clock starts. And I just keep track of the cumulative amount of time. Each side has 2 hours and 15 minutes. Keep in mind clocks are objective, at least in terms

of the Microsoft one that I look at on my screen here, and they don't have any sympathy. When you run out of time, you run out of time.

*MR. RAYKIN:* Fair enough, Your Honor. Thank you.

*MR. BECK:* Your Honor, I would ask that the witnesses be asked to step in the hall so they are separated during testimony.

*THE COURT:* Any objection to sequestration?

*MR. RAYKIN:* No, sir.

*THE COURT:* Okay. Then anyone witnesses other than the first witness called should wait either in the witness room or out in the hallway. However, the plaintiff can stay in the courtroom the entire time. He is a party.

*MR. RAYKIN:* Understood, Your Honor.

Okay, Your Honor. We would like to go ahead and call Ms. Clio Pitula.

(**Clio Pitula** was sworn.)

*COURT DEPUTY CLERK:* Please state your name and spell your first and last name for the record.

*THE WITNESS:* Clio Pitula, C-L-I-O, P-I-T-U-L-A.

**DIRECT EXAMINATION**

*BY THE COURT:*

*Q.* Good morning, Ms. Pitula.

Ms. Pitula, what is it that you do for a living?

*A.* I am a psychologist.

*Q.* And how long have you been a psychologist?
*A.* I have been licensed since 2017.
*Q.* And where do you work?
*A.* I work at The Arete Center. It's a group private practice in Centennial.
*Q.* And what's your highest level of education?
*A.* I have a Ph.D. and a post-doctoral fellowship.
*Q.* Understood. Do you specialize in any particular field in psychology?
*A.* Yes. My Ph.D. is in child development and clinical psychology, a dual degree. And so my specialization is child and adolescent psychology with a sub-specialization in anxiety and related issues.
*Q.* Do you know Jackson Vollmer?
*A.* I do.
*Q.* And how do you know Mr. Vollmer?
*A.* He came to my practice and has been my therapy patient since July 2020.
*Q.* Ms. Pitula, do you know when Mr. Vollmer first came to your practice?
*A.* Yeah, he came in June 2020. He did an intake with one of my colleagues.
*Q.* And why did he seek your assistance?
*A.* He came to our practice looking for some support in coping with anxiety, worries about the future, navigating peer

situations, and already had a diagnosis of autism when he came in to see us and so also coping with some of the challenges that were arising around that.

*Q.* Were you aware of some of his other diagnoses?

*A.* Uh-huh.

*Q.* Is that a yes?

*THE COURT:* You have to answer yes or no.

*THE WITNESS:* Sorry, yes.

*THE COURT:* Go ahead.

*BY QUESTIONER:*

*Q.* And Ms. Pitula, do you know what those other diagnoses were?

*A.* Yes. So he came in with a diagnosis of autism spectrum disorder. And then his mother shared some of his previous evaluations, his IEP evaluations, with us where he also had a speech and language impairment.

*Q.* Okay. Ms. Pitula, you have a book of exhibits in there.

*A.* Okay.

*Q.* That is labeled plaintiff's exhibits. Could you turn to the last one labeled Exhibit 23? And Ms. Pitula, do you recognize this?

*A.* Yes.

*Q.* What is it?

*A.* This is a letter that I wrote in April 2023.

*Q.* You put it together.

*A.* I wrote it, yes.

*MR. RAYKIN:* Move to admit Exhibit 23, Your Honor.

*THE COURT:* Any objection to the admission of Exhibit 23?

*MR. BECK:* Judge, I do object on the grounds of relevance of this report -- or excuse me, this letter of support. It was written after the conduct hearing that is truly the issue in this case. And it is speaking to issues related to what is actually a second conduct hearing. So I am just -- I really am grasping for what the relevance of this report would be.

*THE COURT:* Response, Mr. Raykin?

*MR. RAYKIN:* With respect to the second hearing, that is not the reason that this is being admitted. This is being admitted for an insight into what Jackson Vollmer's disability is and how it affects him. It also speaks to the intentionality of his actions as it pertains even to the first hearing.

*THE COURT:* All right. And anything else from defendant?

*MR. BECK:* Judge, to the extent the Court allows the letter, I would ask the Court not to consider it an expert opinion. It is not styled as an expert report. It was not provided to us in that fashion nor has this witness been qualified as an expert.

*THE COURT:* Do you have any doubt whatsoever that Mr. Raykin could qualify Dr. Pitula as an expert?

*MR. BECK:* Not based on the qualifications that we've heard, Judge; but with regard to the subject matter in this case, yes, possibly.

*THE COURT:* Well, she is not testifying about -- you know, I have read the support letter. The support letter is just -- it's not necessarily a support letter, but I have read the letter. It seems like she is basing it upon her work with Mr. Vollmer, and as a result, I will overrule the objection and admit Exhibit 23.

*BY MR. RAYKIN:*

*Q.* Ms. Pitula, I would like to go back a little. Are you familiar with the term neurodivergent?

*A.* I am.

*Q.* What does that mean?

*A.* It means that we think about neurotypical as maybe the way that most of our brains are wired. And neurotypical refers to the ability to process information, respond to information in the way that might be expected based on how our environment is arranged and how other -- most other people might respond. Neurodivergent then refers to brain wiring that is different from that. So individuals who have autism, who have other developmental disabilities, who have intellectual disability, ADHD, have some different wiring in their brains, so

neurodivergent refers to those, that variation across how we process information, respond to information.

*Q.* And how would you classify Mr. Vollmer?

*A.* He is neurodivergent.

*Q.* Can you describe what autism is?

*A.* Yeah, so autism is -- it's classified as a developmental disability and it refers to a different way of approaching understanding the world. So individuals with autism tend to have differences in social communication in terms of how they interpret social information, how they attend to social information and respond to it. They tend to have other patterns such as repetitive behaviors, stereotypical interests and limited interests. And so our primary deficits we see are in terms of differences or in terms of social communication which can then present as a deficit when interacting with neurotypical people who aren't making accommodations.

*Q.* There are levels of autism too, correct?

*A.* Yeah.

*Q.* What level would you classify Mr. Vollmer as?

*A.* And so there are levels. We also think about ASD with or without intellectual disability. So I would classify him as having ASD with some measure of intellectual disability based on previous testing that was given to me, not based on testing I completed. In terms of levels, I don't have that information from his past testing, so I won't comment on it.

*Q.* Okay. One of the things that you put into your report is that Mr. Vollmer may have "difficulty grasping the underlying intent or context relevant to a social interaction."
*A.* Uh-huh.
*Q.* Could you describe how that impacts him?
*A.* Yeah. So what I've seen in sessions -- and I am just going to flip to that page. Oh, it's taped together. That's okay. So based on my interactions with him and having worked with him pretty closely, what I have often seen in sessions is that some of the conversations we have require clarification. So I tend to provide repeated explanations and different explanations to help him understand some of what we're talking about and working on.
In social situations what I have seen and also what I've heard from based on his report, his mother's report in our sessions is that he may overlook some social information that's relevant to the interaction at hand. So that could be not matching nonverbal cues with the content, the verbal content that's provided. That could refer to interpreting what's being said in a very literal or concrete way without attention to some of the more contextual or abstract factors, difficulty grasping metaphors, for example.
*Q.* Could you give me an example when you have worked with him when you have had to rely on some of these tools of repeating information or providing different information?

*A.* Yeah. So whenever we work on some of our new skills in therapy, and so with cognitive behavior therapy we are often presenting information to interpret our thoughts, feelings and behaviors. And so in presenting our model of cognitive behavioral therapy, there are some more abstract relationships. We are discussing relationships between thoughts, feelings and behavior, which is a much more abstract connection.

And so when we do that, we tend to have an iterative back-and-forth conversation. So I am providing some explanation or introduction. I am having him repeat back to me what he is understanding or hearing. Then I am able to clarify and adjust his need and then take his observations and fit them into our model. So maybe I am going through a situation that happened in the past week where he felt anxious or stressed.

*Q.* What happens to the level of support that he needs when there is new information that's presented to him?

*A.* Yeah, so with new information, like all of us, right, we tend to all need added support in understanding new information, and so he tends to require quite a bit more support when taking in new information, new concepts.

*Q.* And is that support in person or is it written?

*A.* Typically in person, and so it's typically conversational and it goes back and forth. I often have him repeat back to me what he has understood, and then again we modify, we adjust, we clarify from there. Using written materials, I might use it as

a multi-modal presentation, so maybe we have a worksheet and we are talking about it and then we are doing it. So often it's two or three different modalities and then repetition.

*Q.* What happens to the level of support that he needs when dealing with complex information?

*A.* Yeah, so it's pretty high for more complex information, yeah. And we might come back to it in multiple sessions.

*Q.* How could a stressful situation affect him?

*A.* Yes. So for all of us, right, we know that when we are feeling anxious or stressed, we require more support to process information. And so similarly for Jackson when he is anxious or stressed, he does need more support. It's harder for us to take in information and really manipulate it and reflect on it when we're stressed. We are much more reactive.

*Q.* Now, this report was put together in April of 2023. Do you recall, did he ever tell you that he was stressed during the period of March 2023?

*A.* Yeah. So I saw him in April before writing this letter, and he -- yeah, he appeared very stressed in our session and he told me he had been feeling stressed. And his mother who was in our session and who I had phone calls with also echoed this.

*Q.* During this period of time of stress, how would you classify his capacity to process information?

*A.* It diminished.

*Q.* How substantially?

*A.* It's hard for me to give a number on it, right? It's hard if I am not inside his mind. One estimate from researchers is that we lose 30 IQ points when we are in moments of high distress. So I am hesitating to make a guess because I can't say for certain, but what I observed in session and what I heard from parents is that he was requiring a lot more repetition support. And I saw that in terms of our sessions as well just as we processed some of what had been going on that had been feeling stressful. We did have to revisit some of our coping strategies quite a few times.

*Q.* Now, you also testified earlier that sometimes he will miss relevant information. Can you describe what that looks like?

*A.* Yeah. So what we know about individuals with autism is that they may tend to miss the forest for the trees. So they may focus on certain details and extract certain details that are provided without seeing the bigger picture.

And so in terms of my work with Jackson how that might present is maybe presenting a concept. And I have noticed that he might pull out one of the features of what I've discussed. So maybe he is focusing more on kind of one of the details without necessarily considering the most important or most relevant bigger picture.

*Q.* Understood. In working with Jackson, how have you observed his social skills have been affected?

*A.* Can you clarify that question?

*Q.* Well, what are some of his limitations in social interactions?
*A.* Yeah, so some of his -- I am going to answer like a psychologist. I start with the strengths. So his strengths are he is really kind and really sweet and really eager to please and really interested in people, and so that comes across. Some of the challenges are in -- I think again that that receptive expressive language. I think the receptive language difficulty is probably harder to observe.

I think that he does a nice job seeming like he is understanding to be part of the social interaction, which is something that I see with other clients with autism. Maybe there is a bit of copying the cadences of speech or the language that same age individuals use, but then when I pause and probe, he might not really be understanding my contribution to the conversation or the intent of my questions.

And so based on what he has told me and what I know about other individuals' autism in terms of social interactions, he is likely to struggle to catch on to the context behind social interactions.
*Q.* Could you give me an example of when you have observed this dynamic of him appearing to -- or claiming to understand something without actually understanding it?
*A.* Yeah. So that's happened quite frequently and so that we've actually worked on that in therapy. We have worked on

being able to say "I don't know" or "I don't understand" in order to be -- to access more support. And so what I have often observed in session since he first started coming in to work with me is kind of asking a question or providing some information like regarding a coping skill and having a response that suggests like, yup, got it. I know all about that. And then when I pause and say, "Well, what does that mean," or "What are you understanding," the response may be, "Oh, can you repeat the question," or, "Wait, what did you say," kind of playing it off, or ultimately, "I don't know. I'm not sure. Can you tell me?"

So I have typically had to probe to ask whether he understood. It's not often been volunteered. And again, we have been working on it and he has done a nice job of recently being a bit better able in session to say when he doesn't know.

*Q.* Understood. And I noticed in Page 3 of your report you again mentioned some of his difficulties are heightened in moments of stress.

*A.* Yeah.

*Q.* Could that be during a hearing, for example?

*A.* I was not present at the hearing. I am testifying in court right now and I am feeling stressed, so I would extrapolate that most individuals sitting up here would feel stressed. So yeah, in moments of stress and moments of feeling overwhelmed, put on the spot, moments of feeling criticized or when he

thinks he is in trouble and has done something wrong, what I have seen in session is that that does make him feel quite stressed.
*Q.* Do you know how his ADHD affects him?
*A.* Yeah. So ADHD can compound some of the difficulties seen with autism. And so we know with ADHD individuals tend to struggle with impulsivity, emotion regulation, self-regulation. And also seeing the forest for the trees can be a challenge with ADHD as well. So many individuals with ADHD do also struggle with some social interactions. And they may respond more impulsively. They may have less awareness and less ability to follow some of the rules of social dynamics. And it may be -- well, it is harder for them to attend to information. So to maintain focus while information is presented is one of the core difficulties with ADHD.
*Q.* Do you know how his anxiety affects him?
*A.* Yeah. So anxiety, anxiety tends to impact us in a number of ways. For Jackson what I have seen and what we have worked on is once he starts to feel anxious, he tends to become more perseverative or ruminative, so perseverating on certain worries or certain thoughts and getting kind of stuck on some of those thoughts, which then can snowball making him feel more and more anxious and overwhelmed.
*Q.* When he is perseverating, how does that impact his ability to understand information?

*A.* Yeah. So what I have seen in our sessions, when he comes into the session more anxious or when there is a topic that's come up in the session that has made him more anxious, I tend to have to do just some emotion regulation support before we can come back to conversation. And so perseveration then comes up as getting stuck on a certain aspect or a piece of the topic we are discussing that's causing the worry. And then before we can really continue to process and talk through the worry and start to work on some more rational or realistic expectations for the situation, we have to do some diffusing.
*Q.* Understood. Now, are you working on the language processing disorder as well?
*A.* Uh-huh.
*Q.* Is that a yes?
*A.* Sorry, yes.
*Q.* No problem. We are very formal here.
Do you know how that affects -- could you describe how that affects him?
*A.* Yeah, and so I will qualify that. Again, I didn't complete his IEP evaluations. So what I have observed -- this is based on what I observed and what I know about working with individuals who have differences in language processing. Just understanding of certain words and concepts, right, so vocabulary, ability to understand, interpret, take in more complicated or more lengthy verbal and written information.

*Q.* Have you discussed at all any of the panic attacks that he has as well?
*A.* Yeah. And so -- yes. I will let you ask your questions about that.
*Q.* Do you know how often he has panic attacks?
*A.* No.
*Q.* Do you know what generally prompts his panic attacks?
*A.* My sense based on what I have been told by him and his family is that moments of really heightened stress and overwhelmed tend to -- without adequate support tend to lead into this anxiety attack or this panic attack.
*Q.* Okay. You mentioned several times his IEPs.
*A.* Uh-huh.
*Q.* Can you describe what an IEP is?
*A.* Yeah, it's an individualized education plan, so it's the highest level of support providing adaptations and accommodations for individuals who have different learning needs. That's provided within the public school system.
*Q.* That's only from K through 12, correct?
*A.* Correct.
*Q.* Are you aware of -- did he receive any accommodations under his IEP?
*A.* Yes.
*Q.* What is an accommodation?
*A.* So an accommodation is a modification to the learning

environment to best support the student's learning.
*Q.* Are you aware if he was receiving accommodations at the University of Northern Colorado?
*A.* I am less aware of exactly what he received. I am aware of the description of the GOAL program because we actually talked about the GOAL program before he applied, and so I was working with him consistently when he was applying for the GOAL program. And so I don't know if you want me to speak to that.
*Q.* Well, without actually speaking to what any of the accommodations were, are you aware if he had accommodations at UNC?
*A.* Yes.
*Q.* He did?
*A.* I am aware that he was supposed to have accommodations.
*Q.* Understood.
*A.* I really can't speak to exactly what happened. I know that he was in some different classes and he had support in the living situation. That's what was told to me by him and his parents.
*Q.* Do you believe that he is capable of asking for all of the accommodations that he needs on his own?
*A.* Based on what I've seen in our sessions and based on my conversation with his parents, I suspect he is not able to recognize and ask for all the accommodations he needs.
*Q.* And do you believe that he is able to advocate for himself

on his own? I am sorry. Let me strike that. Let me ask it differently. Does he have some self-advocacy skills?
*A.* He has some self-advocacy skills.
*Q.* How developed would you say those advocacy skills are?
*A.* So it's hard to quantify. I will qualify them. What I've seen and what I've been -- right, again just based on my clinical experiences with him, he really benefits from having his parents help to advocate for him. I think that he may notice that he is in distress or he is feeling stressed or he is having a hard time. His tendency in the past has been to try to figure it out on his own. He's pretty good at talking to his parents and telling them what's going on for him and they are really good at understanding what he needs, and so I think that is a system that works for him is having his parents help to advocate on his behalf.
*Q.* Do you think they would be particularly useful in stressful situations?
*A.* His parents?
*Q.* Yes.
*A.* Yeah, yeah, uh-huh.
*MR. RAYKIN:* One second.
*BY MR. RAYKIN:*
*Q.* Ms. Pitula, you mentioned before the concept of adequate supports. What do adequate supports look like for Mr. Vollmer?
*MR. BECK:* Your Honor, I am going to object to this

question. We have kind of -- this question is getting outside the letter of support. There is no discussion about what types of supports she would recommend or believes are necessary, et cetera, in this report. So far to your point earlier she has testified, Dr. Pitula has testified to her observations, her understanding based on working with Mr. Vollmer, but she has not opined in this letter of support on what types of accommodations, so we haven't been provided anything about that.

*THE COURT:* That's true, but this is a preliminary injunction hearing and we haven't had the benefits of all those, you know, expert protections through the rules, so it's a little bit wild and wooly. Overruled.

*A.* Can you repeat the question?

*BY MR. RAYKIN:*

*Q.* Yes. You testified before as to adequate supports for Mr. Vollmer. What do adequate supports look like for him?

*A.* So I can't -- I don't think I can fully answer that question not having completed his testing myself, his IEP or psychoeducational testing. I think specific recommendations and thorough recommendations would come from those evaluators.

Based on my work with him, he tends to benefit from again repetition, clarification, multi-modal presentation, support from a trusted adult, so his parents, me, someone else in his life who knows him well to help clarify concepts, and

then a lot of practice. So that's what I've observed in terms of taking in information that has been important in therapy like different coping strategies and different perspectives about what's going on for him.

*Q.* And you also testified earlier that at times he will try to advocate on his own.

*A.* Uh-huh.

*Q.* But not necessarily be able to successfully do that. Does he sometimes make mistakes when he does that?

*A.* What do you mean by that?

*Q.* Well, have you ever seen him try to advocate for himself but come up short?

*A.* Yeah. I think like all of us, right, when we are feeling stressed or frustrated, our efforts to communicate about our needs may not be the most effective. And so similarly, right, what I've seen is in trying to advocate for himself, maybe he's selected a less helpful path.

So an example might be avoiding. I just don't want to talk about this when actually we do need to talk about it or in the past he's left the therapy room when he was feeling really frustrated with a topic which gave him a break and then he would come back. And that's not necessarily the most effective way to cope with feeling frustrated in a session. Does that answer your question?

*Q.* Sure. And, Ms. Pitula, when he does come up short, what

does he need at that point to help him?
*A.* Typically what we do in session is we diffuse emotion, so kind of allow a break, do some emotional labeling and kind of pausing, taking some deep breaths before we revisit the topic. So first the coping with the big feelings and some validation and empathy, and then we revisit the subject, and then again the clarifying, repeating, repeating back.
*Q.* Would the assistance of trusting adults like his parents help him?
*A.* Yeah. And in session we've often had a parent or both parents present for part of the session or all of the session, so we typically have parent involvement at some point in the session. And I would say either with his parents or with me in session, I know him well enough -- his parents are the best support for him -- but I am typically also able to provide that support. I'd say what I've seen in session is that it's hard for him to self-regulate and reengage without some of that redirection.
*MR. RAYKIN:* Thank you, Ms. Pitula.
*THE WITNESS:* You are welcome.
*THE COURT:* Thank you.
Cross-examination?
*MR. BECK:* Thank you, Judge.

**CROSS-EXAMINATION**

*BY MR. BECK:*

*Q.* Hi, Dr. Pitula.
*A.* Hi.
*Q.* Good morning.
*A.* Good morning.
*Q.* My name is Warren Beck. I am representing the University today along with my co-counsel, Angela Zippin. I just have a few questions for you.
First of all, the Exhibit 23 that you have before you that you were kind of talking through a little bit, I believe Attorney Raykin referred to it at some point as a report. But I want to be clear, this is a letter of support that you wrote on Mr. Vollmer's behalf, correct?
*A.* That's correct.
*Q.* And it's directed to the University of Northern Colorado administrators?
*A.* That's correct.
*Q.* And as you state in Paragraph 3 on the first page, it's really related to this aggressive remark that Mr. Vollmer supposedly made on campus or something like that, correct?
*A.* Yeah. So at the time that the family reached out was just after that incident.
*Q.* Okay. So they reached out in April?
*A.* Yeah, yeah, I think I spoke with mom on April 20th about what had been -- the most recent events.
*Q.* And the letter that you wrote was really sort of, I guess,

your attempt to contextualize or perhaps mitigate what had happened with that remark. Is that fair to say?
*A.* I think so.
*Q.* Because, I mean, you sort of summarize at the last paragraph on the third page. You sort of -- it starts with, "In sum, Jackson does not represent a risk of harm to others, and his behavers over the recent weeks represent a response to sustained high levels of stress and anxiety." So again, you are trying to contextualize what happened.
*A.* That's right.
*Q.* And prior to that you are sort of laying out your observations of Mr. Vollmer and some of the issues that he may have in communication or anxiety, that sort of thing?
*A.* Yes, that's right.
*Q.* And so you are aware that Mr. Vollmer had two conduct hearings that are sort of at issue here, correct?
*A.* Uh-huh, yes.
*Q.* And you are aware, then, that for the first conduct hearing he was accused of violating a no-contact order with another student?
*A.* I am.
*Q.* And that that conduct hearing had already occurred at the time that they contacted you for this letter of support.
*A.* Yes. And I will clarify that. I am aware now much more of the sequence of events between the two hearings than I was at

the time I wrote this letter.
*Q.* Because you weren't involved in any way in the conduct hearings.
*A.* Correct.
*Q.* Neither the first one about the no-contact order, correct?
*A.* Correct.
*Q.* Or the second one about the remark.
*A.* So I wasn't involved in it. I had written a letter in support of that second hearing. And I think I was meant to be his advisor for the hearing, and then it was decided that I couldn't be.
*Q.* His dad ended up being his advisor on the second hearing.
*A.* Yes.
*Q.* And his mom was his advisor on the first hearing?
*A.* Okay. I don't know.
*Q.* Would it surprise you to hear that that was who his advisor was?
*A.* It doesn't surprise me.
*Q.* So you weren't present, then, for either hearing.
*A.* Correct.
*Q.* Are you aware that prior to the hearings --

*THE COURT:* That could be a fire alarm. Can you check on that, Ms. Grimm?

Keep going.

*MR. BECK:* Thank you, Judge.

*BY MR. BECK:*

*Q.* Are you aware that Mr. Vollmer had conversations prior to the conduct hearings with UNC's Disability Resource Center about accommodations that he would need for the hearings?

*A.* I -- I am not. I don't think I am aware of that.

*Q.* So I take it by lack of your awareness that you weren't a part of requesting the accommodations?

*A.* I was not a part of that, no.

*Q.* So you also are not aware that his mom was present during both of those meetings?

*A.* No, I am not aware of much of those details.

*Q.* And then I suppose you are also not aware of the specific accommodations that were provided to Mr. Vollmer for each hearing.

*MR. RAYKIN:* Your Honor, I'll object to the line of questioning. It's outside the scope of direct where we primarily talked about his disabilities and how they affected him. With respect to accommodations, I know they are going to be calling witnesses about that, and of course they are free to ask that, but I don't think Ms. Pitula is really qualified to testify as to what happened during the accommodation --

*THE COURT:* Well, in terms of your objection of it being beyond the scope, you understand that if I sustain that objection, it means that Dr. Pitula is going to have to come back. She is on their witness list.

*MR. RAYKIN:* Fair enough. I will withdraw that part of the objection, Your Honor.

*THE COURT:* Otherwise, the objection is overruled.

*BY MR. BECK:*

*Q.* So just to be clear in sort of summarizing that, you weren't a part of either conduct hearing, correct?

*A.* Correct.

*Q.* Or either accommodations request meeting --

*A.* Correct.

*Q.* -- prior to the hearings?

*A.* That's correct.

*MR. BECK:* Nothing further, Your Honor.

*THE COURT:* All right. Redirect?

*MR. RAYKIN:* No, sir.

*THE COURT:* Okay. I have some questions for Dr. Pitula.

VOIR DIRE EXAMINATION

*BY THE COURT:*

*Q.* So, Doctor, in your sessions and the sessions you had with Mr. Vollmer before, do you ever present him with written materials or are your sessions pretty much verbal?

*A.* They are mostly verbal. I do sometimes use some handouts or worksheets or exercises that would be written, and I write on our white board.

*Q.* Okay. And have you gotten a sense of his written

comprehension based upon your sessions as opposed to testing materials that you've been exposed to?
*A.* Yeah, that's a good question. I don't think I could comment on that. I think his verbal comprehension I know quite well based on my interactions with him. I don't think I have enough experience with his written comprehension.
*Q.* In the therapy sessions that you have, does he -- how frequently does he become stressed?
*A.* Yeah, pretty often, and it changes over time, right? So it happened a lot more earlier in our sessions. So I saw him weekly for a full year before we went -- decreased in frequency. I would say it happened about half the time.
*Q.* And do you attribute his stress to the subject matter of what you're discussing or because of the nature of your therapy session? For instance, are you trying to put some pressure on him to see how he reacts?
*A.* It's a great question. So we do both. And so I do -- we have done some exposure-based therapy, which is practicing approaching situations that feel stressful or hard, and so we've done some of that in our sessions. So it's a controlled structured practice. We've done, for example, having him practice public speaking because that was something that was feeling quite hard or practice answering questions he didn't know the answers to because that was feeling stressful. And then we also sometimes -- so the conversations we had leading

up to going to college, there was often a lot of stress because the future feels stressful, so both.

*Q.* And have you had him -- have you seen him stressed when one or both parents happen to be present in a therapy session?

*A.* I have, yes.

*Q.* And you mentioned in some situations in your therapy sessions when a parent has been present, the parent has been able to help redirect. What does that consist of?

*A.* Yeah, it looks like -- so kind of suggesting some coping strategies.

*Q.* Suggesting to whom?

*A.* To Jackson. So a parent saying like let's take a step back. Let's take a few deep breaths.

*Q.* Okay. Have you had situations where instead of the parent providing some directions to Mr. Vollmer, the parent instead just took over and, you know, did the talking for him?

*A.* Not typically. I would say that his parents are really good at giving him the space to kind of -- giving him that space instead of taking over for him. And they do follow my lead in the sessions too, which I am able to jump in and say, hey, let's try this.

*Q.* As a suggestion to Mr. Vollmer?

*A.* Yeah, yeah, and to parents, to both. But typically his parents have been pretty good at allowing redirecting, prompting some strategies without taking over for him.

*Q.* And you indicated that you had some doubts about the plaintiff's ability to ask for accommodations on his own. Do you have any concerns about both plaintiff's and his parents' combined ability to ask for accommodations?

*A.* I don't know that I can speak to that. Yeah, I don't know that I've seen --

*Q.* But you have seen that before, haven't you? I mean because they have been in the same sessions. And you have mentioned a couple times that you received information from the parents about things.

*A.* My sense is that his parents are willing and able to advocate for him. And I think what they've -- what I have seen them try to do, which is developmentally appropriate, is try to give him a little bit more leeway so they are not jumping in and fixing every time. I think that's been relatively intentional. So I don't know that I would characterize it as a difficulty on their part based on what I've seen. Does that make sense?

*Q.* Yes.

*THE COURT:* Mr. Raykin, any questions of the witness based upon the Court's questions?

*MR. RAYKIN:* No, Your Honor.

*THE COURT:* Any questions, Mr. Beck, based on the Court's questions?

*MR. BECK:* No, Your Honor.

*THE COURT:* Dr. Pitula, you may step down. Thank you very much.

*THE WITNESS:* Thank you so much.

*THE COURT:* And by the way, I won't charge time for the questions I have asked to either side.

*MR. RAYKIN:* We appreciate that,Your Honor.

Your Honor, I would note that Jackson Vollmer's father, Todd Vollmer, had arrived, but he will not be testifying.

*THE COURT:* That's right. He is not a witness. He can stay.

All right. Mr. Raykin, next witness.

*MR. RAYKIN:* Yes, Your Honor. We will call Ms. Annesa Vollmer.

(**Annesa Vollmer** was sworn.)

*THE WITNESS:* I do.

*COURT DEPUTY CLERK:* My name Annesa Vollmer; A-N-N-E-S-A, Vollmer, V-, as in Victor, O-L-L-M-E-R.

**DIRECT EXAMINATION**

*BY MR. RAYKIN:*

*Q.* Good morning, Ms. Vollmer.

Ms. Vollmer, you're the mother of Jackson Vollmer, correct?

*A.* Yes.

*Q.* Okay. And Ms. Vollmer, what do you do for a living?

*A.* I am a speech language pathologist.
*Q.* All right. Do you work with autistic kids?
*A.* Yes.
*Q.* How long have you been a speech language pathologist?
*A.* Almost 30 years.
*Q.* Okay. So obviously you are aware of your son's conditions. Have you had the chance to assist him with your background over the years?
*A.* Yes. I have felt very fortunate. And we knew from a very early age that Jackson was on the autism spectrum which fortunately led to an early diagnosis and allowed us to get intervention services and just with my history and background allowed me to help support his language development, his pragmatic language development and his struggles with comprehension, expressive language and social communication.
*Q.* What is pragmatic language?
*A.* It's a synonym to social communication.
*Q.* Okay. Could you describe that in layman's terms?
*A.* Yeah, the ability to engage effectively with communicative partners, being able to interpret, and verbal and nonverbal communication.
*Q.* Okay. And when did you first know that Jackson was autistic?
*A.* Approximately at the age of two right after his brother was born.

*Q.* Okay. All right.
*A.* But the official diagnosis came after his -- right after his third birthday.
*Q.* Okay. Do you remember when you first sat in on an IEP meeting?
*A.* Yes.
*Q.* Have you been to -- when was that, Ms. Vollmer?
*A.* Probably 1996.
*Q.* Okay. So --
*A.* I apologize. 1994. Sorry.
*Q.* No problem. Have you been to all of his IEP meetings?
*A.* Yes.
*Q.* And have you been an IEP team member?
*A.* Yes.
*Q.* If front of you, you have a white notebook. Could you go ahead and turn to Exhibit 1 and specifically Page 7? It says 1-7 on top.
*A.* Uh-huh.
*Q.* Do you recognize what this is?
*A.* Yes.
*Q.* What is it, Ms. Vollmer?
*A.* The autism rating scale.
*Q.* And this is part of an evaluation report, correct?
*A.* Yes.
*Q.* Do you know what an evaluation report is before an IEP?

*A.* Yes.
*Q.* And what is the purpose of the evaluation report?
*A.* The purpose of the evaluation report is to thoroughly identify a student's strengths and needs with respect to how it's going to impact their ability to access educational curriculum.
*Q.* So an evaluation report, fair to say that it gives you a snapshot of what the disability profile is of a particular child?
*A.* Yes.
*Q.* And are they always done before an IEP is developed?
*A.* Yes.
*Q.* And this one was done in 2021, correct?
*A.* Yes.
*Q.* This was the last evaluation report before he left high school, right?
*A.* Yes.
*Q.* And let's take a look there at the top. And this is the Autism Spectrum Rating Scale. And you were asked questions as part of the ASRS, correct?
*A.* Yes.
*Q.* And ultimately he was determined to be autistic?
*A.* Yes, was continued to be autistic at that point in time.
*Q.* Okay. Let's take a look at social communication at the bottom there. It indicates he was slightly elevated in terms

of his use of verbal and/or nonverbal communication to initiate, engage in, and maintain social contact.

Do you see that, Ms. Vollmer?

*A.* Uh-huh.

*Q.* Could you describe what that looks like in Jackson?

*A.* Well, Jackson is a kiddo who has always sought to engage socially. He craves the desire to have meaningful connections with others. However, due to repetitive behaviors, expressive language difficulties with respect to organization and cohesiveness and understanding reciprocal relationships, that has always significantly impacted his ability to establish those deep meaningful friendships that he has so long sought.

*Q.* And what happens when he is separated from some of these friendships?

*A.* We have experienced just significant emotional distress, lots of extreme sadness, depression, anxiety, high anxiety, feelings of hopelessness. And in the past we've even had to deal with issues of self-harm due to his difficulties with maintaining and establishing these relationships with peers.

*Q.* Is he currently separated from his friendships at the University of Northern Colorado?

*A.* Absolutely, yes, yes. Sorry.

*Q.* That's okay. And how have you observed that that's affecting him right now?

*A.* Well, as I mentioned, Jackson all throughout elementary

school, middle school, high school, he has desperately sought these friendships. And then once he -- we were fortunate enough to be accepted into the GOAL program, it was this incredible turnaround. We saw an increase just in his self-confidence by the relationships he was able to establish with the other GOAL students and with that self-confidence gave him the motivation to go and go through the rush process with the Greek system which led him to pledge a fraternity.

And the gentlemen in those fraternity I think for the very first time in his life gave him the opportunity to feel like a valued member of the community. They accepted him for who he was as a human being and truly established the deep meaningful friendships and relationships he has sought for his entire life.

*Q.* What kind of changes have you observed since his removal from UNC?

*A.* We have seen, one, a total -- a significant loss of independence because of his disability. He is unable to drive. And so he is completely reliant on us to access the community. He has completely lost all of his social relationships at the university. He no longer has any connections with any of the GOAL students and very, very few opportunities to connect with the fraternity members. This has been devastating to him and has led to a complete social isolation. He often self-isolates in his room. We need to encourage him to come out and engage.

I have adjusted my work schedule so that I have mornings and afternoons available to help him engage in opportunities in the community, to engage in physical activity, because if I stayed with the same work schedule, we know that he would be self-isolating in that room of his. And we know the detriment that would cause.

In addition to the self-isolation, we have seen many depressive symptoms, the self-isolation, the feeling of hopelessness, self-doubt. We've seen an increase in fear. He doesn't want to be alone for extended periods of time, is constantly seeking our companionship.

Let's see. He has had a significant increase in his anxiety. He has shown increased agitation behaviors that we had eliminated years ago have reappeared. He has reported -- we had a significant increase in negative self-talk. He has expressed frequently having nightmares, particularly over the trauma that he endured with the harassment that took place for several months.

I just -- I fear for him because we do have this history of self-harm, and we have worked really, really hard to eliminate it. Not we, he has worked really, really hard to eliminate this. And given the trauma that he experienced with the harassment, the months of harassment and emotional retaliation and emotional trauma that this other student impacted on him, in addition to the fact that he is not in this

community where he felt valued and recognized, we truly fear for what may come.

*Q.* Ms. Vollmer, you indicated the behaviors that had been eliminated have reappeared. What kind of behaviors are you talking about?

*A.* Negative self-talk. He makes a simple mistake and he will frequently blurt out, "It's because I'm autistic. It's because I'm autistic." Also the increased agitation. Little things that used to bother him as a child such as a dog barking have reappeared. Auditory sensitivity has been a big one that we've noticed which leads to again a significant amount of anxiety.

Frequent outbursts of crying. I will often walk into his room and he will be crying watching videos that he took of him and his fraternity brothers and again just feelings of hopelessness. Driving by down on the street and perhaps seeing an unhoused person, and he is like, "That's going to be me some day because I didn't -- I'm not -- I got kicked out of college." That's just a few examples.

*Q.* He has a diagnosis of anxiety, correct?

*A.* Yes.

*Q.* He takes medication?

*A.* Yes.

*Q.* Does he have a diagnosis of depression?

*A.* Some of the anxiety medicine is related to depressive issues.

*Q.* Ms. Vollmer, you indicated a fear or self-harm and a fear for what might come. Can you describe that fear?
*A.* Yeah. He has -- in the past several years ago he has talked about ending his life, harming himself. Just because of who he is, he so desperately craves to be neurotypical and have this connection to other human beings where he can engage and feel like he is again part of a community. And without that community we fear again what -- where his mindset might lead us. It was a dark place in time and we are so proud of the efforts he's made to come out of that dark place and to be positive. And we are incredibly proud of where he is now in his battle against going back into that dark place in his life, but we just fear that could switch at any time.
*Q.* Ms. Vollmer, I would like to return to the bottom of Exhibit 1-7. And you noted that he had trouble tolerating changes in routine. Have you observed that since his removal from UNC?
*A.* Yes, absolutely. But we've worked diligently to try and establish a routine for him. We were fortunate that he was able to be employed over the summer months. That ended right before Labor Day. And again, adjusting my job schedule has enabled us to set a routine for him because we know that life without routine can be very anxiety inducing and again lead to those depressive behaviors.
*Q.* I would like you to turn your attention to Exhibit 1-8 on

the next page and take a look at peer socialization. On this evaluation report you noted that he had limited interest or capacity to successfully engage in activities that develop and maintain relationships with other children. What have you noticed about his ability to develop relationships with other peers?

*A.* He is very good at initiating with respect to trying to engage with peers. It's always typically the same thing. Where are you from? What's your address? What high school did you attend? Have you been on an airline lately, something similar to that. So he has the interest. He desperately has the interest. But the capacity is quite obvious to those who are neurotypical that he is -- he is -- he can present as being different and lacking the ability to maintain and engage in topics that may not be of particular interest to others for himself.

*Q.* Why couldn't he just focus on his relationships outside of UNC right now with his peers?

*A.* There is no one else for him. His siblings are all off and away at college. He has one best friend who he's been with since eighth grade and that best friend is at Northern Colorado. There is nobody besides his family that he can engage in with respect to communication.

And our friends, we are fortunate that we do have a support system of friends and family, but it's so different.

When he was at UNC, for the first time in his life he had a support system that he was able to rely upon independent of his family, and that allowed for again such independence and self-confidence. And that is no longer an option to him at this moment.

*Q.* Why can't he develop new relationships right now while he is out of UNC?

*A.* Well, he is unable to attend any other university program. The GOAL program, we specifically chose the GOAL program because of its ability to afford kids with developmental intellectual disabilities the ability to participate in a four-year college experience. And at this moment in time that's not available. And by the time that UNC rendered the decision on July 17th, 110 days after the hearing, it was too late for us to try and get him into a community college knowing that a community college still wouldn't afford him the modifications he needed to actively engage in an academic curriculum.

*Q.* Ms. Vollmer, with respect to social emotional reciprocity, you indicated that he was slightly elevated in terms of his limitations and his ability to provide an appropriate emotional response to another person in a social situation. Can you describe what that looks like for Jackson?

*A.* Yeah. Jackson is a kiddo who has historically had receptive and expressive language difficulties. He struggles

with complex -- understanding complex verbal language, as well as vocabulary. This leads to difficulties with being able to infer, draw conclusions, make assumptions, continue with conversational -- reciprocal conversations.

And then his expressive language difficulties which evolve primarily around difficulties with word retrieval as well as language formulation significantly impair his ability to have a conversation with peers that is cohesive and organized.

*Q.* Let's take a look at your rating on behavioral rigidity which you noted was very elevated, correct?

*A.* Yes.

*Q.* And that indicates that he has difficulty tolerating changes in routine activities or behavior?

*A.* Yes.

*Q.* I would like to take you back to March of 2023. He was attending UNC at that point. And are you aware that he received a no-contact order?

*A.* Yes.

*Q.* What did he first tell you about that no-contact order?

*A.* He called us immediately and said he had received an e-mail from the University, but was confused about what it meant. He understood no contact, but otherwise seemed confused about what was happening.

*Q.* Did you explore his confusion?

*A.* Absolutely, yes.
*Q.* And could you describe that conversation?
*A.* In a sense we had -- it was relief because this girl had been harassing him and emotionally tormenting him for three months. Two months we had had conversations with Ms. Ruffatti, who was incredibly supportive of us, and we feel like she did everything in her power to try to support us with the issue. But our initial thought about the no-contact order and expression to Jackson was that this is good, Jackson. We are relieved. She can no longer bother you anymore. She can no longer contact you. She can't text you. She can't come to your dorm. She can't follow you. So that's the way we tried to explain it best to him.
*Q.* What was your impression of Jackson's ability to understand his obligations under the no-contact order?
*A.* I mean, we kept it as simplistic as we could, again telling him, you know, you are not to text her. And he never initiated any text. This student who continually texted him -- I am sorry, I am losing my train of thought -- we interpreted to him as simplistically as we could. Don't talk to her, basically don't talk to her.

This led to confusion, though, because the University continued to have these two students in the same classes. They had two of the three same classes. They lived in the same dorm. It was very challenging for a kid who struggles with

understanding the complexity of socialization. How am I supposed to not talk to this person when they are so embedded in my world?

*Q.* Did he express confusion to you in March?

*A.* Absolutely, yes.

*Q.* And what did he say?

*A.* He would just -- kept -- you know, just the thought of them being in the same room was confusing, the same dorm. And even throughout the no-contact order, she persisted in texting him through other people, through other students in the GOAL program. She would use their phone to contact him. This was in itself confusing.

*Q.* Could you take a look at Exhibit 1-13, please. "Do you see that last paragraph where it says, While Jackson does demonstrate many strength areas, data indicates that he still struggles with some areas of peer socialization, behavior rigidity and unusual behaviors as noted by the ASRS." Does he still struggle with these things, Ms. Vollmer?

*A.* Yes.

*Q.* Can you describe how?

*A.* Well, again the peer socialization related to being able to establish meaningful connections with peers, the behavioral rigidity, significant cognitive inflexibility. Getting into those moments of perseverative thoughts, often these days they are negative perseverative thoughts. Those negative thoughts

at this moment are lots of self-doubt, just a substantial amount of negative feelings around his autism. And the unusual behaviors is definitely just his interests. They are not the typical interests that someone his age would generally have.

*Q.* Ms. Vollmer, can you describe, what is perseveration or preservative self-thoughts?

*A.* Just continually having the same thought process whether it be internally or expressively about the same topic or subject.

*Q.* And what's the problem with that?

*A.* I am sorry, can you repeat that?

*Q.* What's the problem with that for Jackson?

*A.* It leads to him spiraling emotionally, increase in anxiety. And again these, as what I have stated before, these depressive behaviors which have in the past led to self-harm.

*Q.* Ms. Vollmer, could you please turn to Exhibit 2. Do you recognize what this is?

*A.* Yes.

*Q.* What is it?

*A.* An IEP.

*Q.* Okay. And this was the last IEP that he received in high school, correct?

*A.* Yes.

*Q.* Could you please turn to page -- or Exhibit 2-8. You see there where it talks about the student needs and impact of disability?

*A.* Yes.

*Q.* It says, Jackson has a diagnosis of autism spectrum disorder which impacts his ability to adjust to new routines or transitions. "He has difficulty tolerating changes in routine, activities or behaviors. This change in schedule or routine can cause him anxiety and impact his ability to attend to his academics. He can get 'stuck' in this thinking both in regard to academic and social misconceptions. He requires additional support to move past, organize, or to correct this thinking." Have you observed that after high school?

*A.* Absolutely.

*Q.* Can you describe that?

*A.* It happens daily, if not hourly, with him getting stuck on a topic. He tries desperately to be positive. We have been so grateful for the assistance of his therapist, Clio. We have worked diligently for years to try and -- through cognitive behavioral strategies to try and negate this. But within his mind these types of behaviors tend to overtake his mindset despite all of the strategies that we try and use to impede those types of thoughts.

*Q.* Right below that it says, "He does present with some challenges in successfully engaging in activities that develop and maintain relationships with the same age peers. Some concerns have been noted with Jackson's ability to recognize when a peer or others in the community are being genuine in

their interactions or if they are trying to take advantage of his kindness and trustworthiness."

Ms. Vollmer, did you have conversations with Jackson about what was going on with this other peer at UNC that led to the no-contact order?

*A.* Frequently. His first semester at UNC we were so proud because we anticipated on hearing from Jackson daily. But because of the success and the self-confidence he was feeling with his relationship with -- his new-found relationships with his peers, the success he was feeling with his academics, we never heard from him. We were the ones who would reach out to him.

We knew that the situation was escalating to a serious point towards the end of January because he was calling us daily crying, confused, not sure what to do. We were able to see his texts, and we noticed that the texts and the manner of the texts from this other student were significantly escalating emotionally causing him significant emotional distress, crying, daily phone calls at least two, three, four times a day, expressions of fear because this student was threatening. The student was threatening his relationships with the same people that he had worked so hard to establish relationships with.

And that's when we reached out to Ms. Ruffatti at the end of January or beginning of February to discuss our concerns because we knew and expressed this at the meeting that if this

situation was not -- if there was no intervention with this situation, that this -- it would escalate. And here we are today.

*Q.* At the bottom there, Ms. Vollmer, it indicates that Jackson wanted to attend a four-year college or university after high school. Why did he want to go to college?

*A.* I think first and foremost, because he loves learning. He loves the opportunity to seek and gain knowledge. He is doing that on a daily basis. The social connections, I think his father and I who attended UNC frequently expressed our love of college and how it's benefited us to this day.

His siblings are in college. His friends, our family friends that we have surrounded him with his entire life, they all attend college. So the thought of him not having a college experience was incredibly painful to us as his mom and dad, but even more devastating to Jackson. And that's why we worked so diligently to find a program that we felt would meet his cognitive and developmental needs.

*MR. RAYKIN:* Your Honor, at this point I would move to admit Exhibits 1 and 2.

*THE COURT:* Any objection to the admission of Exhibits 1 and 2?

*MR. BECK:* No, Your Honor.

*THE COURT:* Exhibits 1 and 2 will be admitted for purposes of this hearing.

*BY MR. RAYKIN:*

*Q.* Ms. Vollmer, I would like you to turn your attention, please, to Exhibit 3-14. Do you recognize this, Ms. Vollmer?

*A.* Yes.

*Q.* Is that his previous year's IEP?

*A.* Yes.

*Q.* And he had various accommodations, right?

*A.* Uh-huh.

*Q.* And one of those accommodations was that he would have access to a safe place to go when he needs a break. What did that look like in high school?

*A.* He would frequently in moments of anxiety retreat to the counseling office. They had a wonderful counselor there who he had established a relationship with his freshman year, and that counselor allowed him to deescalate in her room. And she would help him work through those moments of sadness or anxiety.

*Q.* Ms. Vollmer, did you provide these IEPs to UNC when Jackson first began attending?

*A.* Yes.

*Q.* Do you know if you provided the 2022 IEP?

*A.* Yes, I believe, yes. I am sorry, I had three kids who graduated in a row from high school, so I am trying to remember what years they all graduated.

*Q.* How about the 2021 IEP?

*A.* I believe I did.

*Q.* Did you provide the evaluation report that was labeled as Exhibit 1?
*A.* Yes.
*MR. RAYKIN:* Your Honor, I would like to move to admit Exhibit 3.
*THE COURT:* Any objection to the admission of Exhibit 3?
*MR. BECK:* No objection.
*THE COURT:* Exhibit 3 will be admitted.
*BY MR. RAYKIN:*
*Q.* Ms. Vollmer, are you aware, did Jackson ever have an accommodation at UNC to have a safe place to go when he needed a break?
*A.* I can't recall the accommodations that UNC provided at the moment.
*Q.* Understood. And another accommodation there is to pair auditory instruction with visual support whenever possible, especially for unstructured times. Why did he need that?
*A.* Because processing and responding to auditory information is extremely complex, and the visual support helps to aid in his comprehension.
*Q.* What does this look like for him? Could you give an example?
*A.* Specifically, an example in the classroom would be just hearing -- just hearing an instructor present information

without the support of pictures or graphs or visual notes substantially decreases his ability to understand the information being presented because as we know like in a lecture or in a lesson, the greater we tend as educators to talk and talk and talk, and that type of verbal exchange leads to extreme difficulties with comprehension because he is trying to comprehend perhaps the first notion or the first few thoughts of what were being shared. And in that moment of trying to comprehend the first piece of information, his attention loses focus, and it's challenging for him to understand any type of multi-layered conversation.

*Q.* Could you turn, please, to Exhibit 4-4? And this is your ratings on something called a brief, correct?

*A.* Yes.

*Q.* And you noticed that there were several areas where he was elevated, correct?

*A.* Yes.

*MR. RAYKIN:* Your Honor, move to admit Exhibit 4-4 -- I am sorry, Exhibit 4.

*THE COURT:* Any objection to the admission of Exhibit 4?

*MR. BECK:* No objection.

*THE COURT:* Exhibit 4 will be admitted.

*BY MR. RAYKIN:*

*Q.* Ms. Vollmer, did Jackson ever have any disciplinary

incidents in high school?
*A.* Never.
*Q.* When you -- well, there is something called a GOAL program at UNC, correct?
*A.* Yes.
*Q.* What is your understanding of what the GOAL program is?
*A.* It's a program that provides students with a four-year college experience. And in that process they are able to live in the dormitories. They are able to explore what it's like to live on a college campus yet be prepared, have the opportunity to participate in some general education classwork, however with a focus on the actual GOAL program allowing for them to develop independent life skills, as well as provide them with an opportunity to find vocational interests in an effort to hopefully gain meaningful employment after the end of this four-year experience.
*Q.* And the GOAL program is only for students with disabilities, correct?
*A.* Yes.
*Q.* Okay. You helped enroll Jackson into UNC, right?
*A.* I did.
*Q.* In addition to providing them with IEPs, did you communicate with anyone at the school about Jackson's needs as a disabled student?
*A.* Yes. Prior to the application process, Ms. Ruffatti

kindly, we had a teleconference in which she very kindly shared -- I shared with her what type of student Jackson was just so we could gauge whether or not he would be a student who would meet the requirements of the GOAL program.
*Q.* Who is Ms. Ruffatti?
*A.* Christina Ruffatti, the GOAL director.
*Q.* What did you tell her about Jackson's disabilities and how they impacted him?
*A.* Oh, my gosh. It was a long meeting. Basically everything that I've expressed today with respect to his language processing, how his autism impacts him daily, but also that Jackson sees himself as being a kid, a neurotypical student. He so greatly desires to be normal. And I wondered if that would -- how that would impact his participation in that program.
*Q.* Okay. And what did Ms. Ruffatti tell you?
*A.* She said that that was a very common theme with most of their students and that they, if I remember correctly, they worked to support those students in that type of thinking and provide them with the environment in which they felt safe to be who they were.
*Q.* Can you please turn to Exhibit 19?
Do you recognize this document, Ms. Vollmer?
*A.* Yes. I have seen them it times.
*MR. RAYKIN:* Move to admit Exhibit 19.

*THE COURT:* Any objection to the admission of Exhibit 19?

*MR. BECK:* No, Your Honor.

*THE COURT:* Exhibit 19 will be admitted.

*BY MR. RAYKIN:*

*Q.* Now, Ms. Vollmer, just to be clear, this document only references a hearing on March 29th, 2023, and that's the only hearing we will be discussing. Does that make sense?

*A.* Yes.

*Q.* Okay. Had Jackson prepared to defend himself in a disciplinary hearing on March 29th?

*A.* I would not say we prepared ourselves to participate in a disciplinary hearing. We had been told by -- we had been repeatedly told that this was an educational process. And so we went into it naively thinking that this was an opportunity for us to finally present our case, that case being that this kid had been harassed for months having to endure over 3,000 texts in a matter of six weeks, constant knocking on his door, notes under his door, being followed, phone calls, I mean, 10 phone calls a day. So we took it as an opportunity to defend ourselves and show the University that this, despite the no-contact order, this student persisted in reaching out to Jackson.

*Q.* Who told you that this was an educational process?

*A.* Well, in some of the -- in the letters that we received, it

noted that it was an educational process. In the BEAR conduct code, it also states it's an educational process where they strive to result in healthy conflicts and provide a learning experience for students.

So based on the information we received from Ms. Ruffatti, who was generally trying to support us, we firmly believed she was trying to support us to the best of her abilities, but then again based on what the BEAR code states, we firmly believed that this was a learning experience for Jackson. This was his first offense. He had been very successful in his months prior, and so we had really no idea what to anticipate.

*Q.* What efforts did you make to help Jackson during the March 29th hearing?

*A.* I helped support him accessing the Disability Resource Center. I initially tried to do that and was shut down, was told -- and I recognized the FERPA laws and the restrictions with that. But basically I wrote the e-mail for him or dictated it for him to be able to set up a meeting with the Disability Resource Center and then arranging a time for a phone call because it happened over spring break.

*Q.* Did you ever ask to be his advisor?

*A.* I was told I should be his advisor.

*Q.* Who told you that?

*A.* Ms. Ruffatti.

*Q.* Did you function as his advisor at the March 29th hearing?
*A.* Yes, I did.
*Q.* What were you allowed to do as his advisor?
*A.* At that time I was allowed to sit next to him and not speak directly to the two representatives from the Dean of Students, but provide guidance, I guess, from the sidelines as to his responses or, I guess, more like coaching.
*Q.* Did you want to do more?
*A.* Yes, absolutely.
*Q.* What did you want to do?
*A.* I wanted to plead his case for him. I wanted to -- knowing that he has such difficulty with expressively organizing his thoughts, I wanted to desperately give the Dean of Students a sense of what this kid had been enduring for the past three months and continued to endure after the no-contact order.
*Q.* So you wanted to advocate for him.
*A.* Absolutely.
*Q.* Did you ever make a request of anyone to do that?
*A.* At that particular meeting to advocate for --
*Q.* Or before that meeting.
*A.* For anyone else to advocate for him or --
*Q.* For you to advocate for him.
*A.* Yeah, I -- yes. But we were repeatedly told that this was -- this was Jackson's responsibility and that he needed to be the person responsible for taking charge of his

participation.

*Q.* And who told you that?

*A.* The representative from the Disability Resource Center, as well as the Dean of Students.

*Q.* Did you ever ask for accommodations on his behalf for the hearing?

*A.* Yes.

*Q.* Do you remember what kind of accommodations you were seeking?

*A.* We went into this hearing with such naivety that I -- I've worked for the public schools for 26 years, and in my 26 years I always made an effort to see the child for who they were, not who they were on a piece of paper. I have also learned in that process to be kind to the people who are supporting your child because if you show them kindness, the likelihood that they are going to show your child kindness is typically overwhelming.

So when we went into the meeting for the accommodations, again we thought this was an educational process. I thought I was having a meeting, I guess, with the principal and being able to present our case. So it was a very quick meeting. It was basically a review of how about we provide you with an outline of the meeting and notes afterwards, nothing related to looking at his actual IEP and recognizing that he is a student with autism, with a communication disorder, with executive functioning and

behavioral rigidity issues, anxiety.

We brought up the anxiety in the meeting, and we were told that any other person in his situation was going to feel anxious about being in this hearing, so they didn't feel like accommodations to manage his anxiety were necessary because any other typical student would feel anxious in that situation, just completely discounting the severe anxiety that he already experiences on a daily basis.

*Q.* Ms. Vollmer, based on Jackson's disabilities, what kind of difficulties did you think he would have at the hearing?

*A.* I was -- I mean, entirely his expressive language abilities and his abilities to share his experiences of what he had been enduring for three months. I knew that that would be challenging for him to sequence the events, to recall the events, because with -- during moments of increased anxiety with him, he tends to have difficulties with the recall of his memories. And, yeah, I was just myself anxious about how he was going to be able to get his message across to the Dean of Students of what he had been experiencing for the past three months.

*Q.* Anything else?

*A.* With respect to?

*Q.* To the struggles that you thought he would encounter at the hearing based upon his disabilities.

*A.* I was worried about any types of, you know, impulsive

reactions. He is a pleaser. He does whatever he can to try and appease his communicative partner in order to continue the engagement. And so I was worried about many of his responses and how he was going to answer them in an efficient, effective manner.

*Q.* Ms. Vollmer, what did you think you would be able -- or how did you think you would be able to assist Jackson if you were his advocate at the hearing?

*A.* I thought I could be there to support some of his responses; when he was having difficulty answering questions, to provide clarity to those responses, to help him present the evidence of the harassment and the emotional trauma he had been enduring for three months. That was what my hope was, and just to get our message across to beg the University to assist him with this really challenging situation that I think any other neurotypical student would have struggled with.

*Q.* You were at the hearing, correct?

*A.* Yes.

*Q.* Did everyone at the hearing know that Jackson was a disabled student?

*A.* I presume so based upon the fact that he was a student in the GOAL program. I presumed that they did. I went in there again thinking -- trusting the system that they had read his IEPs, that they recognized that he was a student in the GOAL program, what the GOAL program was, the types of students who

are enrolled in that type of program. I anticipated that, yes, that they would be familiar with that.

*Q.* Did everyone at the hearing know what the GOAL program was?

*A.* I believe that there was one of the hearing representatives, I remember feeling sort of stunned and dismayed because she didn't seem to recognize or seem to have knowledge of what the GOAL program was.

*Q.* What is that impression based on?

*A.* Her questioning, asking him what his major was when these kids don't have majors. They are there to -- they are not going to graduate with a four-year college degree, so asking him what his major was. And then Jackson shared that he was in the GOAL program, and she is like, "Oh, I don't know about the GOAL program. Can you tell me about the GOAL program?"

*Q.* Okay. And you ended up appealing the March 29th decision.

*A.* Yes.

*Q.* Or the July decision, correct?

*A.* Yes.

*Q.* There is a black notebook in front of you. Could you turn, please, to Exhibit C? Are you there, Ms. Vollmer?

*A.* Yes.

*MR. RAYKIN:* Your Honor, this is defendant's exhibit, and I would move to admit it.

*THE COURT:* Any objection to the admission of Exhibit C?

*MR. BECK:* No, Your Honor.

*THE COURT:* Exhibit C will be admitted.

*BY MR. RAYKIN:*

*Q.* Ms. Vollmer, this is the appeal that was filed on behalf of Jackson.

*A.* Uh-huh.

*Q.* Yes?

*A.* Yes.

*Q.* Did you assist in this appeal?

*A.* Oh, I wrote it. I wrote it.

*Q.* All right.

*A.* I am not supposed to admit that, I suppose, because this was his responsibility, but I could not submit something that was created and developed by Jackson.

*Q.* All right. Let's take a look there where it says -- the first page of C says Denial of Code Due Process. It says, "Although Jackson did receive notifications and had the opportunity for a hearing with the Dean of Students, the University failed to recognize his multiple disabilities which include the following: Autism spectrum disorder, language processing disorder, attention deficit disorder, anxiety disorder and executive functioning disorder."

What did you base your conclusion on that the University failed to recognize his multiple disabilities?

*A.* Based on the questioning from the hearing. He was

constantly being bombarded with questions. Many of those questions were multi-layered. They were very kind but didn't often afford him the opportunity to process and respond. Sometimes if there was a delay in his response, there would be another question presented on top of that. Nothing about that hearing seemed to recognize that he was a kid with a disability.

I don't expect special treatment for him by no means. We have raised Jackson from the day he was born to be a kiddo who had to follow the rules. Almost to a fault does he follow the rules. But yet I did expect some kind of recognition that he was going to have difficulties answering questions. He was going to demonstrate significant anxiety, confusion, disorganization.

*Q.* Ms. Vollmer, can you turn to the next page, please, the one that starts No. 9679, that paragraph?

*A.* 9679?

*Q.* Yes, just a paragraph that starts with a number there. Do you see that?

*A.* Yes.

*Q.* It says there, "He had to rely on his parents to translate and explain the situation and provide guidance, yet his parents' ability to assist Jackson was limited in a way that failed to acknowledge or accommodate his disabilities. No University officials connected with Jackson to determine if he

required clarification with comprehending the order nor was any guidance provided as to how to appropriately manage the situation."

Do you still believe that?

*A.* Yes. Ms. Ruffatti did reach out to Jackson. I contacted Ms. Ruffatti either that evening that the no-contact order was issued or the following morning, I can't remember exactly, because of our concern about this no-contact order or -- but then again to express relief that it had been issued. And she stated that she would meet with Jackson to go review the guidelines of the no-contact order.

*Q.* Are you aware that that happened?

*A.* I believe it happened. I trust her that she did that, yes.

*Q.* Do you know what was said?

*A.* I don't know what was said. I think basically they were told to stay away from one another, not talk to each other. It was serious and that they needed to stay away from one another.

*Q.* Later on it says here, "At the hearing when Jackson was asked several multi-layered complex questions about this alleged conduct which was 23 days prior, it was visually apparent he was anxious and confused."

How was it visually apparent?

*A.* His body language. I mean, anyone just reading basic body language could tell that he was scared, fearful, confused. He was shifting a lot. He is like, "I don't know. I -- I think

maybe." He just -- it was just pure -- his expressive language was just radiating pure confusion and anxiety and fear, uncertainty.

*Q.* Had he ever been in a hearing like that before?

*A.* Never.

*Q.* On the next page it says, "During the no-contact order, Jackson never once initiated contact, as evidenced in the text messages that were provided at the hearing. He never responded to the texts she sent directly from her phone. Jackson only responded to the texts which were being sent by CM through student NV."

Was Jackson able to effectively convey this during the hearing?

*A.* No, not at all. As the meeting progressed, if I remember correctly, I just -- I think I broke down and looked at Ms. Stephens in the eye and said that -- just presented her with pages and pages of text messages that showed that this student continued to persist and contact Jackson and threaten him emotionally.

And at that moment I just think I just let it out. And I remember just kind of plopping papers out on the front of the table and doing my best to -- at first I tried to coach Jackson into it, but he wasn't responding to that coaching. So then at that point I believe I just probably overstepped a boundary out of frustration and just released my frustration

about insisting that the University recognize what this kiddo was experiencing.

*Q.* Ms. Vollmer, do you believe that Jackson was able to mount an effective defense at the hearing?

*A.* No.

*Q.* Do you believe that if you had advocated for him, you could have done a better job?

*A.* Yeah, if I would have advocated better for better accommodations, absolutely.

*Q.* Is it your belief that the outcome could have been different if you had advocated for him?

*A.* Yes, yes, a hundred percent.

*MR. RAYKIN:* No more questions, Ms. Vollmer.

*THE COURT:* All right. We are going to take a 15-minute break. Then when we come back from the break, we will resume with cross-examination. We will resume at 10:15. We will take a 15-minute break. The Court will be in recess. Thank you.

(Recess at 10:00 a.m. until 10:16 a.m.)

*THE COURT:* Cross-examination, Mr. Beck?

**CROSS-EXAMINATION**

*BY MR. BECK:*

*Q.* Good morning, Mr. Vollmer.

*A.* Good morning.

*Q.* I am Warren Beck. I am one of the attorneys for the

University. I have got a few questions for you this morning. Let's start with one of the last things that you were discussing, the appeal of the conduct decision.
*A.* Uh-huh.
*Q.* Now, you said that you wrote that.
*A.* I did, yes.
*Q.* Do you recall that prior to submitting the appeal, you and Jackson reached out about seeking an accommodation to allow you to write the appeal?
*A.* I do.
*Q.* But you never heard back on that, correct? Excuse me. You didn't hear back on that before you submitted the appeal for Jackson.
*A.* I -- I would have to recall the chain of e-mails at that time, but I believe that we received one e-mail that we had asked for additional time for the appeal. And then I remember I believe asking if I could write that appeal on his behalf. And I -- I would have to recall -- look at my e-mail specifically.
*Q.* Sure, sure.
*A.* I apologize.
*Q.* Suffice it to say you weren't approved to write the appeal for him.
*A.* Yes.
*Q.* But you did.

*A.* Under the guidance of -- when the decision was rendered on July 17th, we were shocked and stunned at the severity of the consequence. And so from July 18th on we reached out to various attorneys to try and present our case to see if it would be worthwhile to pursue this. And --

*MR. RAYKIN:* Objection, Your Honor. I just want to advise we are getting into some attorney/client confidentiality issues.

*THE COURT:* Well, we really haven't yet.

But, Mr. Vollmer, Mr. Raykin is right that you should be careful in your answers not to divulge any advice you may have received from an attorney because that could possibly waive the attorney/client privilege, okay?

*THE WITNESS:* Okay. Thank you very much.

*BY MR. BECK:*

*Q.* Just to be clear -- so we will get away from that part of your answer -- my question is just related to the appeal that was written and submitted on Jackson's behalf. Was it your understanding he was supposed to do that himself, and you requested an accommodation; but before that was approved, you submitted it for him.

*A.* Yes. I could swear that I did -- we had not received that response based on us replying. Based on us requesting other accommodations and being declined, I suspected that that would be declined as well and just decided to submit it on his

behalf.
*Q.* Okay. And just -- this hearing is not really about the alleged conduct or even the decision. It's really about the accommodations that were or were not requested, granted, that kind of thing. Is that fair to say?
*A.* Yes.
*Q.* But I just want to point out in the appeal that you wrote for your son, you do acknowledge that, as you say, Jackson admitted to violating the no-contact order.
*MR. RAYKIN:* Objection, Your Honor. It seems like counsel just essentially said that this hearing is more about the accommodations, but now we are getting into the substance of the hearing which appears to be irrelevant.
*THE COURT:* Overruled.
*BY MR. BECK:*
*Q.* You state in the appeal that Jackson admits that he violated the no-contact order, correct?
*A.* On two occasions, not the number of times that the University claims he did.
*Q.* Sure. About but he admits that he did violate it.
*A.* Yes, but only -- he did not initiate those contacts. The other student was the one who initiated the contacts. He was merely responding.
*Q.* But he responded.
*A.* He responded. He is a kid with social communication

difficulties. He was -- there were two that we admit that, yes. But on the other instances when the other student was texting him via someone else, that's confusing to him.

*Q.* In the appeal you state -- and this was something that you went over with Attorney Raykin before, but I just want to understand this -- that it was your belief that his due process was violated because the University failed to recognize his multiple disabilities. And then you list several.

*A.* Uh-huh.

*Q.* If I could turn your attention to the white binder in front of you, plaintiff's exhibits. If you could turn to No. 2.

And you recognize this document as Jackson's IEP, correct?

*A.* Yes.

*Q.* And there right on the front page it says his primary disability is autism.

*A.* Uh-huh.

*Q.* And then secondary disability, it doesn't list anything.

*A.* Uh-huh.

*Q.* So the IEP indicates autism spectrum disorder, correct?

*A.* Correct.

*Q.* So then in his appeal when you are saying they failed to recognize all these other disorders, those are not actually specified as his disabilities in the IEP, are they?

*A.* Correct. However, if anyone who knows a student with

autism, the co-morbid disabilities that commonly occur with autism are executive functioning, anxiety disorder, as well as language processing issues.
*Q.* Well, let's talk about that. We've reviewed the 2022 IEP.
*A.* Uh-huh.
*Q.* And we've reviewed the 2021 evaluation report, and that's where he was tested by I presume the school psychologist, that kind of thing. And the 2022 IEP is based on that '21 evaluation, correct?
*A.* Yes.
*Q.* His testing was for verbal, written, you know, comprehension, that sort of thing, was all within the low average to average range, correct?
*A.* Uh-huh.
*Q.* And that was on the regular adult testing. For his age he tested in the low average to average range.
*A.* Yes, on the cognitive test.
*Q.* Sure. And that's for verbal comprehension and processing, word recognition, all of that stuff. Again, it was in the average range, low to mid average range.
*A.* Verbal comprehension on the WISC is significantly different than verbal comprehension on a standardized language processing assessment. Verbal comprehension on a WISC is basically looking at their vocabulary and is essentially -- and do have similarity subtests. It's two subtests that verbal

comprehension assesses on the WISC. It's not a full-blown language processing assessment that looks at ability to infer and make assumptions and understand complex language.

The speech pathologist at the time declined to assess Jackson during this reevaluation, as is pretty typical for a student of Jackson's age because generally when there is two or more assessments completed under that category of communication with similar results as they were at his 2015 and 2018 IEP, they see those as not changing, and that subjecting the student to a full-blown evaluation is a waste of time because there has already been two standardized assessments which have documented his speech language disability.

*Q.* So digging into that, if you could turn to Plaintiff's Exhibit 1, Page 2. Are you there? Yes, Exhibit 1, Page 2.

So here on Page 2 they are going into a description of the testing and what it showed. To your point, they were digging in a little further about how he did on the individual portions of the test, correct?

*A.* Yes.

*Q.* And so right there in the third full paragraph on Page 2 it talks about the working memory index. And it says that he was from low average to above average range on that test, which is a measure of his ability to register, maintain and manipulate auditory information, conscious awareness which requires attention and concentration, as well as auditory

discrimination. So he was in the average range for all of that.

*A.* Working memory, that assessment is not language based. It's numerical.

*Q.* So you are disputing the testing results?

*A.* Working memory is a completely separate cognitive process than from language processing.

*Q.* So if you go two paragraphs below on the verbal comprehension index, it says that he performed consistently, verbal reasoning skills. It was in the average range. It specifically reflects his ability to verbalize meaningful concepts, think about verbal information and express himself using words.

So he is in the average range on that skill as well.

*A.* Again, that's two subtests. It's not a comprehensive look at his ability to process complex language. The similarities, they are both essentially vocabulary based. Vocabulary, the vocabulary subtests has him define words. The similarity subtest presents him with two vocabulary words and has him define how they are similar or different.

*Q.* Well, I guess I am pointing out those sections of the report because when you were having direct examination with Attorney Raykin, the portions that he was reviewing were on 7 and 8 primarily, Page 7 and 8, and that was under the parent report section. So that was what you were reporting your

perception of Jackson's difficulties to be, correct?
*A.* On which assessment?
*Q.* On Exhibit 1, Pages 7 and 8. We spent some time on your direct examination reviewing that chart under parent report at the bottom.
*A.* Uh-huh.
*Q.* So that's your perception versus the test results that you are sort of quibbling with here, but that is what's listed earlier in the report that we just reviewed, correct?
*A.* Right. But again, that's a separate evaluation that doesn't look at the ability to understand abstract language. It's activities of daily living and having the ability to socially communicate with other peers is what that rating scale looks at.
*Q.* The rating scale that you were rating him on you mean?
*A.* Yes, the autism spectrum rating, it looks at communication from a daily living perspective.
*Q.* Based on what your interpretation and perception of it, correct?
*A.* Right.
*Q.* For the parent report.
*A.* Right.
*Q.* Which is part of the evaluation. I am not saying it shouldn't be. But I just want to make sure that's what we were talking about earlier.

*A.* Yes.

*Q.* Okay. Well, then going back to Page 2 of that exhibit, you are talking about the social communication skills and your perceived deficits of that. If you look at the bottom of Page 2, the communicative status assessment, that first paragraph, the second sentence it starts with, "It is used to identify verbal and nonverbal pragmatic deficits that may negatively influence social and academic communication." And again it says that Jackson's abilities on this task fell within the average for students of his age.

So again we kind of got this dichotomy between your report and the testing results.

*A.* Yeah, I am happy to answer that. That was -- this was in the middle of COVID when his high school was in a hybrid model. He was at home participating on-line in a very different situation. Jackson is very good at what we call masking his difficulties. So, yes, if he is on a computer screen and he is being asked basic questions and sitting on a screen and looking like he is participating, all of these -- and these were teachers that had known him for just -- basically through the model of schooling that was happening at that time. There was very, very little face-to-face interaction at that moment in time. And Mr. Markson, who was his social studies teacher, is a personal friend of mine.

*Q.* Am I understanding that you don't agree with the report and

the IEP, then?
*A.* I wouldn't say that. I -- I think it was the diligence of this staffing team who I respected, who I felt like were doing their best in a very, very challenging time, a very, very challenging time educationally. I myself was experiencing a lot of stress because of what was happening in the educational system during COVID. And honestly, I was providing grace. I would have never anticipated having to go back two years later and dispute what they wrote.
As I stated before, I am so grateful to the people who are willing to support and work with Jackson. Did I agree with everything, particularly the language sample and some of the perceptions of the teachers? No. But at that time my kid was getting what he needed. The school was providing him with a safe space and access to the general education curriculum in a manner in which Jackson was -- I wouldn't say thriving, but doing the best he could in a really challenging time in history.
*Q.* Well, so let's talk about that a little bit. He was in -- in high school he was in 100 percent general ed classes, correct?
*A.* He was, but with co-taught classes, so he had a special education teacher.
*Q.* And he had accommodations that needed to be met per the IEP, and we discussed those earlier.

*A.* Yes.
*Q.* So he was getting those accommodations, but he was in general education classes.
*A.* With the support of a special education teacher. The special education teacher for his core classes were coteaching with the general education teacher. So he had those opportunities to be pulled aside, had reteaching opportunities, and his work was modified.
*Q.* And he earned a high school diploma?
*A.* Yes.
*Q.* I was looking at the IEP, that's the Exhibit 2 before you. You probably could remember this, but on Page 5 it talks about the grades that he had gotten for the 2022 school year?
*A.* Uh-huh.
*Q.* It looks like he had Bs and higher in everything except for financial algebra in the general ed classes with the accommodations, correct?
*A.* Yeah. I can tell you why. I wrote all of his papers. His dad is to blame for the poor grade in the financial algebra.
*Q.* My wife will probably blame me for that too for my kids.
*A.* In the IEP meetings, we would have a joke. I would say they are like, oh, his writings -- I was like, I write his papers for him. I wrote -- and I admitted that to the IEP team. I told them that Todd would oftentimes -- I mean, that was -- I wrote papers for him in Greeley. That's -- he has a

better GPA than I did in high school, and I'm proud of that because I did all of -- I wrote every paper he had to submit.

*Q.* Sure. Well, that's interesting for us to hear that today.

*A.* I hate to admit that, but that was life. I mean, the process of writing is such a stressful activity for Jackson. It brings on so much anxiety because he is unable to -- he really struggles with, one, finding a topic to focus on. He can find the facts for it beautifully. But then taking those facts and then organizing into a succinct organized paper is very, very challenging and presented with lots of anxiety within the home. And so in an effort to ease that anxiety, he would type and I would dictate.

*Q.* So it sounds like even with accommodations in high school and the modified program at UNC that maybe he are you suggesting isn't capable of meeting the requirements of the GOAL program, then?

*A.* The GOAL program's requirement is that they can read and write at a third grade level.

*Q.* He is well above that, though.

*A.* Yes. I believe he is above that.

*Q.* According to his IEP, I believe maybe 10th grade level, correct?

*A.* If you are looking at the subtests that are performed on the WIAT. The subtests that you have to write for a writing paragraph is basically you look at a picture and you write one

paragraph.

*Q.* But the subtests that are used throughout Colorado, throughout the nation to assess any students, in particular students with IEPs, their levels though.

*A.* Right.

*Q.* We are talking about testing that isn't some random test.

*A.* You could also look at he had to take the PSAT. He had to take the CMAS test. Those were all -- if you look at those types of scores, they were well, well below high school level if you look at that type of data.

*Q.* I want to talk a little more about the GOAL program, the requirements and that sort of thing. So if you could turn in that white binder in front of you to the Plaintiff's Exhibit 21.

So you mentioned before when Attorney Raykin was asking you questions that you all specifically chose UNC because of the GOAL program. So I take that to mean that you looked closely at the program and what it offered, correct?

*A.* Yes. And we felt incredibly grateful that it was available.

*Q.* And so you -- as part of the application process, you said you submitted, you know, like an application questionnaire type of thing.

*A.* Uh-huh.

*Q.* Jackson did that as well. And you met with the GOAL

program staffing, in particular Ms. Ruffatti, the director. And then after he was accepted, you all went on a retreat, I think.

*A.* Yes.

*Q.* And you learned about the GOAL program and various requirements at UNC and all that kind of thing.

*A.* Yes, yes.

*Q.* And so this plaintiff's exhibit that the attorneys for Jackson have offered here, does this look familiar to you? This looks like a printout version of the GOAL website, correct?

*A.* Yes. I trust you, yes.

*Q.* That's -- I mean, that's how the attorneys for you have characterized it and I think that that's accurate. But is that what it appears to be to you?

*A.* Uh-huh, yes.

*Q.* And if you will flip to Page 19, 21-19, actually it begins at the bottom of 18. Do you see the bottom of 18 it talks about admissions criteria?

*A.* Uh-huh.

*Q.* And so admissions criteria, do you understand it the way I do that these are the things that are required for a student to be accepted into the GOAL program?

*A.* Yes.

*Q.* And so one of them, if you look at the very top of 19, is

that the student must be their own legal guardian?

*A.* Uh-huh.

*Q.* I presume Jackson is his own legal guardian?

*A.* Yes.

*Q.* If he hadn't been, then, you would have said, oh, I guess this program isn't right for us because he has to be his own legal guardian.

*A.* Well, I had been researching the GOAL program for probably 18 months prior to our application. And there were moments where we did consider becoming his legal guardian, but because we had such -- were so excited for this opportunity to be a participant in the GOAL program and recognized these qualifications, we chose not to be a legal guardian.

*Q.* Okay. A little bit further down there is a bullet point, an open circle bullet point that says that the -- for admissions criteria the student must "demonstrate the ability to accept responsibility for their actions and maintain respect for themselves and others."

*A.* Uh-huh.

*Q.* So by certifying your application and accepting admission, you were saying that Jackson was capable of doing that, correct?

*A.* Absolutely, yes.

*Q.* And as with the one below that, "No history of disruptive or challenging behaviors"?

*A.* Yes.
*Q.* I think his IEP, the most recent one that we have been reviewing, it says that there were no behavioral modifications for him because behavior issues, following the rules, et cetera, had not been an issue for him.
*A.* Correct.
*Q.* I think finally I want to just look down the second to the last bullet point there, a little open circle one. It says that the student will "Agree to follow all University of Northern Colorado rules and regulations."
*A.* Yes.
*Q.* So you were aware as was Jackson that he would be responsible for following UNC's rules and regulations.
*A.* Yes.
*Q.* And by applying and acknowledging that you met those criteria, you were acknowledging that he was capable of doing that.
*A.* Yes, under the assumption that he wasn't going to be stalked and harassed and put under emotional distress, absolutely. We recognize that Jackson did on several instances break that no-contact order, but again this kid was trying to defend himself. Those reciprocal contacts were him begging her to stop in most instances.
*Q.* You said before once you all received this notice that Jackson had allegedly violated the conduct code, it sounds like

you reviewed the student code of conduct, the BEAR code I think you called it?
*A.* Yes.
*Q.* I imagine you reviewed that previously during the admissions process and the retreat and that kind of thing. So you were familiar with the BEAR code?
*A.* I was not familiar with the BEAR code until it was presented to us with a link in the no-contact order.
*Q.* So you did review it at that point.
*A.* I did review it at that point, yes.
*Q.* And so then you reviewed that for allegations of misconduct that is violating the BEAR code.
*A.* Right.
*Q.* That there would be a conduct hearing.
*A.* I mean, yeah, I guess you're right. But when I read the BEAR code, when I saw conduct, I saw assault, robbery, sexual assault, trespassing. I saw property damage. I viewed that as conduct.
*Q.* But violating an order by a school administrator is also conduct.
*A.* Right, yeah.
*Q.* I will grant you that violating a no-contact order is not as severe as assaulting someone, but it is still a violation of the conduct code.
*A.* I agree. And I was just hoping again that the University

would recognize that these -- this contact order was broken by two individuals on the autism spectrum who have social communication difficulties, not that I expected again that special treatment, but I was hopeful for recognition by the University that these were two individuals whose primary component of their disability is difficulties with social engagement and social interpretation, et cetera.

*Q.* And you engaged with the University on that point, though. You said before that you talked extensively to Christina Ruffatti as the GOAL director because both Jackson and the other student were in the GOAL program. And you said before she did everything she could to help you all with this situation.

*A.* At the level of what she could. And she said, I can only do so much as the GOAL director. I would a hundred percent agree that she worked diligently to support Jackson through this effort. But there were moments or situations where a lot of it was out of her hands, specifically the conduct issue.

*Q.* And you also engaged with the Disability Resource Center prior to the conduct hearing.

*A.* Briefly, yes.

*Q.* You had a meeting with them, correct?

*A.* Yes, a telephone meeting.

*Q.* You and Jackson were present on the telephone with them.

*A.* Yes.

*Q.* And the result of that meeting was that they had granted, they provided Jackson with accommodations for the hearing, correct?

*A.* Very minimal accommodations.

*Q.* They offered him 50 percent extra time.

*A.* Uh-huh.

*Q.* They offered him the prehearing outline. I mean, you had suggested that it would be better for him to see something in writing, so they provided, hey, here are the steps of the hearing that is going to take place.

*A.* Yes.

*Q.* You had the notice previously as well that spelled out what he was allegedly to have done in violation of the code of conduct. So that was in writing as well.

*A.* And I have to say and we have said the reason why -- the initial no-contact order, the initial violation that he received for the no-contact order on March 9th, we vehemently deny that that contact took place. He did receive a second notification sometime on or around March 20th, I believe, but we vehemently denied that contact on March -- I believe, I can't remember the specific date.

I called Christina. I believe I had a communication with her. Jackson called me swearing he hadn't done anything. I spoke to Christina. If you read the report from the student herself, she says that she didn't know when the contact

occurred. She couldn't remember what happened, but she thinks he spoke with her.

And when I spoke to Christina about this, she said that she talked to the people that were in the classroom that day and no one saw Jackson do this. Jackson also received a text message from her that same exact day that said, "I am so sorry. I have to do this. You won't respond to me. I hope you learn from this."

*Q.* I understand that you disagree with the outcome of the hearing. You disagree with some of the allegations and exactly how everything transpired, but the Court isn't going to be making any factual determinations about that. We are talking about the accommodations.

*A.* Right.

*Q.* So to get back to that briefly.

*A.* Okay. I apologize.

*Q.* That's okay. So we said time and a half, an outline before the hearing, and then a summary and next steps following the hearing, correct?

*A.* Which I assume the summary and next steps were part of the process in and of itself.

*Q.* And you were his advisor during this first hearing which is the one we are really here about today.

*A.* Yes.

*Q.* And it sounds like you are frustrated that you couldn't be

his advocate, but you were present and allowed to assist him during the hearing, in other words, like side bars, you could discuss privately.

*A.* I saw myself as his advocate. Had I gone into this meeting -- I mean, again, we went into this naive and I take full responsibility for that, but I went in there as his mother. I went in there as his mother. I wanted to protect him. I mean, this opportunity that he has had to be in this program is once in a lifetime. And we had saw how he had thrived and had excellent behavior, had great grades, was making these social connections. I went in there as his mom to defend his ability to stay in this program because it was such a valuable opportunity for him. I went in there as a mom.

*Q.* Yeah, I understand. But in terms of being naive, you had reviewed the allegations and the letter informing Jackson of his violation.

*A.* Yes.

*Q.* You had met with the Disability Resource Center to get accommodations in place.

*A.* Yes. Had I known better, I would have done a much better job of advocating.

*Q.* Okay. And you were present during the hearing as his advisor having that full knowledge of what the conduct hearing was about from reading the BEAR code, what the allegation was from reading the letter, and what his accommodations would be

from your meeting with the DRC, correct?
*A.* Yeah, but again going under the assumption that the participants from the Dean of Students would, you know, had the -- recognized that he was a student with a disability. He was in the GOAL program.
*Q.* You say they didn't recognize it, but it was in the letter that they sent you that they were going to give him these accommodations during the hearing. So they were aware that he needed disability accommodations, correct?
*A.* Very minor minimal ones, yes.
*Q.* And not are suggesting that they don't implement those.
*A.* No, not at all, no, not at all.
*Q.* The three we just discussed.
*A.* Yeah, I don't dispute that at all.
*MR. BECK:* I don't have any further questions, Judge.
*THE COURT:* Thank you.
Redirect?

**REDIRECT EXAMINATION**

*BY MR. RAYKIN:*
*Q.* Ms. Vollmer, could you describe the difference between working memory in cognitive versus language processes?
*A.* Well, I am not a psychologist, so Clio would probably have been a better person to discuss working memory, but --
*MR. BECK:* Judge, I would object. I think that is her answer to the question. I would object to her speculating

further about the difference.

*THE COURT:* And just so the attorneys are aware, when you make an objection, you need to stand up.

*MR. BECK:* Sorry, Your Honor.

*THE COURT:* Response?

*MR. RAYKIN:* I think she could testify as to her understanding of it without being an expert. We are not seeking expert testimony. She had testified earlier that there was a difference in working memory in cognitive versus language processes.

*THE COURT:* Clearly a subject of expert testimony. You just admitted she is not an expert. Sustained.

*BY MR. RAYKIN:*

*Q.* The Wechsler is just one report, correct?

*A.* Yes.

*Q.* And there are other reports that would basically give you a profile of what's going on with the student.

*A.* Yes.

*Q.* Could you turn to Exhibit 1-8, please? And toward the bottom there, do you see where it says teacher report?

*A.* On 1-8?

*Q.* Yes.

*A.* Yes.

*Q.* Okay. And the teacher report indicated a total score for autism is slightly elevated?

*A.* Uh-huh.
*Q.* Social communication slightly elevated?
*A.* Uh-huh.
*THE COURT:* Sorry, Mr. Vollmer. You need to answer the questions yes or no as opposed to --
*THE WITNESS:* I apologize. I'm sorry.
*THE COURT:* It's hard, but we have to make a clear record. The court reporter needs to write down, you know, a word, not a kind of --
*THE WITNESS:* I apologize.
*THE COURT:* No problem.
*A.* Yes.
*BY MR. RAYKIN:*
*Q.* Turning to Exhibit 1-9. Teacher report was that unusual behaviors were elevated?
*A.* Yes.
*Q.* And the DSM 5 scale for autism was slightly elevated?
*A.* Yes.
*Q.* Peer socialization was elevated?
*A.* Yes.
*Q.* Social/emotional reciprocity slightly elevated?
*A.* Yes.
*Q.* So fair to say that the report was not just based on your determinations, but those of a teacher as well, correct?
*A.* Yes.

*Q.* Okay. Could you turn now to Exhibit 1-11. I am sorry, 1-10. This is a Vineland assessment?
*A.* Yes.
*Q.* That measures adaptive behavior, the things that people do to function in their everyday lives?
*A.* Yes.
*Q.* There was a parent report from you, right?
*A.* Yes.
*Q.* Now let's go back to 1-11. There was also a teacher report?
*A.* Yes.
*Q.* And that was by a special educator?
*A.* Yes. Ms. Hanna was a special education teacher.
*Q.* Ms. Hannah. Okay. And she provided an adaptive behavior composite which provides an overall summary measure of Jackson's adaptive function. His ABC standard score is 90 with a 90 percent confidence interval of 86 to 94. His percentile rank of 25 means that his score was greater or equal to 25 percent of individuals in Jackson's age group in the Domain-Level Teacher Form normative sample, correct?
*A.* Yes.
*Q.* And then the communication domain measures how well Jackson exchanges information with others.
*A.* Yes.
*Q.* And that he was given a percentile rank of 27 percent,

right?

*A.* Yes.

*Q.* And the social -- looking below the socialization domain reflects his functioning in social situations?

*A.* Yes.

*Q.* Yes?

*A.* Yes.

*Q.* And the percentile rank there is 18 percent?

*A.* Yes.

*Q.* This is all from the teacher report, right?

*A.* Yes.

*Q.* Who wrote this evaluation report? I am sorry, let me ask it differently. Did you write the evaluation summary?

*A.* No, I did not.

*Q.* Was it written by the people at the school?

*A.* Yes, it was.

*Q.* And do they incorporate both data from you and from staff members at the school?

*A.* Yes, they did.

*Q.* How did coteaching supports work in the classroom?

*A.* Basically the general education teacher would present the information or the learning material whether it be in the course of English, history -- or English, social studies, math, as well as science. And so a general education teacher would present the information. And then the special education

teacher would meet with the special education students in that class and provide reteaching opportunities and modified work in order for them to access the curriculum.
*Q.* Okay. So he needed the specialized instruction to access the curriculum.
*A.* Absolutely, yes.
*Q.* Even though he was in general education for most of the day.
*A.* Yes. We had -- that's the reason why we chose the high school he went to is because they provided those opportunities as opposed to other high schools in our neighborhood.
*Q.* Could you look at Exhibit 3-16, please? And you see there that he was receiving specialized literacy instruction for 250 minutes weekly?
*A.* Uh-huh.
*Q.* And that was still inside the general education classroom, right?
*A.* Yes.
*Q.* So this is basically specialized instruction in general education.
*A.* Yes.
*Q.* And that's what allowed him to stay in general education most of the day?
*A.* Absolutely, yes.
*Q.* He was also given psychological services, correct?

*A.* Yes, to support his anxiety.
*Q.* Now, Mr. Beck asked you earlier about 50 percent more time during the hearing. Well, did that also provide him 50 percent more time to ask him more questions?
*A.* I would say that that was a possibility.
*Q.* How would 50 percent more time actually help someone with an expressive language disorder?
*A.* It has no relevance in my opinion. Because the expressive language productions are so limited, the additional time isn't a significant accommodation.
*Q.* Okay.
*A.* Irrelevant.
*Q.* How did the outline before the hearing help someone with an expressive language disorder?
*A.* It didn't support the expressive language, but it did help ease his anxiety as to what to anticipate.
*Q.* How would a summary of what happened after the hearing help him during the hearing?
*A.* It didn't. Basically that goes along with pairing visual information with the verbal information after the fact.
*Q.* Did you want more robust accommodations?
*A.* Absolutely. Had I known the format of the hearing, I would have been more of a staunch advocate.
*Q.* Specifically related to his disabilities?
*A.* Yes.

*Q.* And in particular autism?
*A.* Yes, and the language processing.

*MR. RAYKIN:* Thank you, Mr. Vollmer.

*THE COURT:* Thank you very much, Mr. Vollmer. You may step down.

*MR. BECK:* Judge, I would like to request admission of Plaintiff's Exhibit 21. That was the GOAL website.

*THE COURT:* Right. Any objection to the admission of Exhibit 21?

*MR. RAYKIN:* No, sir.

*THE COURT:* Exhibit 21 will be admitted.

Plaintiff may call its next witness.

*MR. RAYKIN:* We would like to call Jackson Vollmer.

*THE COURT:* Mr. Vollmer, if you don't mind, could you please come up and stand right next to the witness stand where you saw your mom stand, and Ms. Grimm in the yellow there is going to administer an oath to you.

(**Jackson Vollmer** was sworn.)

*THE WITNESS:* Yes, I do.

*COURT DEPUTY CLERK:* Please state your name and spell your first and last name for the record.

*THE WITNESS:* So my name is Jackson. That's my first name, J-A-C-K-S-O-N. My last name is Vollmer, V-, as in Victor, O-L-L-M-E-R.

*THE COURT:* And Mr. Vollmer, anytime you want to take

a break or have a drink of water -- we have got some water up there -- just let us know, okay?

*THE WITNESS:* Thank you.

*THE COURT:* Great.

**DIRECT EXAMINATION**

*BY MR. RAYKIN:*

*Q.* Good morning, Mr. Vollmer.

*A.* Good morning.

*Q.* Have you ever testified before?

*A.* I have never testified in my life.

*Q.* I am just going to ask you some questions about how you are doing since you have been -- your removal from the University of Northern Colorado.

*A.* Okay.

*Q.* Do you want to return to UNC?

*A.* Of course I do.

*Q.* Why?

*A.* I have never experienced a year without learning before. I just miss all my friends in the world. I just want to learn, grow, and be more successful.

*Q.* How is being out of UNC affecting you right now?

*A.* It's affected me a lot worse. It's torn me apart from my friends. I have no relationships. Everyone is in college. My brother and my sister, I have to watch them grow and it kind of makes me feel a little jealous.

*Q.* How are your relationships right now with friends from UNC, like why can't you see them?
*A.* It's a little bit of a pain because they are busy with school and they are far distance.
*Q.* Why can't you just drive up there?
*A.* I don't have -- I don't drive.
*Q.* How is your emotional state right now?
*A.* I am a little anxious.
*Q.* Can you describe that anxiety?
*A.* Like how?
*Q.* Well, tell us how you are feeling.
*A.* I feel like ever since I got that letter where I got kicked out I have been very depressed, torn apart.
*Q.* Okay. When do you want to return?
*A.* January.
*Q.* Why can't you wait to reapply until August?
*A.* Because it's just -- it's just -- we all make mistakes. Everyone makes mistakes.
*Q.* Well, how would you be harmed by waiting until August to reapply?
*A.* I don't know.
*Q.* Do you think your mood will be any better if you have to wait until August?
*A.* No.
*Q.* How about your anxiety, do you think it will get any

better?
*A.* Until August?
*Q.* If you have to wait until August.
*A.* No.
*Q.* What about your depression?
*A.* Probably not. I think it would be more comfortable to just go back.
*Q.* So do you think you would do better?
*A.* I would do better at it.
*Q.* You think you would do better if you returned in January?
*A.* Yeah.
*Q.* How -- is it easy for you to make friends?
*A.* Very.
*Q.* What does it mean to make a friend?
*A.* I don't know, maybe having like the same kind of similarities. I don't know, just like calling each other, texting each other through social media.
*Q.* What's -- are you making friends right now while you are outside of --
*A.* Not really.
*Q.* Why not?
*A.* Because they are far away. They are far distance.
*Q.* Why can't you make friends with the people around --
*A.* Because I have been self-isolated and it's kind of hard for me to like go out and try to explore. Like all my friends are

up at school.
*Q.* Is your self-isolation getting better or worse?
*A.* It's getting better. It's getting sometimes a little worse because it's hard for me not to be with friends. I haven't seen them in six months ever since I have been back up on campus.
*Q.* Your mother talked before about the possibility of self-harm.
*A.* Yeah.
*Q.* What is self-harm?
*A.* I don't know, maybe trying to have like suicidal thoughts or plans of killing yourself. I don't mean to take -- I don't mean to take it seriously. I really don't.
*Q.* Have you ever had thoughts like that before?
*A.* Yeah, I have had thoughts like that before, yeah.
*Q.* During what kind of periods in your life did you have thoughts like that?
*A.* Maybe before college started.
*Q.* Have you had any thoughts like that since being removed from UNC?
*A.* No, not really.
*Q.* Have you had depression since?
*A.* Yeah, I have had depression.
*Q.* Did you ever have depression come before thoughts of self-harm?

*A.* No.
*Q.* What kind of thoughts usually came before the thoughts of self-harm?
*A.* I don't remember.
*Q.* Okay.
*MR. RAYKIN:* Thank you.
Cross-examination?

**CROSS-EXAMINATION**

*BY MS. ZIPPIN:*
*Q.* Good morning, Mr. Vollmer.
*A.* Good morning.
*Q.* My name is Angela. I am representing the University here. I would like to ask you some questions about when you first enrolled at UNC and became part of the GOAL program.
*A.* Okay.
*Q.* When you first enrolled in the GOAL program, GOAL staff explained to you that you had to comply with all the same rules as other UNC students, correct?
*A.* Yup.
*Q.* And that included the student code of conduct?
*A.* Yeah.
*Q.* And can you look to the black binder there? It should be labeled J.
*A.* Okay.
*Q.* Do you recognize this document?

*A.* Yeah.

*Q.* You were provided this document at the GOAL orientation retreat; is that correct?

*A.* Yes.

*Q.* And what is this document?

*A.* All the rules I have to follow, all of the -- meaning I have to agree to follow and understand if I do not follow this contact, there will be some appropriate consequences determined by the University.

*Q.* Thank you.

*MS. ZIPPIN:* Your Honor, I would like to admit Exhibit J for admission.

*THE COURT:* Any objection to the admission of Exhibit J?

*MR. RAYKIN:* No, Your Honor.

*THE COURT:* Exhibit J will be admitted.

*BY MS. ZIPPIN:*

*Q.* And if you look to the second page, Mr. Vollmer, of that document, is that your signature?

*A.* That is my signature.

*Q.* Okay. I am sorry to make you flip back to the front, but the -- that first sentence that asks for your initials, it says you understand and will follow the student code of conduct.

*A.* Yeah.

*Q.* Are those your initials?

*A.* Those are my initials, JV.
*Q.* And if you look to the fifth line down there where it says you understand you are responsible for your safety and your actions at all times, are those your initials next to that statement?
*A.* Yup.
*Q.* I am sorry?
*A.* Yeah.
*Q.* Now I would like to ask you about the no-contact order that was issued between you and the other student in the GOAL program.
*A.* Okay.
*Q.* After you received the no-contact order, you had a meeting with GOAL staff about the order, correct?
*A.* Uh-huh, yes, correct.
*Q.* And at that meeting you and GOAL staff discussed what sorts of conduct violated the no-contact order?
*A.* Yeah.
*Q.* And you received the written order before that meeting occurred.
*A.* Correct.
*Q.* So you had the writing and you had a meeting where it was discussed verbally what the requirements were of that no-contact order.
*A.* Yeah.

*Q.* So the no-contact order itself is clear that you were not to contact this other student, correct?
*A.* Right, right, yeah.
*Q.* And GOAL staff also explained that.
*A.* Yeah.
*Q.* And when you were in this meeting, did you have the opportunity to ask any questions?
*A.* Well, I had really thought like -- when I was at the hearing, I really thought like it was going to help better educate me and talk about what the no contact is all about.
*Q.* And GOAL staff provided that information?
*A.* Yeah.
*Q.* All right. I would like to ask you about the hearing notice that you received. You received a letter from student conduct and accountability stating that you may have violated the no-contact order?
*A.* Yes.
*MR. RAYKIN:* Your Honor, we are getting pretty far afield here from the scope of the direct. I would object to this line of questioning.
*MS. ZIPPIN:* Mr. Vollmer is also listed as one of the witnesses we plan to call.
*THE COURT:* Well, counsel has the right to object based on exceeding the scope. Sustained.
*MS. ZIPPIN:* We have no other questions for this

witness at the time, but we would like to reserve the right to recall Mr. Vollmer.

*THE COURT:* Yeah, of course, during your case. As long as he is listed, and I think he is, you may. Thank you.

Any redirect?

*MR. RAYKIN:* Yes. Just one second, Your Honor.

*THE COURT:* Yes.

**REDIRECT EXAMINATION**

*BY MR. RAYKIN:*

*Q.* I just wanted to ask you, Mr. Vollmer, what is your understanding of what a hearing is?

*A.* A hearing is when -- it's kind of like going to trial and seeing whether or not you did violate the no-contact order. I did.

*Q.* Did you think you would be given more of an explanation?

*A.* If I would be given like more an explanation, I really thought it would help me better educate myself and knowing what it was.

*Q.* When did you think you would get that explanation?

*A.* The day of the hearing.

*Q.* Okay. Did you talk to Ms. Ruffatti the day of the hearing?

*A.* From what I can remember, I don't remember. I feel like I did, yes.

*Q.* Did you ever ask her what the hearing was going to look like?

*A.* I don't think I -- I don't remember.

*MR. RAYKIN:* Okay. No more questions.

*THE COURT:* Thank you.

All right. Mr. Vollmer, you may resume your seat in the gallery. Thank you.

Additional evidence or witnesses on behalf of plaintiff?

*MR. RAYKIN:* No more witnesses, Your Honor.

*THE COURT:* Thank you.

Witnesses on behalf of the University?

*MS. ZIPPIN:* The defendant will call Christina Ruffatti as the first witness.

(**Christina Ruffatti** was sworn.)

*THE WITNESS:* Yes.

*COURT DEPUTY CLERK:* Please state your name and spell your first and last name for the record.

*THE WITNESS:* Christina Ruffatti, C-H-R-I-S-T-I-N-A, R-U-F-F-A-T-T-I.

**DIRECT EXAMINATION**

*BY MS. ZIPPIN:*

*Q.* Good morning, Ms. Ruffatti.

*A.* Good morning.

*Q.* Where do you currently work?

*A.* University of Northern Colorado.

*Q.* What do you do at the University?

*A.* I am the executive direct for the GOAL program, UNC's inclusive higher education program.
*Q.* How long have you had that position?
*A.* I was hired in June of 2019.
*Q.* Prior to taking on that position with GOAL, did you have experience working with people with disabilities?
*A.* Yes. I am a certified rehabilitation counselor.
*Q.* And what is that?
*A.* That is a national certification directly related to employment supporting people with disabilities.
*Q.* How long have you held that certification?
*A.* Since 2013.
*Q.* I would like to ask you some questions about the GOAL program at the University. What is the GOAL program?
*A.* Sure. So the GOAL program is UNC's inclusive higher education program, so that is one of four programs in the state, and there is approximately 323 programs nationwide.
*Q.* And what is an inclusive higher ed program?
*A.* Yeah. So our students come to us. They are not degree-seeking students. They have a separate admission process. And by the nature of not being degree-seeking students, that is because they are receiving modifications to the academic coursework.
*Q.* I want to break down basically what you said piece by piece there. So you said that it's a modified admissions process for

students in GOAL. What is different about the admissions process for students in GOAL than other UNC students?

*A.* Sure. So we collect a body of evidence, so that body of evidence is a student application, a parent application, three letters of recommendation, disability documentation, a parent readiness survey, a student support inventory survey. And from that we determine whether we will extend an interview to a student.

*Q.* And what criteria is necessary for a student to be enrolled?

*A.* So students must be their own legal guardians. And in addition to that, they must be able to follow the same rules and procedures as any degree-seeking student at UNC.

*Q.* What is the significance of the requirement that a potential GOAL student be their own legal guardian?

*A.* Yes. So they must be their own legal guardian because we do have a residential living component in our program. Our program rests upon three pillars, academic, social inclusion independent living and vocational. So that independent living piece, they live in the residence halls and have to be able to sign their own legally binding contracts.

*Q.* And you also said that students in the GOAL program receive academic modifications? I believe that's how you worded it. Can you explain what kinds of modifications students in the GOAL program receive?

*A.* Yeah. So the modifications to the academic coursework could be something like if a degree-seeking student is writing a five-page paper for the class, a student in GOAL may be asked to write a two-page paper or perhaps do a PowerPoint presentation to demonstrate that they understand the major themes of the learning, but they are not asked to demonstrate they understand the minutia. So through that modification process, that is the reason why our students earn a certificate of comprehensive higher education and not an undergraduate degree.
*Q.* So those are modifications to course curriculums?
*A.* That's correct.
*Q.* Are there any other types of modifications that students in GOAL receive?
*A.* No.
*Q.* Or is it just academic?
*A.* It's to the academic coursework, yes.
*Q.* Are students in GOAL automatically provided those academic modifications?
*A.* So through the nature of our program, they are provided the modifications in conjunction with the faculty, the student, to determine the modifications that make the most sense for the student.
*Q.* So it is a process.
*A.* That's correct.

*Q.* And the student GOAL staff and the faculty members come to together to determine what those modifications would be.
*A.* Uh-huh.
*Q.* Okay. Are those modifications through GOAL different than reasonable accommodations that are necessary for people with disabilities in higher education?
*A.* Yes.
*Q.* They are different.
*A.* They are different.
*Q.* How are they different?
*A.* So modifications are changing the expectation of the coursework. Accommodations is not anything that my office directly does. That is through our Disability Resource Office.
*Q.* So GOAL does not provide disability-related accommodations. Those go through a different office on campus.
*A.* Correct.
*Q.* And are students in the GOAL program made aware of how to obtain disability-related accommodations through the Disability Resource Center?
*A.* Yes.
*Q.* And does GOAL help students in the program make sure that they are aware of how to access the Disability Resource Center?
*A.* Yes.
*Q.* How does GOAL staff do that?
*A.* So when we extend an offer of admission, we then work with

the student to get them the information about the Disability Resource Center. During the 2022 academic year, we were still helping students set up initial virtual meetings, so there is an initial meeting and then there is an in-person meeting that happens when a student comes to campus. So we work with our partners at the DRC to help facilitate that meeting, but we are not the folks who determine those accommodations.

*Q.* To be clear, DRC refers to --

*A.* Sorry, Disability Resource Center.

*Q.* It's kind of a lengthy title, so that's fair. In working with students in the GOAL program to help them work with the DRC, does GOAL provide the DRC documentation and information that it has received about the student's disability to the DRC?

*A.* Yes. So we have a release in place that allows us to share those records with the DRC to begin the accommodation process.

*Q.* I would like to shift gears a little bit and talk about what the expectations of students in the GOAL program are. Are students enrolled in the GOAL program required to comply with all University policies?

*A.* Yes.

*Q.* Any policy that specifically pertains to students.

*A.* Yes.

*Q.* And that includes the student code of conduct?

*A.* Yes.

*Q.* And are students in the GOAL program made aware of that

requirement that they must adhere to the student code of conduct?

*A.* Yes.

*Q.* GOAL, the program, the staff, they specifically provide that information to students?

*A.* Yes. We provide it a couple different points. We provide it during our mountain retreat. We provide it again on the first day of every class regardless of what year a student is in.

*Q.* I would like you to look at the black binder there at the document labeled Exhibit L. Do you recognize this document?

*A.* I do.

*Q.* What is this document?

*A.* This document is a supplemental teaching tool that we created. And it is the code of conduct in plain language that, like I said, is supplemental and we use as a teaching tool to help inform our students of the rules and expectations of the code of conduct.

*Q.* When you say us, are you referring to the GOAL staff?

*A.* Yeah, myself and my staff.

*Q.* So this was created by staff in the GOAL program?

*A.* Yeah.

*MS. ZIPPIN:* At this time, Your Honor, I would move to admit Exhibit L.

*THE COURT:* Any objection to the admission of Exhibit

L?

*MR. RAYKIN:* No objection.

*THE COURT:* Exhibit L will be admitted.

*BY MS. ZIPPIN:*

*Q.* How does the GOAL program use this document?

*A.* So as I mentioned, it's a teaching tool. We use it during our mountain retreat to help students understand in more plain language what the expectations are, but it is in conjunction with the University created document. So it does not supersede. It is a supplemental tool.

*Q.* So it does not supersede the UNC student code of conduct.

*A.* That's correct.

*Q.* And when is this document provided to students in the GOAL program?

*A.* This is provided during our mountain retreat prior to students coming to campus.

*Q.* And you said this is a teaching tool. What is it that you hope to teach students in the GOAL program through this document?

*A.* So that they are expected to follow the same rules and procedures related to the BEAR code or UNC's code of conduct as any other student on UNC's campus.

*Q.* And do all students in GOAL receive this document?

*A.* Yes.

*Q.* I would like you to move to the next document there labeled

M. Do you recognize this document?
*A.* I do.
*Q.* What is this document?
*A.* This is the BEAR code PowerPoint presentation that we review at the beginning of every semester with students. Once again, it is a teaching tool. It is meant as a supplement. It does not supersede UNC's code of conduct.
*Q.* You said you review this at the beginning of each semester?
*A.* The beginning of each semester with each and every GOAL student.
*Q.* And would you say the purpose is the same as the plain language code of conduct?
*A.* Yeah. So, I mean, it breaks down and offers some visuals to just multiple ways of teaching the expectations of the code of conduct.
*Q.* Now I would like to turn to the plaintiff in this case. Are you familiar with Jackson Vollmer?
*A.* I am.
*Q.* How do you know Mr. Vollmer?
*A.* He was a GOAL student during the 2022-2023 academic year.
*Q.* And I would like to ask some specific questions about the no-contact order that was issued between Mr. Vollmer and another student in the GOAL program. Are you aware of this no-contact order?
*A.* I am aware of the no-contact order.

*Q.* How did you become aware of the no-contact order?
*A.* So the process is when a student in GOAL is part of the conduct process, I am copied on correspondence that goes to the student. That's something we do for special populations overall at UNC, so for example, student athletes, students in GOAL, so I was copied on that correspondence.
*Q.* And after the no-contact order was sent, did you have any discussions with Mr. Vollmer about the no-contact order?
*A.* Yes. So we printed a copy, and by "we" I mean myself and my staff. So on my staff I also have two licensed special educators and all of us are master's level trained. So we did sit down with Jackson and the no-contact order in a small office and we explained it explicitly. We asked him if he had any questions regarding the no-contact order. At that time he did not.
*Q.* When did that meeting occur?
*A.* That meeting occurred on March 1st.
*Q.* And this discussion, you said you talked about what -- essentially the contents of the no-contact order.
*A.* Yes.
*Q.* Did you specifically discuss what behaviors were prohibited by the no-contact order?
*A.* We did. I mean, it's pretty clearly stated in the no-contact order, and then we also reviewed it.
*Q.* You stated that Mr. Vollmer didn't ask questions at that

time.
*A.* That's correct.
*Q.* You asked him if he had any.
*A.* Yes.
*Q.* And he responded --
*A.* That he did not.
*Q.* At any point did Mr. Vollmer indicate to you that he did not understand the contents of the no-contact order?
*A.* No.
*Q.* Not during this meeting?
*A.* Not at any point. I mean, he -- each time we would meet with him we would remind him like there is a no-contact order. And each time he would break the no-contact order we would remind him there is a no-contact order. This means you cannot have contact with the other student. That includes using other students as a go-between, any sort of electronic communication. We were very clear you cannot.
*Q.* Based on what you just described, it sounds like this was an ongoing series of conversations --
*A.* Yes.
*Q.* -- with Mr. Vollmer? Either at this meeting or anytime after, did Mr. Vollmer ever indicate that he was having trouble understanding the student code of conduct?
*A.* No.
*Q.* Did he ever indicate that he was having trouble

understanding the UNC disciplinary process?
*A.* No.
*Q.* To your knowledge, did he ever indicate to any other GOAL staff that he was having trouble navigating the disciplinary process?
*A.* Not to my knowledge.
*Q.* One more topic I would like to ask you about is Mr. Vollmer's request in this matter to be readmitted to the GOAL program before next academic year. If Mr. Vollmer were to be readmitted to the GOAL program mid-year, would that have an impact on the GOAL staff?
*A.* Yes.
*Q.* What kind of impact do you believe that would have?
*A.* So the overall impact is it would fundamentally alter the nature of how we run our program. And we are at week 11 in the semester. There would be no feasible way for all of that coursework to be made up. And the way that our program is structured through scope and sequence, students have to complete the prerequisites. So for example, students have to complete GOAL 201 before they can go on to GOAL 202. And those courses are only offered -- so 201 is only in the fall. 202 is only in the spring. Reason being, we are a small program. We don't have capacity to run those courses each semester, right? And we would have to go back to curriculum committee and have all of that reworked so we can offer -- if we were to offer

those courses, we would have to go through an entire process.

Additionally, our students live in a residential learning community. And as of right now, we do not have a space available for Jackson in the residential learning community in housing. So it would require a lot of shuffling and disruption to the overall nature of the program. And we still have students who were directly impacted by what happened last year that have not had time to process or fully understand --

*MR. RAYKIN:* Objection, foundation. I don't know how Ms. Ruffatti understands what's going on with other students.

*THE COURT:* Sustained. If you could lay additional foundation as to that aspect of the answer.

*BY MS. ZIPPIN:*

*Q.* As the executive director of the GOAL program, are you working with the students in the program on a regular basis?

*A.* Yes.

*Q.* And have they shared any concerns with you about via as you described it things that happened last year? I assume that that refers to the relationship between Mr. Vollmer and the other student?

*MR. RAYKIN:* Objection, hearsay.

*THE COURT:* Overruled.

*MS. ZIPPIN:* You can answer.

*A.* Yes. My students have commuted via text with me in direct

conversations the impact that it has had to them. We are a small community of learners, and the other students continue to have contact with the other student. So, I mean, it would require a lot of shuffling and ultimately an undue burden on the program at this time.

*BY MS. ZIPPIN:*

*Q.* And you mentioned the difficulty that readmitting Mr. Vollmer right now this semester would have. Would any of your concerns change if he were to be readmitted in January?

*A.* The concerns would remain the same. Again, we are talking about scope and sequence. He would not have completed the prerequisite to take our next GOAL scope and sequence course and would still have to make up everything that he had missed during this semester.

*MS. ZIPPIN:* I have no further questions.

*THE COURT:* Thank you. Cross-examination?

**CROSS-EXAMINATION**

*BY MR. O'DONNELL:*

*Q.* Good morning, Ms. Ruffatti. My name is Conor O'Donnell. I am here on behalf of Jackson Vollmer.

To get started, I would like to ask what kind of specialized training you have on autism.

*A.* I am an expert in the field of disability overall. That's -- my master's degree, as I mentioned, is in rehabilitation counseling.

*Q.* So with that being your degree, is that a degree that has a general disability degree or does that have specific training in autism?
*A.* So it's general disability related, yes.
*Q.* Now, in regards to your staff, I believe you mentioned a couple of individuals participating in your meeting with Jackson. Do they have specific training on autism?
*A.* Yes.
*Q.* And what kind of training is that?
*A.* One has experience with disability, specifically autism, and is a master's level, almost doctoral special educator. The other is specifically trained in significant support needs in disability.
*Q.* So I just want to clarify. For both of those individuals, is that training specific for autism or specific for more general disabilities?
*A.* So one has specific autism training. Ann has generalized disability training.
*Q.* And then you mentioned the lived experience. I just want to make sure I understand that you mean actually one of the individuals has autism; is that correct?
*A.* That's correct.
*Q.* Now, did you have any specific training on dealing with the communication issues that someone with autism has?
*A.* Can you clarify your question?

*Q.* For example, one of the things that we know Jackson struggles with is providing answers he thinks people want to hear. Did you have any specific training on working with people with autism in those kind of communication situations where they are maybe not providing truthful answers but trying to be helpful?
*A.* So, I mean, I work with my students like I would work with any human, right? And we presume competence, so ...
*Q.* Are you aware of Jackson's history of providing answers that -- indicating he understands something even if he doesn't?
*A.* If I was aware of that, we wouldn't have admitted him to the program.
*Q.* Now, you work with primarily special needs individuals, right?
*A.* I work primarily with students with disabilities, that's correct.
*Q.* So you have a lot of experience with them.
*A.* Yes.
*Q.* Now, does one student's disability, even if it's the same disability, mean they have the same manifestation, the same symptoms as another student?
*A.* No. They are all individuals.
*Q.* And so does one student's accommodations work for another student?
*A.* I can't speak to accommodations. That's not my office's

responsibility.
*Q.* So within GOAL the sort of assistance you provide, the modified curriculums, are those one size fits all?
*A.* No. As I mentioned, that's in conjunction with the student, faculty, and my academic coordinator.
*Q.* And they are tailored to that individual student's needs?
*A.* Yes.
*Q.* Now, you have worked with Jackson personally, right?
*A.* Yes.
*Q.* And do you think he understands things to the same level as a neurotypical student?
*A.* Yes.
*Q.* Even though he needs a modified curriculum?
*A.* He needs modified access. That doesn't mean he doesn't understand.
*Q.* For example, some of the things in GOAL are modified courses, modified class work. Do you think he is at the same level as the students not in GOAL?
*A.* If he was at the same level of a degree-seeking student, he would be in the degree program.
*Q.* So just to clarify, then, so he does have modifications that are different than the traditional students.
*A.* For the academic coursework, yes.
*Q.* Now, you were already aware that Jackson had disabilities before he enrolled, right, and when he enrolled?

*A.* I am sorry, I didn't hear you.
*Q.* Yeah. So you were aware Jackson had disabilities prior to and while he was enrolling?
*A.* Yes.
*Q.* And what did you know about the extent of those disabilities?
*A.* Can you clarify your question?
*Q.* Yeah. Basically I want to know how -- whether you knew the extent to which his autism affected his communication skills, if you relied primarily on his IEP. Can you give me information about that?
*A.* As I mentioned, we collected a body of evidence, and part of that body of evidence is also the student interview. So we interviewed Jackson for about 45 minutes independent of family and we asked him questions. He was able to articulate responses pretty directly to us. We also have a mountain retreat which is more of our applied portion of our interview process where we are assessing how students navigate novel situations. And, in fact, what was said to us is we have never seen him engage with other people like he is doing here.
*Q.* So I just want to clarify, you did review his IEP, correct?
*A.* Yes.
*Q.* Do you recall which IEP or if it was more than one?
*A.* I can't -- I am sorry.
*Q.* Do you recall which IEP or if it was more than one?

*A.* So we reviewed the IEP that was given as part of his application which would have been the most recent transition IEP and the most recent tri-annual IEP with testing data.
*Q.* And you are aware that Jackson has struggles with communication?
*A.* I am not -- I mean, I am not sure I would characterize it as struggles.
*Q.* So are you aware that Jackson has in his previous IEPs or in communications it's noted as part of his diagnosis that he struggles communicating or understanding complex topics?
*A.* Again, I wouldn't.
*Q.* But you did review his IEPs, correct, which note he has an autism diagnosis?
*A.* Yes.
*Q.* Including he has communication issues that were assessed as part of that diagnosis?
*A.* Yes.
*Q.* Now, you have discussed some fundamental changes or what you classified as fundamental changes to the program. I want to talk about that for just a moment. First, just to clarify, essentially classes are only offered -- or the specific classes you mentioned are only offered in one semester each.
*A.* Correct.
*Q.* And one of the issues you thought that Jackson would have is having to complete that makeup work.

*A.* Yes.
*Q.* Isn't that his responsibility?
*A.* To complete the makeup work?
*Q.* Yes.
*A.* Yes.
*Q.* So if he is capable of completing the makeup work while doing the second semester, does that create a barrier to him doing both work at the same time?
*A.* He would not be able to complete the makeup work for spring semester that he missed in fall. I am so sorry. I am struggling to hear you. Your voice is a register that's really hard for me.
*Q.* I am sorry. I will try to speak a little higher. My question here is if Jackson had the capacity to do that work in the spring, would he be able to complete that work with the University at the same time?
*A.* Are you asking if he could do it concurrently?
*Q.* Yes, essentially.
*A.* No.
*Q.* And that's because of the GOAL's own policy?
*A.* That's -- I mean, if we are saying that he is stressed because of disability, that would be putting undue stress on him. And I also don't have the staff at this time in the form of a peer mentor who could help facilitate that process.
*Q.* So just to clarify that answer, is your concern more about

his -- essentially his stress in handling it or that it would be -- you wouldn't be able to complete it with staffing?

*A.* My concern is about all of it. I mean, we are holistic. We have to care about the students.

*Q.* So I do want to clarify that if basically a GOAL student misses class time in the fall semester, is it possible for them to make that time up?

*A.* I am not sure I understand your question.

*Q.* So if a student misses class time, misses assignments, makeup work, things like that --

*A.* That would be at the instructor's discretion. So every instructor determines their own attendance policy. So in some cases if a student misses X amount of days, their grade is penalized 10 percent each day. Our students earn letter grades in their classes and they still have to maintain at least a 2.0 GPA to be in good standing with the University.

*Q.* So if a student missed a significant amount of time, say, for an illness or they missed a month or so, two months, and they had a lot of make up work that they just were struggling to complete, would that render them ineligible for the second semester?

*A.* So they would not have earned a passing grade if they haven't completed the coursework.

*Q.* So is that yes, that they wouldn't then be able to do the second semester's courses?

*A.* They would fall below that GPA and they wouldn't have completed the prerequisites.
*Q.* Which would render them ineligible?
*A.* Yes.
*Q.* So essentially any student who misses that chunk of time, misses that coursework, cannot complete it in the second semester?
*A.* If they take an incomplete, but --
*Q.* And I also wanted to ask about housing. You mentioned that basically the GOAL facility is full; is that right?
*A.* So we have set aside rooms in housing, yes.
*Q.* And couldn't Jackson be housed somewhere else on campus?
*A.* Not if we're saying that he needs specialized support in the independent living and social inclusion aspect.
*Q.* For example, couldn't he live at his fraternity?
*A.* That would be a fraternity decision.
*Q.* If it were available, would that absolve the issue?
*A.* I can't speak to that.

*MR. O'DONNELL:* Nothing further at this time, Your Honor.

*THE COURT:* All right. Thank you.

Redirect?

*MS. ZIPPIN:* Yes, Your Honor.

It comes to my attention that I did not have Exhibit M admitted. I believe we went through the discussion of Exhibit

M, the BEAR code presentation, and I would like to request that it be admitted at this time.

*THE COURT:* And that was Exhibit N?

*MS. ZIPPIN:* M.

*THE COURT:* Any objection to the admission of Exhibit M?

*MR. RAYKIN:* No, sir.

*THE COURT:* Exhibit M will be admitted.

**REDIRECT EXAMINATION**

*BY MS. ZIPPIN:*

*Q.* Ms. Ruffatti, I would like to ask a bit more about the issues of making up coursework. You said that there is sequencing and staffing that is provided within the GOAL program. Can you elaborate on that?

*A.* So each course builds upon itself, right? So 201 is a course that is dealing with communication. And then 202, we take that and that is how we transfer those skills, so on and so forth. So if we miss a course, right, 15 to 16 weeks of the class, we are missing all of that content that would carry into the second semester, so there would be a gap in knowledge.

*Q.* So someone would need to have completed the 201 course before they could take advantage of what they were learning in 202 course?

*A.* I mean, it builds upon itself, right? You take algebra I

then you take algebra II. Those fundamental concepts need to be learned before we can go on to the next step.
*Q.* And in addition to what would be missed after a one semester of not attending, to reenroll mid year, are there other sorts of impacts that you anticipate Mr. Vollmer would experience?
*A.* So I would be concerned that he would have not had the opportunity for all the new student days, all of the community building that happens on UNC's campus during those first four to six weeks of the fall semester.
*Q.* Those experiences are not provided during the spring semester?
*A.* No. Spring semester there is not the big move-in day and the Rec Fest and all of the new student programming and returning student programming that is put on. Spring semester it's just -- I mean, most students have already been there and don't need to redo that.
*Q.* And as for the housing issue, can you explain what the housing options are for students in the GOAL program?
*A.* So for students within their first and second year, we have a partnership with housing where there is set aside spaces in one of our resident living halls, right? So students have -- are roommates with other GOAL students. And that allows us to teach more explicitly in that space than if a student was like with a degree-seeking student and also a GOAL student, that

would be kind of intrusive to the degree-seeking student. So first and second year they live in set aside spaces within one of the residence halls.

*Q.* And if a student in the GOAL program were housed somewhere else on campus, would there be any practical concerns that you would have?

*A.* So the benefit of having students in those set aside spaces, we also have a residence life peer mentor who helps navigate some of those gray spaces of social nuances within the living situation. And if a student does not live in those set aside spaces, they don't have access to that residence life peer mentor.

*Q.* So there would be less support for that.

*A.* There would be less support, yes.

*Q.* Through GOAL.

*A.* Correct.

*MS. ZIPPIN:* No further questions.

*THE COURT:* Thank you.

Ms. Ruffatti, you may step down. Thank you.

We can do one of two things at this point. It's 10 minutes of noon, and at noon we would normally break for lunch. We can either break now, take an hour, plan on reconvening at 10 minutes to 1:00, or we can put on a witness for 10 minutes.

Mr. Beck?

*MR. BECK:* I would prefer to go ahead and break now.

*THE COURT:* Okay. Any objection to that, Mr. Raykin?

*MR. RAYKIN:* No, sir.

*THE COURT:* So why don't we go ahead and take the lunch recess now. We will plan on reconvening 10 minutes to 1:00. Let me give you your time totals so you know about that. Plaintiff has used 121 minutes. That means you have 14 minutes left. And defendant has used 71 minutes cumulatively at this point in time.

Anything else before we break, Mr. Raykin?

*MR. RAYKIN:* So just to be clear, Your Honor, the 14 minutes, that would include all my cross-examination and my closing?

*THE COURT:* Not your closing. That's separate. Just the testimony is under the 2 hours and 15 minutes limit.

*MR. RAYKIN:* Okay. So would I be limited in cross-examination to 14 minutes?

*THE COURT:* Yes.

*MR. RAYKIN:* Understood.

*THE COURT:* Any questions on behalf of the University?

*MR. BECK:* No, Your Honor.

*THE COURT:* We will be in recess until 10 minutes until 1:00. Thank you.

(Recess at 11:52 a.m. until 12:53 a.m.)

*THE COURT:* All right. Defendant may call its next witness.

*MR. BECK:* Thank you, Judge. We would call Dr. Miranda Martino.

(**Miranda Martino** was sworn.)

*THE WITNESS:* I do.

*COURT DEPUTY CLERK:* Please state your name and spell your first and last name for the record.

*THE WITNESS:* Miranda Christine Martino, M-A-R-T-I-N-O.

**DIRECT EXAMINATION**

*BY MR. BECK:*

*Q.* Dr. Martino, where do you work?

*A.* I work at the University of Northern Colorado's Disability Resource Center. I am the assistant director.

*Q.* And what exactly do you do at the Disability Resource Center?

*A.* Absolutely. I supervise our team as well as I provide legally and appropriate accommodations to our students. So accommodations can look like student employment, housing, academic, anything related to that.

*Q.* Now, I am referring you to as Dr. Martino, so if we could explain that. What is your training and qualifications for your role?

*A.* Absolutely. I completed an APA, an accredited school psychology doctoral program in 2022 at the University of Northern Colorado. I also completed a post-doc in K-12

education as well.
*Q.* And do you have any other role outside of DRC in working with students with disabilities?
*A.* I do. I am a nationally certified school psychologist. I continue to keep that license. And I practice in an alternative high school in the City of Greeley where I work as well.
*Q.* Sound like you are pretty busy, then.
*A.* I love it. I love being a school psychologist.
*Q.* How long have you been working at DRC?
*A.* I have started working at DRC in April of 2018. I became a graduate assistant through my doctoral program working at the DRC about 18 hours a week. From there I continued with the DRC, and on July 1st I became the assistant director officially.
*Q.* So throughout that five years, since 2018 have you been working with the accommodations process?
*A.* I have the entire time, yup, and I supervise our team that does provide accommodations as well.
*Q.* Are you familiar with the GOAL program?
*A.* I am very familiar with the GOAL program. Because of my background as well as the five years continuity at the DRC, I am actually the point person in our office for the GOAL program, as well as we conduct events and things like that with them, but yes, I am familiar with the program.

*Q.* And I want to talk a little bit about the disability accommodations process. Can you tell us how that process works if a student comes to your office seeking accommodations?

*A.* Yeah. So anyone can make an accommodation for a student. But if a student traditionally comes to our office, they can e-mail. They can call. They can come in or we have an on-line application they can fill out calling getting started with the DRC. So they tell us a little bit about themselves, their contact information, if they identify with a disability. They upload any files there.

And from there my staff contacts them immediately to set up a meeting with us. So we meet with all of our students, but they can really come into our office for anything at any time and we will engage in that interactive process with them.

*Q.* You just used the phrase interactive process. Am I understanding the interactive process, then, is someone, usually a student, I guess, requesting accommodations and then submitting an application, submitting documentation, and then meeting with your office to discuss. That in its entirety is the interactive process.

*A.* Yes. It depends on what they are requesting, right? I may have to involve other campus partners, talk to other folks, but yes, what you just described is the typical interactive process that we go through.

*Q.* Okay. And you mentioned through the files or the

documentation piece. What specifically kind of documentation would you be looking for in this context?

*A.* Yeah. So our office does require documentation. Those guidelines are on our website, but we will really take any sort of documentation a student has that tells us the functional impact of their disability. I provide accommodations under the Americans with Disabilities Act, so I do need to know how their disability impacts them. So typically if a student has an IEP or a 504 plan, they are welcome to submit that. But if they don't, they can submit medical provider, anything from a licensed provider that can speak on their behalf.

*Q.* It sounds like if there is an IEP, that's a document that you would frequently get as sort of the disability documentation.

*A.* Correct.

*Q.* We had some discussion of this earlier, so I just want to clarify. In the higher education context, would you be bound by an IEP?

*A.* No. IDA does not cover higher education. I am under the Americans with Disabilities Act. IDA governs IEPs and 504s and things like that.

*Q.* So that applies to the K-12 setting?

*A.* Correct.

*Q.* K-12 would be bound by what's in an IEP and having to provide those same accommodations, et cetera.

*A.* Absolutely.
*Q.* So the IEP, then, is sort of a guiding document for your purposes?
*A.* Yeah, it's a guiding document. We attempt -- we can't always duplicate that, right? In the college setting, there is a lot of different things like that. But we will review those IEPs and we will look at those accommodations that were used in an attempt to match some of those if the student endorses those as helpful and if they apply to the higher education setting.
*Q.* This process, this interactive process that DRC engages in for disability accommodations, is it different at all for GOAL students?
*A.* It is not different at all for GOAL students. Again, I am that point person. And so our GOAL students will still fill out the application. They will provide us documentation. They meet with me or one of my trained staff to determine appropriate and reasonable accommodations.
*Q.* So just to be clear, then, someone's status as a GOAL participant, in other words a student in the GOAL program, they don't automatically qualify for disability accommodations.
*A.* No, they do not.
*Q.* For academic purposes they don't automatically qualify?
*A.* No. They, of course, engage with us in the program. It doesn't require it, but it really encourages them to come engage with us. But if a GOAL student or any student on my

campus said, "I have a disability but I don't want accommodations," they don't have to engage with us.
*Q.* Are you familiar with the plaintiff in this case, Jackson Vollmer?
*A.* I am.
*Q.* How do you know Mr. Vollmer?
*A.* So Jackson and I initially met when he was an incoming GOAL student in August before his first year at UNC and then after that. Again, we had that initial meeting. We set up his accommodations. I reviewed the IEP that was provided to me. And then after that I did not hear from Jackson until March.
*Q.* Okay. And in March you heard about conduct accommodations?
*A.* Correct. They requested accommodations for a conduct hearing.
*Q.* We will come back to that. First, if you could look in that black binder that says defendant's exhibits. Turn to Exhibit N, please. Do you recognize this Exhibit N?
*A.* I do. This is in our information management system. This is Jackson's initial application with our office and any e-mails that were sent or sent to him or received from him or his family prior to him becoming a student on our program which happened once he moved in to UNC.
*Q.* Does this appear to be a full and accurate copy of that initial application?
*A.* Yes, it does.

*MR. BECK:* Judge, I would move to admit Defense Exhibit N.

*THE COURT:* Any objection to the admission of Exhibit N?

*MR. RAYKIN:* No objection.

*THE COURT:* Exhibit N will be admitted.

*BY MR. BECK:*

*Q.* Before we move on from Exhibit N, if you can turn to Exhibit 3. And under the questions there do you see midway down?

*A.* Yes.

*Q.* It indicates where the student is supposed to -- is asked what types of accommodations they might be seeking from your office. What did Jackson indicate he would be seeking?

*A.* Yeah. At that time he just indicated academic accommodations. There is a four choice box, right? So it's academic, housing, student employment or other. So if any student wants to request anything outside of that, they are welcome to put in one of our fillable boxes. But at this time Jackson just requested accommodations.

*Q.* So there wasn't initially any requests regarding behavioral accommodations?

*A.* No.

*Q.* Nothing about student code of conduct or understanding that, anything like that.

*A.* Correct.
*Q.* So I take it you had an initial academic accommodations meeting with Jackson?
*A.* I did.
*Q.* Tell us about that. Who was present?
*A.* Yeah. So Jackson was present as well as his mother was present. We just went through what his IEP was, right, like what things he found helpful, what functional impacts of his disability may be impacting him at college outside of the GOAL problem, right? They were already admitted to the GOAL program and so they understood, right, the modification versus accommodation. So my office really just does accommodations outside of the GOAL program's modified curriculum.

But we talked about that. We talked about Jackson's interests. He stated he didn't need anything further than academic accommodations. We talked about what he was approved for at this time, and we talked about next step.
*Q.* Was that in person or was that virtual?
*A.* It was virtual.
*Q.* And you mentioned you went through his IEP. Was that the 2022 IEP?
*A.* Correct. Yeah, that's the IEP that his mother e-mailed to me on July 21st.
*Q.* And that 2022 IEP would have been the most recent one.
*A.* Uh-huh, yup.

*Q.* Going into the '22/'23 academic year, correct?
*A.* Yes. Annual IEPs are updated at least once a year, so that would have been the most current IEP that I was privy to.
*Q.* If you could go to that white binder in front of you real quick. I just want to confirm that we are talking about the same document. If you could turn to Tab 2 for Exhibit 2.
*A.* Yes, I see it.
*Q.* Do you recognize Exhibit 2? This is Plaintiff's Exhibit 2.
*A.* Yes. This is the IEP I was provided. Exhibit 2 is missing -- oh, wait. Yup, this is the IEP I was provided.
*Q.* Were you provided any other documentation at that time?
*A.* At that time, no. And I didn't ask for any additional documentation at that time. What we had discussed about, academic accommodations were supported in this individualized education program.
*Q.* Well, speaking of which let's talk about his accommodations for academics. Do you recall what those were?
*A.* I do. He was given based on again IEP and self-report, he was given 1.5 or 50 percent more time on tests. He had the option to take those in the DRC, so we have a reduced distraction environment or private testing rooms in our office if he wanted to utilize that. He was also given a note-taking software app called Glean.
Based on self-report of ADHD and autism, at times he could miss information, right, given by the instructor or

things like that. So we offer Glean to a lot of our students, so we thought that would be something that would be appropriate and helpful for Jackson. So he was given a Glean license. Our students do not pay for that. It is completely free. He was also given early registration, and so with that he could register the first day that registration opens in order to account for scheduling, right, and making sure that we have classes that fit the functional impact of our disability.

The final academic accommodation he was given was preferential seating. This is pairing with Glean. So he may sit in the front in order to reduce distractions. He may sit near the professor, near one side of the room, wherever is most comfortable for him to access the curriculum that's being given to him. And so that Glean can record, it's easier if you are sitting near the person speaking.

So those are the four academic accommodations that were discussed and approved at that time. He did not request any additional academic accommodations. He stated his strengths were in writing, in reading, that he was -- had functional -- like had access to those things. So there was nothing else that was discussed or needed at that time.

*Q.* If you could turn back to the black binder and go to -- first just open up to Exhibit B. Do you recognize Exhibit B?

*A.* I do. So this would be Jackson's entire DRC file in that same information management system. So any phone call, e-mail,

meeting with students are all documented in our protected system, so this is a printout of that.

*Q.* This document here, Exhibit B, runs several pages. We are going to talk about some specific portions, but does it appear to you to be a complete and accurate copy of the DRC file for Jackson?

*A.* Correct.

*MR. BECK:* Judge, I would move to admit Exhibit B.

*THE COURT:* Any objection to the admission of Exhibit B?

*MR. RAYKIN:* No objection.

*THE COURT:* Exhibit B will be admitted.

*MR. BECK:* Thank you, Your Honor.

*BY MR. BECK:*

*Q.* Briefly, Dr. Martino, if you could turn to Page 5 of Exhibit B.

*A.* I am on it.

*Q.* What is this page?

*A.* Yeah, so these are his eligibilities for academic accommodations. What I just reviewed with you are on here.

*Q.* This is what's documented in the file.

*A.* Correct.

*Q.* I notice it has someone else's name that input this, Cristin Turner. Briefly who is Cristin Turner?

*A.* Cristin Turner is our director of the Disability Resource

Center. She is the one who met with Jackson as well as other GOAL students during their follow-ups. So what she did was make sure he knew how to use our program, request his accommodation letter, and then give him that Glean license I spoke about as well.

*Q.* So this was a follow-up to your initial meeting.

*A.* Correct. All students engage in two meetings with our office.

*Q.* I want to transition now to Jackson's conduct hearing accommodations. So I believe you said earlier that he came to your office for accommodations related to conduct violations that were alleged; is that correct?

*A.* Yeah. Our first outreach was from his mom on March 13th. She called our office stating he did have a conduct hearing and that he may need accommodations. We did not have an active release of information with mom, so one of my staff members immediately e-mailed Jackson in order to say like, hey, we got this from your mom, as we do with any parents. Do you need support? Is this something that you need?

And at that time Jackson did reply that same day and said that he is requesting accommodations for the conduct hearing. From there my graduate assistant, Candice Pedroza, sought supervision with me after she did contact Jackson about that. And then from there I engaged in the interactive process with Jackson regarding those accommodations.

*Q.* I want to bring your attention to Page 7 of Exhibit B. At the very bottom there is an e-mail that has a bullet point titled E-mail to DOS. Do you see that?
*A.* I do. That is from me.
*Q.* That is from you to the Dean of Students?
*A.* That is from me to the Dean of Students as well as Jackson in order to keep him in the loop. I really feel like it's important for my students to know what's happening.
*Q.* Sure. What was the purpose of that e-mail?
*A.* Yeah, that e-mail, it continues on Page 8. I am just letting the Dean of Students know that he has requested accommodations. I am alerting them of that so I can engage in the interactive process. His meeting was like, I think, the next day. And so in order to give me time to do my legal obligations, we have an agreement with them for any student that they will pause the meeting in order to have time for the student to engage with me, have the approved accommodations, and then they will reschedule a meeting with whatever student.
*Q.* And so you had a meeting with Jackson about what accommodations he might need or want for the conduct hearing; is that correct?
*A.* Yes. On the 17th of March, him and his mother over the phone had a meeting with me.
*Q.* Okay. And what was generally discussed during that accommodations meeting?

*A.* Yeah. So we talked about just in general conduct hearings. I don't know why my students are being sent to conduct. I am not privy to that information. But I always ask students, right, "Do you know why you are going? Have you received this communication?" He stated yes, again did not provide me details. And that was fine. I did not ask for details.

From there he talked about that it might be beneficial to have extended time for the meeting similar to mirroring those academic accommodations, right? They didn't really know what the meeting was going to be. They were nervous as any other student and parent may be nervous for this process. That's understandable. So we talked about how do maybe some of these academic accommodations transfer over to the conduct hearing. They don't automatically transfer over, right? It's a different environment.

So we talked about having extra time during the meeting. We also talked about having an outline of what's happening in the meeting. The meeting is a semi-structured interview format from my knowledge, so I can't provide any student with what exactly is going to be asked of them, right? In order to mitigate that, we give an outline, right? They will do introductions. They will introduce this, right? Things like that. He did not request any additional accommodations other than that. I sent that to the Dean of Students right afterwards.

*Q.* So to that point if you could turn to Page 8 of Exhibit B. There is a bullet that says, E-mail to DOS and Student.
*A.* Yes.
*Q.* Is that the e-mail you were referring to where you let the Dean of Students office know what accommodations?
*A.* Yes, that is the e-mail. And Jackson is included in that e-mail as well so he would know that he has requested and been approved at this time for these accommodations, extent of the time, provide that outline that I just talked about, and that any follow-up steps and a summary of the meeting should be provided to him afterwards.
*Q.* Okay. And so just to be clear, 50 percent extra time, outline of the steps before the hearing.
*A.* Correct.
*Q.* Summary afterwards of what was discussed in next steps. That was what was provided.
*A.* Correct.
*Q.* And nothing else was requested by Jackson or his mother --
*A.* Not at that time, no.
*Q.* -- during that initial conduct hearing accommodations request.
*A.* No.
*Q.* Did they ever follow up with you about that first meeting and say, hey, actually we've got some other ideas about what we might want for this first conduct hearing? Did they ever

follow up with you about those first accommodations?
*A.* No, not about the first conduct hearing at all.
*Q.* I want to talk briefly about the accommodations request for the second conduct hearing. We are not here today about the second conduct hearing, really just the first one, but I think that it's important for us to discuss some of the accommodations that have been requested.
*A.* Absolutely.

*MR. RAYKIN:* Objection, Your Honor. I think if we are not here to talk about the second conduct hearing and it wasn't a basis for the suspension from school, it's not relevant.

*THE COURT:* Response?

*MR. BECK:* Judge, I think it is informative with regard to some of the testimony that Annesa Vollmer gave earlier about needing an advocate and the types of accommodations that she would want if she could do it over for the first conduct hearing. So there is some discussion of that with the second conduct hearing, so that's what we were going to talk about is what accommodations were requested and provided for the second conduct hearing.

*THE COURT:* Anything more on that, Mr. Raykin?

*MR. RAYKIN:* Your Honor, in fact, I specifically asked Ms. Vollmer to limit the testimony only to what happened March 29. That was the basis for his removal. What they subsequently did may be relevant at some point down the road in

this litigation, but at this point it's not.

*THE COURT:* The objection is overruled.

*BY MR. BECK:*

*Q.* So Dr. Martino, again just briefly about the second conduct hearing accommodations request, were you contacted regarding a second conduct hearing?

*A.* I was contacted regarding the second conduct hearing in mid to late April. And then we met again on April 24th, him and his mother and I, over the phone.

*Q.* And there were some accommodations that were approved again for the second hearing, some that were added for the second hearing, and then some that were denied, correct?

*A.* Correct.

*Q.* So we are going to go through those, but I just want to make sure we are on the same page about where we are going. So first of all, were the same accommodations for the first hearing approved again for the second hearing?

*A.* Correct.

*Q.* And those were?

*A.* The extra time is needed, a synopsis of the meeting beforehand, right, so the steps of the meeting, a meeting outline, right, provided the day before, and then extra time, and then afterwards any follow-up or a summary of our meeting needs to be provided to Jackson in writing.

*Q.* And so there were also a couple of accommodations that were

added based on the requests of Jackson and his mother?
*A.* Correct.
*Q.* What were those?
*A.* Yeah. So the accommodations that were added were breaks as needed, as well as if the Dean of Students Office provides a report against a student or provides allegations, right, that allegedly the student has committed at the meeting, then those needed to be provided a day in advance to Jackson.
*Q.* So breaks as needed. What was that one about?
*A.* Yeah, so breaks as needed is Jackson and his mom and I really talked about how he is feeling some feelings of being anxious potentially and that it would be helpful to either have breaks or to have that second person there. And since we did not approve that second person at this time, breaks as needed was to mitigate the functional impacts of that disability presentation.
*Q.* And just to be clear, the breaks as needed and the synopsis of allegations beforehand, that was not requested for the first conduct hearing.
*A.* Correct.
*Q.* Now, there were a couple of accommodations denied for the second conduct hearing. I want to talk about those briefly. What were those?
*A.* Yeah. So the things that were not approved at this time were to have an additional participant, as well as to have the

result of the conduct hearing given to Jackson and his family within seven days.

*Q.* And starting with that second one first, the results of the hearing within seven days, what was their basis for requesting that?

*A.* Yeah. So their basis for requesting that was that Jackson feels anxious, and it has put a stress on their family to have to wait to know the results of the hearing. So based on that, I did request additional documentation as well in order to have the functional impact explained.

*Q.* Did they provide additional documentation?

*A.* They did provide me an evaluation report from 2018.

*Q.* And so you listened to what they said about it, looked at that report, and you denied that request. Why was that?

*A.* Correct. So I took Jackson's self-report as well as the evaluation report, sought supervision from my direct supervisor, Cristin Turner. At that point we didn't approve it because there was not an issue of equal access, right? My accommodations provide equal access for folks? Everyone has equal access to maybe feel anxious while they wait for a decision. Additionally, that report did not provide any functional impact related to anxiety, feeling anxious or how that presentation impacts Jackson related to disability, so at that time it was not approved.

*Q.* Let's talk about the additional advisor. So they were

asking for an additional advisor to be present. That is additional to the one that is allocated for all students, correct?
*A.* Yeah. They use the word participant. I was talking to Jackson and Jackson actually asked his mom not to answer for him, but mom was the one that really talked about the additional participant being the therapist in addition to his father in order to help with emotion regulation, right, things like that. I did not get Jackson's self-report on that, but that is what was requested was an additional participant and that was not approved.
*Q.* And why was that not approved?
*A.* There was no relation to the functional impact of disability that could not be appropriately accommodated. So like I talked about earlier, right, the breaks, providing that summary report if the Dean of Students Office provided that, but there was no evidence and no self-report from the student as to why that was needed or how those two folks were different from one another.
*Q.* Before we move on from that, I just want to be clear, the request was for an additional advisor, not for an advocate to speak for Jackson during the hearing, correct?
*A.* Correct.
*Q.* And so if you could look at Exhibit B, Page 10. There is -- at the bottom of Page 9, there is another e-mail headed

E-mail to DOS. Is that the e-mail where you indicated to the Dean of Students what the accommodations for the second hearing would be?
*A.* Correct, I did that. And underneath that I also e-mailed Jackson the same list.
*Q.* And that's on Page 10, E-mail to Student. You informed him of everything as well?
*A.* Absolutely.
*Q.* Did they ever follow up about additional accommodations that they would want for the second hearing?
*A.* Not at that time, no.
*Q.* Did they ever for the second hearing?
*A.* No.
*Q.* I just want to draw your attention quickly to Page 14 of Exhibit B. There is a Staff Note there --
*A.* Uh-huh.
*Q.* -- first half of the page. And that's from the meeting that you had for the second accommodations where you are sort of describing the conversation that you had with Jackson and his mother, correct?
*A.* Correct. A note was written by me about their phone appointment for the second conduct hearing accommodation interactive process.
*Q.* We don't need to go through it again because you kind of laid out what they were asking for and why they said they

needed it, correct?
*A.* Correct.
*Q.* I want to just move on to a couple final topics. Was there ever a request made for accommodations for the appeal of the first conduct ruling?
*A.* There was an accommodation request made in an e-mail to Jala Randolph. I then followed up with Jackson about that accommodation request and let him know the next steps. And I never heard back from Jackson or anyone in his family again.
*Q.* So directing your attention to Page 12 of Exhibit B., there is an E-mail with Student.
*A.* Uh-huh.
*Q.* Do you see that?
*A.* Yes. So he did again in that e-mail that is signed his mom and dad, sent it to Jala about the accommodation request. Then Jackson e-mailed and asking for additional accommodations on July 21st. I then e-mailed back the next business day and asked how he would like to discuss this. I would need additional accommodations related to this request because they were requesting that mom and dad or someone write his appeal for him, and so I needed documentation related to that request as well as to do the interactive process, so it was a new accommodation request. And I did not hear back from Jackson or anyone in his family about that request.
*Q.* Okay. Finally, I want to talk about a couple of

accommodations that it appears were not granted to Jackson for this that also appears that they weren't requested, but I want to talk about what you would have done if you'd received a request.

*A.* Sure.

*Q.* First for an advocate to speak on Jackson's behalf at the conduct hearing, how would you have viewed a request like that generally? And then second, how would you have dealt with that in Jackson's case?

*A.* Yeah, so any request for accommodations has that same interactive process, right? We will always default to that. So I would take his request. I would offer to again meet over phone, e-mail, in person. I can gather his self-report on any of those types of communications, right?

*Q.* And if I may, by the same interactive process, in other words, you wouldn't have said nope, we are not doing that.

*A.* Correct.

*Q.* You would have said let's engage in the interactive process.

*A.* Correct. By saying nope, that is illegal. So I do have to engage in the interactive process.

*Q.* Sure. So you would have requested documentation, had the meeting.

*A.* Yes.

*Q.* So that was obviously not made here. But based on your

review of the conversations with Jackson and his mom and his supporting documentation, would you have granted him an advocate? How would you have seen that in this process?
*A.* It's difficult to look into the future without Jackson's self-report and documentation that I was or was not privy to, but in general someone speaking on behalf of someone, it sounds like a fundamental alteration to me. The purpose of the conduct hearing to my knowledge is an educational process where Jackson is required to give a self-report, right? It has accommodations related to having equal access to giving that report, but if he were to ask for an advocate, I would strongly consider that that is a fundamental alteration. And I would need documentation specific to that accommodation request as to why Jackson could not speak for himself and why someone had to speak for him.
*Q.* Finally, what about an accommodation request for some aspect of the conduct code? We have been calling it the BEAR code today. You are familiar with that?
*A.* I am.
*Q.* What about a request, hey, this shouldn't apply to me? How would you have handled that kind of request?
*A.* I think the same thing again of the interactive process, getting his self-report and documentation specific as to why a code of conduct or a governing body of rules should not apply to one person based on the disability and their functional

impact of disability. But I default to what I stated earlier that it may be a fundamental alteration of the GOAL program or of being a student at UNC in general if they don't follow the rules as every other student. It's different than if there is an accommodation request made to understanding the BEAR code. That would be a lot different, right, than being exempt from parts of or the entire BEAR code.

*Q.* In terms of a request for an accommodation to understand the BEAR code, that was never made by Jackson.

*A.* No, not to me.

*Q.* Not to you, sure. And as far as not applying the BEAR code to him, that also was not made to you.

*A.* No.

*Q.* And again based on the information that had been provided, would you have seen any reason based on the prior conversations where that wasn't requested that you would have granted a request like that in Jackson's case?

*A.* No. I think the information provided to me highlighted a lot of Jackson's skills and his strengths and things that he did really well. The testing results that I reviewed as not only the assistant director, but as a practicing school psychologist, did not support that request, that mythical request for an accommodation at this time.

*Q.* In other words, based on what you reviewed, he had the ability to understand. And that wasn't something they were

claiming he couldn't do anyway.
*A.* Correct. Yeah, his academic scores were in the average to right below average range, his reading comprehension. They said his strengths were in writing, right, and being a student, so there was not anything that I saw initially. If the accommodation request was made, I would go through it again with that accommodation lens, but right now with what I know about the evaluation report and IEP, I don't see anything that would support that.

*MR. BECK:* Nothing further, Your Honor.

*THE COURT:* Thank you.

Cross-examination?

**CROSS-EXAMINATION**

*BY MR. RAYKIN:*

*Q.* Hello, Ms. Martino.
*A.* Hi. It's Dr. Martino.
*Q.* I'm sorry. Hello, Dr. Martino.
*A.* Thank you. Hi. How are you?
*Q.* I am okay.

Could you take a look, please, in your black notebook under Exhibit N?
*A.* Yes. I am there.
*Q.* And turn to Page 3.
*A.* I am there.
*Q.* It says his primary disability is autism, right?

*A.* Correct. That is what he entered into our application, yes.
*Q.* I just asked you if that was his primary disability, correct?
*A.* Yes.
*Q.* You are a school psychologist?
*A.* I am.
*Q.* What are some of the features of autism?
*A.* Yes. Some of the educational features or diagnostic features of autism?
*Q.* I would like to know about the communication features.
*A.* The communication features for autism, autism is a spectrum. Students who are diagnosed with autism do not have to meet all of the criteria. I am not privy to Jackson's specific autism diagnosis, but students with autism may experience echolalia or repeating speech. They may have difficulty with social communication or they may have difficulty with verbal communication, et al.
*Q.* Could it also include receptive problems in terms of understanding speech?
*A.* It could.
*Q.* Pragmatic language deficits?
*A.* It could.
*Q.* What's a pragmatic language deficit?
*A.* I am sorry, can you --

*Q.* What's a pragmatic language deficit?
*A.* Pragmatic language is not understanding social language or understanding language put together. That deficit may be tested, right, or it may be different observational reports by a speech language pathologist. I don't give pragmatic language tests.
*Q.* Didn't you have evidence that he actually had various communication deficits?
*A.* In what?
*Q.* Did you look at his IEP?
*A.* I did. He did not have a GOAL in speech or language.
*Q.* I didn't ask you if he had a GOAL. I asked you didn't you have evidence that he had communication language deficits?
*A.* There was evidence of a history of that, yes.
*Q.* Do you know specifically what that history was?
*A.* I do not.
*Q.* Did you know that he had functional impacts of his disability based on his communication deficits?
*A.* That was reported to me in the IEP, as well as by his mother and him.
*Q.* Why is it that under N-3 there is no functional impact of his disability listed?
*A.* This is a student application and so the functional impact is not asked of the student. The student just identifies their disability.

*Q.* At that point an IEP was provided, correct?
*A.* It was provided by his mother via e-mail.
*Q.* Okay. So is it your contention that the IEP did not indicate that there were any kind of functional impacts of his disability?
*A.* It did indicate that.
*Q.* Okay. So why was that not listed there? Wouldn't that information have actually been useful?
*A.* I don't edit the application that students submit. They have free will to submit whatever information they want. I did have the IEP and that's documented in our system, but I would not edit a student -- an application a student completed.
*Q.* Did you request that it be edited?
*A.* I am sorry?
*Q.* Did you request that it ever be edited?
*A.* It does not need to be edited. It is documented in our system. It is just a part of Jackson's file. It's his application that he submitted.
*Q.* Wouldn't it be important for people at the University to know that there is a functional impact of his disability?
*A.* No one else has access to this application outside of my office.
*Q.* Wouldn't it be important for you to know that he had a functional disability with his communication?
*A.* I did know that in the IEP that was provided to me by his

mother.

*Q.* Let's take a look at that. Could you please turn to Exhibit 2-8?

*A.* In what binder?

*Q.* In the white binder.

*A.* Can you repeat the place, please?

*Q.* 2-8.

*A.* I am here.

*Q.* This is a 2022 IEP, correct?

*A.* Let me check the first page. Yes, it is dated that.

*Q.* Do you see where it says Student Needs and Impact of Disability?

*A.* I do.

*Q.* Do you see there where it says -- that statement that starts, "Jackson has"?

*A.* I do see that.

*Q.* It says, "Jackson has a diagnosis of Autism Spectrum Disorder which impacts his ability to adjust to new routines or transitions. He has difficulty tolerating changes in routine, activities or behaviors. This change in schedule or routine can cause him anxiety and impact his ability to attend to his academics. He can get 'stuck' in his thinking both in regards to academic and social misconceptions. He requires additional support to move past, organize, or to correct this thinking."

Did you review that part before or when you initially

reviewed his IEP?
*A.* Yes.
*Q.* What does that tell you about how he is functionally being impacted by autism?
*A.* That tells me at the time of the IEP in May of 2022 that Jackson may need additional support in routine activities or behaviors.
*Q.* Well, there is no "cure" for autism, is there?
*A.* No.
*Q.* Okay. Let's take a look at the part right before -- right after that. "He does present with some challenges in successfully engaging in activities that develop and maintain relationships with his same age peers. Some concerns have been noted with Jackson's ability to recognize when a peer or others in the community are being genuine in their interactions or if they are trying to take advantage of his kindness and trustworthiness."
What does that tell you about some of the functional impacts on Jackson?
*A.* That tells me exactly what is stated by the IEP team.
*Q.* Could you put it in your own words?
*A.* It's stated to me that Jackson is a student with autism who presents with those concerns at that time.
*Q.* So he did have functional limitations based on his disability.

*A.* Absolutely.
*Q.* Do you realize he also had ADHD?
*A.* I did. His mother and him self-reported that at some point in time during our interactive process.
*Q.* Anxiety?
*A.* That was not reported to me until the conduct hearing.
*Q.* That he suffered from panic attacks?
*A.* No.
*Q.* How about a language processing disorder?
*A.* That was self-reported to me, but I did not see evidence of that. He did not meet the IDA criteria under speech language impairment.
*Q.* But the IDA criteria are different than the 504 and ADA criteria, aren't they?
*A.* Yes, they are.
*Q.* You have a Ph.D., correct?
*A.* I do.
*Q.* What are the criteria for someone to qualify to be protected under the ADA?
*A.* Having a disability that impacts their daily life functioning and requiring accommodations.
*Q.* It's actually something that substantially impairs a major life activity, correct?
*A.* Yes.
*Q.* Major life activity, does that include making friends?

*A.* It could if that is your major life activity.
*Q.* Communicating?
*A.* It could.
*Q.* Understanding language?
*A.* If that is your major life activity.
*Q.* Any one of those things could actually qualify a person for accommodations even if they don't qualify under IDA correct?
*A.* Correct.
*Q.* And accommodations are what universities provide, right?
*A.* Yeah, that is what my office provides.
*Q.* Did you provide him any kind of accommodations for any of his functional limits related to communication?
*A.* I did. I would say that my accommodations are not directly linked to, right, like a disability label, but more of his functional impacts. And so extra time on tests, right? If we have concerns with receptive language, right, then your reading, then your receptive language, right? If you have concerns with maybe needing extra time to meet with your advisor, then we gave you early registration. If you have preferential seating, you can sit closer to the speaker. Receptive and expressive language. Those things were provided to him.
*Q.* But he had functional limits with respect to the way that he interacted with people socially as well, right?
*A.* That is documented in this IEP, yes.

*Q.* Were there any accommodations for that?
*A.* No, not directly at this time in my program. That's why he was in the GOAL modified program to my knowledge.
*Q.* He had functional limits as well in terms of understanding the intent of people as well, correct?
*A.* That is what is documented in this IEP.
*Q.* Were there any accommodations for that?
*A.* Not at my office at this time directly linked to that.
*Q.* Well, your office exists to provide accommodations, right?
*A.* Correct. He did not request any accommodations directly linked to social interactions with peers. I provide academic accommodations in the classroom.
*Q.* Well, let's take a look at Exhibit B-7, please.
*A.* In the black binder?
*Q.* Yes.
*A.* I am there.
*Q.* You see this e-mail on March 13th?
*A.* Which e-mail?
*Q.* The one labeled Monday, March 13th. It's roughly in the middle of the page.
*A.* I do see that.
*Q.* Okay. And you see that Jackson Vollmer had sent an e-mail here?
*A.* Yes.
*Q.* To someone named Candice Pedroza. That is your assistant,

right?
*A.* That is my graduate assistant. She is in a school psychology doctoral program.
*Q.* Gotcha. And he writes, "Hello there, Candice. Thank you for reaching out to me. I have a meeting this Wednesday, March 15th, with the student accountability office and I'm requesting to provide them with my accommodations. Please let me know if there is any additional assistance that you guys can provide me with. Thank you very much!"
He is asking for accommodation help there, isn't he?
*A.* Correct, yeah.
*Q.* Did you provide him any assistance with accommodations with relation to the functional communication issues that he had?
*A.* I provided him with the accommodations that he provided in the self-report, as well as documentation for that first conduct hearing.
*Q.* But he is asking for help beyond that, isn't he, Dr. Martino?
*A.* I am not seeing what you are seeing.
*Q.* Okay. He is actually saying here, "Please let me know if there is any additional assistance that you guys can provide me with."
*A.* Correct. And that's why I met with him to do the interactive process related to those accommodations. I met with his him and his mom.

*Q.* But at the same time no accommodations were ever provided in order to assist him with his functional communication gaps, were they?
*A.* I disagree.
*Q.* Okay. What were the accommodations that were provided in order to assist him with his social communication functional gaps?
*A.* Academic or for conduct?
*Q.* Social.
*A.* I do not provide social accommodations to GOAL program modified curriculum.
*Q.* Well, ma'am, let me ask you something. The ADA and 504, they apply to any major life activity, correct?
*A.* Correct.
*Q.* And that could include communicating with people.
*A.* Correct.
*Q.* Understanding people.
*A.* Correct.
*Q.* Correct? So I am trying to understand. Is the policy of UNC just to ignore these major life activities?
*A.* Jackson did not request anything related to social communication at any time in my office.
*Q.* But his profile indicates that he had needs in those areas, doesn't it?
*A.* Correct. The profile or IEPs will indicate things that

students no longer want accommodations for, make requests related to their self-report of functional impact.

*Q.* Your office exists to help disabled students, right?

*A.* Correct.

*Q.* Would it have been helpful to Jackson to provide him with accommodations to assist him with social/emotional functioning and major life activities related to communication?

*A.* I can't speak on that because he didn't have a self-report, so I don't know if it would be helpful for him or not. I would have to have his self-report related to that.

*Q.* You could have certainly asked him about what else he was struggling with, right?

*A.* I could have.

*Q.* Did you?

*A.* Not at this time. He did not make requests related to that.

*Q.* Let's take a look at these accommodations that were actually provided. He was given 50 percent additional time?

*A.* Are you talking about academic or for the conduct hearing?

*Q.* For the conduct hearing.

*A.* Yes. He was given 50 percent more time. They did not need to use the entire time, just make sure it was scheduled extended.

*Q.* That's typically an academic accommodation, isn't it?

*A.* In this case it was an accommodation for the conduct

hearing.
*Q.* But that's -- I am asking that's typically an academic accommodation, right?
*A.* For extra time on tests or assignments, it could be.
*Q.* What evidence is there that giving somebody 50 percent more time actually helps address a functional communication deficit when they have a receptive language gap?
*A.* I am not -- this accommodation was not directly related to that.
*Q.* I see. Okay. And there was an accommodation also giving him an outline of what would happen at the hearing?
*A.* An outline of the parts of the meeting. I told him that I did not know the exact questions, right, that would happen. I was not privy to why he was being sent, but they were going to provide him beforehand an outline so that he could prepare his responses or prepare a scenario, do some social, right, situations, some social like situations with his parents or with a trusted adult with his therapist, potentially what that may look like depending on that outline.
*Q.* How was that accommodation designed to assist a person with pragmatic expressive and receptive language deficits?
*A.* I think it's directly related to that. If you know what you are going to be asked, then you can prepare some hypothetical questions, not directly asked, right, but if you know the parts of the meeting, if you know what may happen

during the meeting, you can start with those social situations and start maybe practicing some of those things or practicing questions being asked to you if you knew the first part of the meeting was going to go over the allegations of why you are being sent there.

*Q.* Did he know what he was going to be asked?

*A.* That is a question for the conduct officer.

*Q.* Okay. And he was also given an accommodation of being -- of a summary after the hearing?

*A.* That is directly related to language in my opinion.

*Q.* How does a summary after the hearing actually help him during the hearing?

*A.* Yeah. So if during the hearing if he was told things, right, if he was maybe not understanding the spoken language, that he could review that summary afterwards.

*Q.* Only afterwards. It would not provide him any benefit during the hearing, would it?

*A.* I am not sure you can make a summary during a meeting.

*Q.* But that's kind of the point, isn't it? How is a person benefited by something that they are provided after a hearing?

*A.* They have equal access to next steps, as well as equal access to a summary of what happened during the meeting.

*Q.* And you believe a person with the kind of disability that he has including functional limits and expressive pragmatic and receptive language actually had equal access?

*A.* I do. That's based on their self-report as well as the documentation I was privy to at the time.
*Q.* Just like a nondisabled student?
*A.* They have equal access to the conduct hearing, yes.
*Q.* Just like a nondisabled student?
*A.* Correct.
*MR. RAYKIN:* Thank you.
*THE COURT:* Thank you.
Redirect?
*MR. BECK:* Nothing further.
*THE COURT:* None? Okay.
*MR. RAYKIN:* I may be wrong, Your Honor, but I believe I am out of time.
*THE COURT:* Right. You are out of time at this --
*MR. RAYKIN:* I shouldn't have said anything.
*THE COURT:* Well, I would have figured it out eventually.
Dr. Martino, you are excused. Thank you very much.
Defendant may call its next witness.
*MR. BECK:* Thank you, Judge. We call Jala Randolph.
(**Jala Randolph** was sworn.)
*THE WITNESS:* Yes.
*COURT DEPUTY CLERK:* Please state your name and spell your first and last name for the record.
*THE WITNESS:* Jala, J-A-L-A, and then Randolph,

R-A-N-D-O-L-P-H.

**DIRECT EXAMINATION**

*BY MR. BECK:*

*Q.* Thank you, Ms. Randolph.

Where do you work?

*A.* I work at UNC as the neighborhood coordinator in housing and residential education and then also work a little bit in the student conduct and accountability office.

*Q.* Let's break that down a little bit. First as the neighborhood coordinator with housing, what exactly does that entail?

*A.* Yeah, so I supervise our resident assistants, oversee desk operations, and then also help with anything crisis management-wise in terms of conflict resolution, roommate mediation, and then six hours out of a week we work in student conduct.

*Q.* And on to the student conduct, what exactly is your role there?

*A.* So I work as one of the hearing officers up there. So I meet with students from lower level just warning cases to also some student in support outreach, kind of SOS-type cases.

*Q.* So you do conduct hearings.

*A.* Yes.

*Q.* And speaking of that role, for Jackson Vollmer you were the conduct hearing for the conduct violations that led to his

suspension, correct?

*A.* Yes.

*Q.* And just before we get into that, did you know Jackson before this incident?

*A.* No, not directly.

*Q.* And are you also, generally, are you familiar with the GOAL program?

*A.* Yes.

*Q.* What is that?

*A.* Yeah. So it's a nondegree-seeking program for students that have some type of disability. And they go to classes. They stay in our residence halls, do whatever a typical student would do. They are just nondegree seeking.

*Q.* And you said they do everything that non-GOAL students do. I suppose that also means that the conduct code applies to them in the same way?

*A.* Yes.

*Q.* So they are not treated any differently under the conduct code, correct?

*A.* Correct.

*Q.* They are not treated any differently just by virtue of being GOAL students during the conduct hearing process, are they?

*A.* No.

*Q.* There should be a black binder in front of you. It says

defendant's exhibits. If you could turn to Exhibit O.
Now, before we get into Exhibit O -- are you there?
*A.* Yeah.
*Q.* Before we go into that, quickly circling back, were you aware going into this conduct process with Jackson that he was part of the GOAL program?
*A.* Yes.
*Q.* How so?
*A.* So when we send out the conduct hearing notices, there is a part where we have to CC. And like in a demographics part it shows if they are a part of any athletics, any part of any special programs or things like that so that we CC whoever is director of that program to let them know that like this notice is going out.
*Q.* We will touch on that in a second, but let's look at Exhibit O. Do you recognize Exhibit O?
*A.* Yes.
*Q.* What is it?
*A.* So this is the conduct hearing notice basically stating that allegedly these policies might have been violated, and this is the day that we will have your meeting, your conduct hearing.
*Q.* And we are going to get to the second notice in a second, but this is the first of two notices that were sent for Jackson, correct?

*A.* Yes.
*Q.* And turning --
*MR. BECK:* Well, first, Judge, if I may, I would move to admit Exhibit O.
*THE COURT:* Any objection to the admission of Exhibit O?
*MR. RAYKIN:* No, sir.
*THE COURT:* Exhibit O will be admitted.
*BY MR. BECK:*
*Q.* Ms. Randolph, if you could turn to the second page of that Exhibit O, front and back, I think. Now, down there at the CC -- you didn't actually send this letter. You were CC'd on it, correct?
*A.* Yes.
*Q.* Sorry to make you do this, but flipping back -- right above that, sorry, it's sent by Lynn Rose. Just so we understand, who is Lynn Rose?
*A.* So Lynn was the person who would schedule all our conduct hearings on behalf of us, so she would access all our schedules and things like that and schedule the hearing based on when we were available.
*Q.* And she CC'd you because you were going to be the conduct officer.
*A.* Yes.
*Q.* And she also CC'd to your point earlier Christina Ruffatti,

the GOAL director.
*A.* Yes.
*Q.* I want to just highlight a few more points in this.
So you already mentioned if you flip back to the first side, the first page, in that second paragraph it states what conduct allegedly violated the code, correct?
*A.* Yes.
*Q.* And then down there in the last paragraph of that first page, the last line, it refers to the meeting you all are about to have as a conduct hearing, doesn't it?
*A.* Yes.
*Q.* Flipping it over again, in that first full paragraph below the italics, it talks about the hearing officer in the last line, right?
*A.* Yes.
*Q.* And right above that it identifies you as the person that he is meeting with, so the hearing officer; is that right?
*A.* Correct.
*Q.* And also it talks about in that same paragraph that the standard of proof is going to be preponderance of evidence. So what exactly does that mean for you as the conduct officer?
*A.* Yeah. That basically is just saying based on preponderance of evidence, so more likely or not did this happen based off basically what's in front of us, so the incident report and then the notes that we take during the actual hearing itself.

*Q.* So that would include like the statements the party?
*A.* Yes.
*Q.* Finally, I want to direct your attention to the two bullet points there. That first bullet point indicates that if you need accommodations, that you should contact the Disability Resource Center, correct?
*A.* Yes.
*Q.* As we are going to talk about in a second, that was done in this case.
*A.* Yes.
*Q.* And it also mentions, hey, you have the right to have an advisor there present with you, correct?
*A.* Yes.
*Q.* So moving on, then, to the next exhibit actually, Exhibit P, do you recognize this?
*A.* Yes.
*Q.* And what is this exhibit? It appears to be an e-mail. What is it?
*A.* Yes. So this is an e-mail that came to I think somebody in the DRC to me that was basically saying that these were the accommodations made through the Disability Resource Center that I needed to implement for the conduct hearing.
*Q.* So this is where you were forwarded the e-mail from Miranda Martino saying this is what you have to provide him during the hearing as far as his disability accommodations.

*A.* Yes.

*MR. BECK:* Judge, if I may move to admit Exhibit P.

*THE COURT:* Any objection to the admission of Exhibit P?

*MR. RAYKIN:* No, sir.

*THE COURT:* Exhibit P will be admitted.

*BY MR. BECK:*

*Q.* Quickly moving, then, to Exhibit D. Do you recognize Exhibit D?

*A.* Yes.

*Q.* What is Exhibit D?

*A.* So this is another conduct hearing notice basically saying that the date was changed.

*Q.* If you go to the second page, what is the first set of bullet points? What is that indicating?

*A.* So this is stating the accommodations that were made through the Disability Resource Center saying that these were the accommodations that were able to be used that Jackson was able to have.

*Q.* And this letter is actually sent to Jackson, correct?

*A.* Yes.

*Q.* And it's CCing you and Christina Ruffatti again.

And finally the second set of bullet points there, it indicates what is someone, in this case Jackson, supposed to do if, hey, I think I need different or more accommodations.

*A.* Yeah. So it states back again at the bottom that if additional accommodations are needed, that they would just reach out to the Disability Resource Center as well.
*Q.* And to be clear, the first hearing date that we read about in Exhibit P, that was postponed so the interactive accommodations process could take place.
*A.* Yes.
*Q.* And had further accommodations been requested, this hearing presumably would have been postponed again while that process took place.
*A.* Correct.
*Q.* Okay. So let me just ask you, you conducted the hearing in this case.
*A.* Yes.
*Q.* Did you implement the accommodations that DRC said he should be provided?
*A.* Yes.
*Q.* So turning to Exhibit E, do you recognize Exhibit E?
*A.* Yes.
*Q.* What is it?
*A.* This is an e-mail I sent to Jackson probably the day before the hearing just outlining this is what the hearing is going to look like.
*Q.* This is in line with that first accommodation that we've talked about.

*A.* Yes.

*MR. BECK:* Judge, I would move to Exhibit E.

*THE COURT:* Any objection to the admission of Exhibit E?

*MR. RAYKIN:* No, sir.

*THE COURT:* Exhibit E will be admitted.

*MR. BECK:* Judge, I neglected to move to admit Exhibit D. That was the second conduct letter. If I could do so.

*THE COURT:* Sure. Any objection to the admission of Exhibit D?

*MR. RAYKIN:* No, Your Honor.

*THE COURT:* Exhibit D will be admitted as well.

*MR. BECK:* My apologies, Your Honor.

*BY MR. BECK:*

*Q.* During the hearing extended time was provided, correct?

*A.* Yes.

*Q.* And did all of that time take place?

*A.* Yes.

*Q.* That allowed more time for questions, but also more time for answers?

*A.* Yes.

*Q.* During the hearing Jackson had an advisor with him, didn't he?

*A.* Yes.

*Q.* Do you recall who it was?

*A.* It was his mom.
*Q.* And did he take opportunities to confer with her about what was going on?
*A.* Yes.
*Q.* Did they ever leave the room?
*A.* Yes, at one point they did.
*Q.* So you gave them permission to pause the timer and step out.
*A.* Yes.
*Q.* During the hearing was Jackson answering your questions?
*A.* Yes.
*Q.* Did it appear to you as the conduct officer that he understood what you were asking him?
*A.* Yes.
*Q.* And that his answers were responsive to what you were asking him?
*A.* Yes.
*Q.* Did he seem nervous?
*A.* I think a little bit, yeah. I would say so.
*Q.* Did he seem a little anxious too?
*A.* Yes.
*Q.* Is that abnormal for a student going through a conduct proceeding?
*A.* No. It's actually quite normal, which is I know for me personally, I try to make sure I get to know them first and

tell them like, "I am just going to kind of get to know you first, you get to know me a little bit," so it's not awkward, so that it's a little breather and things like that.

*Q.* Sort of like an ice breaker at the beginning of the hearing telling Jackson or whoever about yourself and getting to know them personally aside from the conduct issue.

*A.* Yes.

*Q.* Turn To exhibit F for me, please. Do you recognize Exhibit F?

*A.* Yes.

*Q.* What is Exhibit F?

*A.* So this is an e-mail that I sent the day after the conduct hearing was had that just talked about everything that we talked about in the hearing itself.

*Q.* So this would fulfill the third accommodation that you were tasked with implementing, correct?

*A.* Yes.

*Q.* So number No. 1 an outline before the hearing, hey, this is what it's going to look like. No. 2, 50 percent extra time. And then No. 3, hey, here is a summary of everything we discussed in your next steps.

*A.* Yes.

*Q.* Did you ever get any response on Exhibit F? Did they ever respond to you and say, hey, we didn't remember talking about that or that's not what we said. Was there anything like that?

*A.* I do not think so.

*MR. BECK:* Judge, I would move to admit Exhibit F.

*THE COURT:* Any objection to Exhibit F?

*MR. RAYKIN:* No, sir.

*THE COURT:* Exhibit F will be admitted.

*MR. BECK:* No further questions for Ms. Randolph, Your Honor.

*THE COURT:* Cross-examination?

*MR. RAYKIN:* I believe I am out of time, Your Honor, so no.

*THE COURT:* I have got some questions, Ms. Randolph.

VOIR DIRE EXAMINATION

*BY THE COURT:*

*Q.* Can you give me a sense, how long did the hearing last?

*A.* In terms of like the initial meeting with Jackson?

*Q.* No, from the time that the hearing began to the time that it was all over, how long is that?

*A.* Yeah. So it's about that whole hour and a half.

*Q.* Hour and a half, okay.

*A.* Yeah.

*Q.* And what evidence other than your asking questions of the plaintiff was presented during the hearing?

*A.* So any text messages were submitted, any incident reports that were written throughout the time before the no-contact order, the incident reports written after the no-contact order

was everything that we kind of went over.
*Q.* And at some point did Jackson Vollmer's mother give you some text messages?
*A.* Yes.
*Q.* And did you accept those?
*A.* Yes.
*Q.* And did you review those?
*A.* Yes.
*Q.* Any other witness testimony other than your asking questions of Jackson Vollmer?
*A.* Yes. There was one witness before I think I even had the hearing with Vollmer.
*Q.* Before you what?
*A.* I think it was before the actual hearing with Jackson.
*Q.* Okay. So some testimony took place before he came into the room?
*A.* Yes, not that same day, though, like days prior.
*Q.* This was a proceeding that took place over several days?
*A.* Yeah.
*Q.* And is that normal or is this just because of the particular dynamics of this incident?
*A.* I think it's because of the dynamics of this incident, but this was also my first suspension level. So I am not sure if this is typical because I am normally on like the warning level. It's super simple. It only takes one day unless they

don't show up to the meeting, then it might take more than that, but ...

*Q.* Okay. But the hearing at which Jackson Vollmer attended, was he the only witness for that portion of the proceeding?

*A.* Yes.

*Q.* Okay. Got it.

*THE COURT:* Mr. Raykin, any questions that you have based upon the Court's questions?

*MR. RAYKIN:* Just one question.

*THE COURT:* Go ahead.

**CROSS-EXAMINATION**

*BY MR. RAYKIN:*

*Q.* I am sorry, is it Dr. Randolph or Ms. Randolph?

*A.* Ms.

*Q.* Ms. Randolph, were you aware that Jackson had disabilities?

*A.* Yes.

*THE COURT:* Mr. Beck, any questions based on the Court's questions or based on the question that Mr. Raykin just asked?

*MR. BECK:* Just one question, I think, or one sort of area.

**REDIRECT EXAMINATION**

*BY MR. BECK:*

*Q.* Ms. Randolph, this other witness, was this related to the other student on the NCO?

*A.* Yeah, I am pretty sure.

*Q.* So this was related to her conduct.

*A.* Um-hum, in terms of her contacting to Jackson like through text messages and stuff.

*MR. BECK:* Got it. Okay. I just wanted to clarify that. Nothing further, Judge.

*THE COURT:* Thank you, Ms. Randolph. You are excused.

*THE WITNESS:* Thank you.

*THE COURT:* The University may call its next witness.

*MR. BECK:* Yes, Judge. Our final witness is Stephanie Stephens.

(**Stephanie Stephens** was sworn.)

*THE WITNESS:* I do.

*COURT DEPUTY CLERK:* Please state your name and spell your first and last name for the record.

*THE WITNESS:* Stephanie Stephens. First name is S-T-E-P-H-A-N-I-E. Stephens is S-T-E-P-H-E-N-S.

**DIRECT EXAMINATION**

*BY MR. BECK:*

*Q.* Thank you. Ms. Stephens, where do you work?

*A.* I work at the University of Northern Colorado.

*Q.* I could have guessed that from the prior witnesses. What do you do there?

*A.* My position is the Assistant Dean of Student Development, so I oversee our Student Conduct Office.

*Q.* What does that entail in terms of your day-to-day responsibilities?
*A.* Yeah. So I supervise and train our full-time staff who facilitate our student conduct process and then ensure that we are following through with all of our policies as stated.
*Q.* And in terms of the policies that apply for student conduct, there is a BEAR code as we've been calling it. That's the UNC student code of conduct; is that correct?
*A.* That's correct.
*Q.* We have been talking about that a lot, and I don't think it's actually been admitted by other parties. If you can look at the black binder that says defendant's exhibits. Go to Exhibit A, please.
*A.* Okay.
*Q.* Do you recognize this with the BEAR on the front of it?
*A.* Yes.
*Q.* Is this the student code of conduct?
*A.* Yes.
*Q.* Otherwise known as the BEAR code?
*A.* Correct.
*Q.* Just kind of flipping through that, does it appear to be the full code, a complete copy of it?
*A.* I believe so.
*MR. BECK:* Judge, I move to admit Exhibit A.
*THE COURT:* Any objection to Exhibit A?

*MR. RAYKIN:* No, sir.

*THE COURT:* Exhibit A will be admitted.

*BY MR. BECK:*

*Q.* And we are not going to read through this, but I just wanted to point out a few points. So first of all, on -- it's Page 1 -- the pages are at the bottom right -- it says application of the BEAR code. So who does the BEAR code apply to?

*A.* We define students as anyone who has been accepted to the University or at the time that they apply to the University. So from their date of admission they receive a BEAR number, and that's the time in which our policies apply to them.

*Q.* Are you familiar with the GOAL program?

*A.* Yes.

*Q.* What's your understanding of that program?

*A.* It's a certificate program for students with intellectual disabilities.

*Q.* And in terms of the BEAR code, does it apply to those students as well?

*A.* It does.

*Q.* So there is no automatic modification of the conduct code for a GOAL student.

*A.* No.

*Q.* No automatic accommodations related to the conduct code for a GOAL student?

*A.* No.

*Q.* Then they could go through the DRC process, the Disability Resource Center, and get some type of accommodation for the hearing, et cetera, but there is nothing that automatically exempts a GOAL student from this code.

*A.* Correct, yup. And the Disability Resource Center are the experts in making accommodations, so we leave that to them to decide.

*Q.* Moving on a little bit, starting at the second page there is this whole long list of definitions. The first one, for example, is for advisor. Is that what's referred to for the conduct hearings?

*A.* Yes.

*Q.* And if you go to the next page, it defines the notification of a conduct violation. It talks about possible outcomes, No. 8. So this kind of lays out, hey, these are what we would consider violations of the conduct code and this is how we deal with it.

*A.* Yeah, and we help define some of those language terms that we use throughout.

*Q.* Sure. So when someone says that they need disability accommodations for the conduct code or the conduct hearing process, how does that work?

*A.* Yeah. We refer them directly back to the Disability Resource Center. So if they give us a phone call, we often

follow up in an e-mail back to the Disability Resource Center notifying them that somebody had asked for an accommodation and ask them to connect directly with the student to start that process.

*Q.* And do you just barrel forward with the hearing or do you kind of hit pause and wait for that process to play out?

*A.* We push pause. So if the hearing is scheduled for a week out and there might be a chance that they are able to receive the accommodations in that time frame, we'll hold that slot on our calendars because we don't want to delay it any further if we don't have to. But if by the time the hearing comes and we haven't received that information, then we do cancel that meeting and then reschedule it after we've received the accommodations.

*Q.* And just to be clear, DRC is responsible for granting or providing -- saying what accommodations should be provided, correct?

*A.* Correct.

*Q.* So you don't provide accommodations. You just kind of get your marching orders from DRC?

*A.* Yes.

*Q.* So when they send you that e-mail that says do this for student X or in this case Jackson Vollmer, you all do that.

*A.* Correct.

*Q.* Did you happen to be present for Jackson Vollmer's conduct

hearing?
*A.* I was, yup. I was shadowing for training for Jala.
*Q.* For Ms. Randolph?
*A.* Uh-huh.
*Q.* Let's just talk broadly about the importance of a student conduct code. So you oversee the student conduct and accountability office as part of your Office of Dean of Students. Why does the conduct code exist?
*A.* Yeah. Mostly it outlines rights and responsibilities for students in our process, as well as the expectations we have for students and how they are going to behave in our community.
*Q.* And is it important for the University that students uphold the conduct code?
*A.* Yes, I would think so.
*Q.* It seems obvious, right? Why?
*A.* All of our students engage in our community in a variety of ways. They live on campus. They may go to the rec center. They might participate in fraternities, sororities, club sports, any of those things. And so having a set of expectations and guidelines about how they are going to treat other people and how they are going to engage in our community to make sure it's a safe learning environment is important for me.
*Q.* You guys deal with a fairly robust number of conduct hearings at UNC?

*A.* Yeah. I think last year we had about 650.
*Q.* So this is conduct allegations, violations of conduct that run the gamut from minor to major, everywhere in between, right?
*A.* Uh-huh.
*Q.* Why is it important to UNC to do this conduct hearing process when someone is alleged to have violated the code?
*A.* Yeah. It's important for my staff to run an equitable process so all students know exactly what they are going to expect in the process as outlined. So I think it's important that we follow through with that because that's what we've prepared our students on how to navigate the system. And then if there is any modifications that they might need from that in the form of an accommodation, that they know how to request those through the DRC.
*Q.* And making sure that people have an equitable hearing and equitable access to that, I mean, that's important. But more generally, though, why is it important that you guys follow through with discipline for conduct violations?
*A.* Yeah. You know, especially as a residential community, we have a significant burden of safety to maintain on campus or just a positive learning environment. So all of the policies that we have in place are to ensure a safe campus as well as ones where students can thrive academically and socially as well.

*Q.* I want to touch just finally on the no-contact order in this case. You issued the no-contact order involving Mr. Vollmer and this other student, correct?
*A.* Correct.
*Q.* There is a white binder in front of you. Did you find that?
*A.* Correct.
*Q.* If you can go to No. 17, Exhibit 17.
*MR. BECK:* Your Honor, I believe this was already admitted during plaintiff's case in chief.
*THE COURT:* It was not.
*MR. BECK:* It was not? Okay.
*BY MR. BECK:*
*Q.* Do you recognize that exhibit, Exhibit 17?
*A.* I do.
*Q.* What is it?
*A.* It's the no-contact order that I issued to Jackson on March 1st.
*Q.* And you issued it to Jackson. You also issued it to another student in the GOAL program, student A?
*A.* Yes. So anytime we issue a no-contact order between students, those are mutual, so we issue them simultaneously between the individuals involved.
*Q.* Ms. Stephens, does this appear to be a full and accurate version, copy, if you will, of the no-contact order in this

case?
*A.* I believe so.
*Q.* It's got your signature there on the second page?
*A.* Uh-huh.
*Q.* And CC'd multiple people including Christina Ruffatti. Who is she?
*A.* She is the executive director for the GOAL program.
*Q.* Did you send that to her when it was flagged for you that Jackson was a participant in GOAL?
*A.* Yeah. We have an agreement with the GOAL program that anytime a student in the program has a conduct notification or receives notice like this, that we would copy her on that.
*MR. BECK:* Judge, I would move to admit Plaintiff's Exhibit 17.
*THE COURT:* Any objection to the admission of Exhibit 17?
*MR. RAYKIN:* No objection.
*THE COURT:* Exhibit 17 will be admitted.
*BY MR. BECK:*
*Q.* And I just want to note at the bottom of the first page, it informs the student who is receiving this if they have any questions, they should contact your office, correct?
*A.* Uh-huh.
*Q.* Did Jackson ever contact your office?
*A.* I don't believe so.

*Q.* Did your office conduct outreach to try to set up a meeting to discuss this information?
*A.* We sent outreach to Jackson from a case manager to follow up on the incident that had led to the no-contact order to try to gather more information about that, and that happened at a later date.
*MR. BECK:* Nothing further, Your Honor.
*THE COURT:* All right. Thank you.
Cross-examination?
*MR. RAYKIN:* No, sir.
*THE COURT:* Thank you very much, Ms. Stephens. You are excused.
So there is an indication that was the last witness. Any additional evidence on behalf of the University?
*MR. BECK:* No, Your Honor.
*THE COURT:* Okay. And there is no time -- Mr. Raykin is out of time, but any additional exhibits to offer?
*MR. RAYKIN:* No, sir.
*THE COURT:* So the evidence is closed. It's about -- it's 2:11 at this time. Do you want to take a 10-minute break at this point in time so you can kind of gather your thoughts, and then at that point we'll go right into our arguments, or we can go right into the arguments now. It doesn't matter to me.
*MR. RAYKIN:* I can, but I don't object to a 10-minute break depending on how Mr. Beck feels.

*MR. BECK:* I am also fine either way, but a 10-minute break wouldn't hurt.

*THE COURT:* Oftentimes that helps people get a little more organized. So why don't we take 10 minutes and plan on reconvening at 20 minutes after 2:00, okay? The Court will be in recess. Thank you.

(Recess at 2:12 p.m. until 2:25 p.m.)

*THE COURT:* We will go ahead and have argument now. Keep in mind that if I ask you questions during your whopping 20 minutes, that counts against your time. So we'll just see how it goes.

Mr. Raykin, if you want to break up your 20 minutes so you have a rebuttal, effectively a rebuttal argument, you can, of course, do that. I will keep track of the time, so you will have that time.

Mr. Raykin, go ahead.

*MR. RAYKIN:* Why does GOAL exist at UNC, Your Honor? It doesn't exist to help students who are neurotypical. That's relatively easy. UNC has been around and educating students for a very, very long time. GOAL exists and programs like it exist in order to help people who are neurodiverse, people who have special needs. And people who have special needs need special supports. They need a helping hand that people who are neurotypical do not need.

In this case, unfortunately, UNC, despite its best

intentions, failed to provide Jackson with the special supports that he actually needed and that he is entitled to under Section 504.

*THE COURT:* So part of it goes to the question of whether he requested an accommodation. I mean, obviously the University had the IEP, the most recent one. And as was admitted to by Dr. Martino, she could read through. She did read it through. You could presumably come up with all sorts of potential accommodations, but that's not the law. The law is that someone has to ask for the accommodations.

So even though you are right, the University has its GOAL program, has students who by their very nature are disabled in some respect, but are we not so much worried here about the program as we are about the student? Because, of course, accommodations need to be tailored to the student, but also the law says they have to be requested.

*MR. RAYKIN:* I think there are a couple of things, Your Honor, that I would say to address that. No. 1 is that we have cited to the *J.V. v. Albuquerque Public Schools* case. And there is some language there that indicates that the entity is on notice that an individual needs an accommodation when it knows that an individual requires one either because that need is obvious or because the individual requests an accommodation.

*THE COURT:* Right. But can you cite to me any case where a court said that despite the plaintiff not requesting a

particular accommodation, nonetheless, the defendant had the duty to provide it because it was obvious in a situation like this where, you know, there is a lot of info in an IEP. And here you can imagine it would be difficult for the University to -- you would read it in the IEP, but would you have a duty under the ADA to, without the student asking for any of those things, to start implementing them in some respect?

*MR. RAYKIN:* I will confess, Your Honor, that we are kind of in new territory here with respect to duties of requesting accommodations and especially as it applies to these kinds of students. If we are talking about a student who has a relatively low-level need, let's say it's some kind of a motor need -- well, not an intellectual need, okay? It's certainly easy for a student to ask for something like that or a relatively low-level need like ADHD for example. It's easy for a student to ask for something like that.

Here we are talking about a new program or relatively new program, and the law hasn't really quite caught up. I will confess that we are trying to extend the law based on some of the previous case law that we have that says that there is a need for accommodations when it's obvious essentially. And in this case we would submit that it was obvious, and that's what gives rise to the need when we are talking about neurodiverse individuals who have challenges that go beyond the relatively low-level challenges that many schools deal with on a typical

basis.

I would say this too, Your Honor, a couple of other things. No. 1, the GOAL program itself is different, okay? We are not talking about just going to the regular UNC office. And, you know, UNC might be dealing with 15, 20, 25,000 students. No, it's not going to be reasonable to expect the University at that point to identify all the disabilities and the various students and go to each one of those students and say, Do you need supports or do you not?

The GOAL program is very small. It's very focused. And it has a staff -- it has staff who are highly trained in recognizing a lot of things. I would submit to the Court that their duty should be higher in light of other case law that says, okay, to you folks here working closely with your specialized training knowing that everyone in your program has some kind of intellectual disability, the expectation is higher of you to identify what should be obvious actually to folks like you.

*THE COURT:* But does the University only let people into the GOAL program who at least have the ability to ask for accommodations on their own? In other words, does the screening that takes place and the qualifications that take place for the GOAL program already presume someone who should be able to make an accommodation request?

*MR. RAYKIN:* No, sir. From the literature that I've

reviewed, there is nothing in there that says that in order to be part of this program, you have to have the ability to ask for accommodations on your own. It does say that in order to be in this program, you have to have some kind of intellectual disability. That's what he had. But this is the reason that accommodations exist is that we know that when students get into these kinds of programs, they may need an additional helping hand, but that helping hand is going to vary from student to student.

And if you had a student who has already presented that he has information that there is neurodiversity there that presents a lot of communication challenges, then I think it becomes incumbent upon that university at that point to provide assistance to him.

One other thing, Your Honor. I think there were requests made by Jackson Vollmer in this case for various accommodations. He just made those requests in his own way. He is not the kind of student who is going to be able to pull his IEPs together, go down to the Office of Disability Services and say here is the accommodations that I need. But he wrote an e-mail and he had communications where he said, look, this is what I have going on. Can you help me out?

And he submitted this to people who are highly trained, to Ms. Ruffatti, to Dr. Martino. We are talking about a school psychologist here dealing with autism. This is a

common condition these days. And the first thing anyone is going to tell you who deals with autism is there is communication issues with anyone who deals with autism. That should have been apparent. And at that point in his own way, I do think that Jackson actually made that request.

*THE COURT:* And I don't mean to jump ahead on your outline, but we better just for the sake of time. So in terms of causation, the accommodations that you have posited as ones that would have potentially helped him, you know, like having someone be an advocate, why do you believe that they would have changed the outcome if the University's decision seems to have been grounded on conduct that both the plaintiff and his mother agree took place?

*MR. RAYKIN:* Well, Your Honor, I think what we have to take a look at here is what the ADA is supposed to do, and that is to assure equal access. We don't know how the hearing would have turned out, okay? But it stands to reason that if you have a student who has functional communication limits and can't present information on his own, that that student doesn't stand as much of a chance at a hearing as his mother who, for example, Dr. Pitula indicated his parents are his best support who would have the ability to present information on his behalf. No, we don't know how it would have turned out, but we do know it would have actually given him equal access where he lacked it before.

I would say one other thing too, Your Honor. I think we can't just focus on the hearing, but we have to go back to what took place in early March and the conversations with Ms. Ruffatti. And Ms. Ruffatti testified earlier that Jackson understands everything seemingly perfectly. This was actually a bit disconcerting to hear because we received testimony from Jackson's mother and from his therapist and we had years of IEPs and evaluations as well that Jackson's mother said she had submitted to the school that indicated that Jackson does not actually understand everything perfectly, and, in fact, he has some pretty pronounced challenges in terms of understanding things.

*THE COURT:* But at the same time if that seems to be true, there wasn't much evidence other than some general comments about how he did really well in school. Now, if you presume that it wasn't simply because his mother did all of his homework, doesn't that kind of contradict the notion that he is so disabled that he can't understand a no-contact order if he otherwise is doing well in school which presumably involves him being able to understand things and read things and process them.

*MR. RAYKIN:* I think that we are getting into something very difficult here which is we are really trying to kind of access to inside a person's head and see what they did and didn't understand. And this is where I think we have to

rely a lot on the testing that we have and the testimony that we received as well.

One of the things that I think Dr. Pitula said that was very instructive is that sometimes Jackson will say, "I understand, I get it," but he really doesn't. And we also have to understand that there is so much -- human beings are complex. And a student can do very well academically even but struggle socially, emotionally, struggle with other mental health issues. And that's what we had with Jackson here is someone who, yes, could access the academic environment with additional supports. Clearly, though, he can't function at the level of a neurotypical student. Otherwise, he wouldn't be in the GOAL program at UNC. He would just be at UNC. This was a specialized program because he has special needs.

With respect to the extent of what he understands, I don't think we are really ever going to know that. And that's, I think, why we have to rely on the testimony of people who have worked with him closely and who have expertise and say, well, look, my conclusion is that this is -- that he would have difficulty understanding something like this.

I think we have to take into account something else too, Your Honor. We heard a lot of testimony here about how, well, the student code of conduct applies to everyone and we have these rules for everyone. But GOAL students are different. I don't think it's really sensible and reasonable

to treat someone who violates a student code of conduct who is very much neurodivergent in a specialized program for other neurodivergent students the same way that you would treat a student in another program or just in general programming.

*THE COURT:* So let me just see if I understand that argument. So obviously there were accommodations that were made, although there is some disagreement about what accommodations should have been allowed. But is this -- is your argument here that, for instance, certain parts of the code shouldn't apply to GOAL students such as the plaintiff because by their nature they would not be understood, and therefore the person would naturally or at least have a tendency to violate them or would have a greater likelihood of violating them without really understanding, you know, what's wrong about doing so?

*MR. RAYKIN:* Not exactly, sir. I think if I sent that message, I was mistaken in doing so.

*THE COURT:* No, I was just trying to characterize it to help understand, but go ahead.

*MR. RAYKIN:* Sure. The code certainly should apply. But we all know as lawyers that in every code, no matter how finely it may be written, there is still always going to be some kind of flexibility within that code. By way of example, we went from zero to 60 here pretty quickly. We went from a no-contact order, skipped any kind of a shorter term of

suspension or probation or a behavior contract or what have you or some of the other interventions that are available in the student code of conduct and immediately went to a one-year suspension.

*THE COURT:* Yeah, but is that a violation of the ADA? I mean, you could argue that it seems like a harsh punishment, but is what we are talking about here, you know, what accommodations were provided at the hearing. So that's why I am kind of wondering why I would take that into account.

*MR. RAYKIN:* Here is why I think it matters, and that is because of the issue of intent. And that's where it matters for codes as well. When we have someone, let's say a neurotypical student, who has a relationship with another student on campus, violates the restraining order or violates a no-contact order, clearly something like that was intentional. And it makes sense to have a certain level of punishment for them.

Here if we have a student who doesn't entirely understand it, okay, and whose acts are not always intentional, then I think there has to be greater flexibility in that student conduct code in the way that he is disciplined. And again, I think we heard over and over again, well, the student conduct code applies to everyone. Yes, but -- and here is where the contradiction is.

Applying everything equally does not necessarily mean

that it's being applied in accordance with the ADA, okay? Sometimes if you have the same standards for neurotypical students as you have for neurodivergent students, you are implicitly discriminating against neurodivergent students because you are ascribing a level of intent and ability to them that they simply may not possess.

*THE COURT:* But does the complaint identify one of the lack of -- or the failure to accommodate being in terms of the punishment or even being charged with this particular code violation? I am not quite clear on what your position is.

*MR. RAYKIN:* Sure. I think the complaint addresses the accommodations more. I think when we are talking about the punishment, that's kind of ancillary to this. But I think when we talk about accommodations, we talk about two really big things here. No. 1, what accommodations were taken early in March to make sure that he actually understood and internalized that order; and No. 2, what accommodations were actually given to him at that hearing so he could successfully provide information that would allow him to defend himself.

*THE COURT:* Okay. But I don't hear you then to claim that one of the failures to accommodate was to somehow not charge him or not apply this particular rule against him or something of that nature; is that correct?

*MR. RAYKIN:* The rule may be applied. And I confess, I don't remember if we raised this issue in the complaint.

Here is the thing too. We haven't gone through discovery. We don't know right now how neurotypical students there are disciplined.

But I would say this. Again, the student code of conduct should apply. The rules should apply. But if the argument here is, well, we are going to treat neurotypical students who intentionally commit acts the same way as we are going to treat neurodiverse students in a very highly specialized program with a high level of specialized supports for acts that may or may not have been intentional, that appears to be implicitly discriminatory because it may be applying the standard to them that they are simply not capable of meeting.

*THE COURT:* Okay. Two minutes left.

*MR. RAYKIN:* Okay. One of the things here that was particularly surprising is the role here of the Office of Disability Services. And Dr. Martino testified that Jackson had presented or his family had presented clear evidence that he had functional limitations to his communication ability due to his disabilities. At that point I think it's incumbent upon that office to do more than simply be a scribner for whatever Jackson actually is requesting and ask him the question, Could you use some other kind of accommodations?

I also think, by the way, that the accommodations here, just to go back --

*THE COURT:* Isn't there a tension there between the case law that you cite about obvious and then, you know, some duty on the part of the University to just ask an open-ended question? Because those seem to be two different things.

*MR. RAYKIN:* Sure. If it's obvious Your Honor, and this office exists to actually provide services and equal access for disabled students, then at that point I would submit that the office has some kind of a duty at that point to see what can we do to help this particular student access the educational environment better.

*THE COURT:* And we can get into the meaning of policy and whether you use policy to interpret a statute and whatnot, but don't you think that the effect of my ruling the way that you wish would be that universities like UNC would just not take neurodiverse people or they would just exclude those people? Because if their duty was so nebulous that they couldn't rely upon the student or a student's advocate to request an accommodation, but rather they have to read the tea leaves in a 40-page IEP from high school that doesn't even apply in the first place to affirmatively provide accommodations, it seems -- that would be challenging.

*MR. RAYKIN:* I don't think we'd necessarily know that they would cancel their programs. I think, by the way, one of the things we raised in the complaint is that actually these students are charged quite a bit of money. In fact, there may

be some evidence that they are charged more money to attend the GOAL program.

*THE COURT:* Yeah. I think the information in the materials in your reply brief I think was that they get charged an extra $9,000.

*MR. RAYKIN:* So that being the case, I think it stands to reason that if you are going to charge these students more money and have more staff for them, then you have a greater responsibility at that point to provide more for these students. Will UNC actually cancel these programs? I don't think we heard any testimony to that effect.

But what are we asking for here? Basically what we are asking for here is in terms of accommodations, one is perhaps more involvement in actually explaining things to students perhaps involving their parents more closely. And two, what is really wrong with allowing someone to have an advocate when they have substantial challenges that limit them from presenting their own information? We do that all the time as lawyers.

But beyond that they say, well, this is a fundamental alteration. It's not a fundamental alteration. It's an alteration, but not a fundamental one. The student code of conduct still applies. The hearing still apply. All of the rules still apply. The only thing that is changed is who is presenting that information. Jackson still could have been

questioned even if his mother was his advocate. Jackson still could have provided information. He still could have provided evidence. All of these things are alterations, but I don't think they are fundamental ones. The University could continue to exist and at the same time become much more inclusive by offering services, although with greater supports, to a much broader array of individuals.

*THE COURT:* Thank you very much, Mr. Raykin.

*MR. RAYKIN:* Thank you.

*THE COURT:* Argument on behalf of the University. Go ahead, Mr. Beck.

*MR. BECK:* Thank you, Judge.

Your Honor, a student who violates the BEAR code and in this case admits to such a violation has not been exempted from those violations because they have a disability.

*THE COURT:* Yeah, Mr. Raykin is not saying that in so many words. There is a little bit of ambiguity there, but let's assume that that's not plaintiff's argument, that they think that the policy should apply, but rather you have to take into account a given student's limitations or disabilities for purposes of the hearing, which in this case might include actually having an advocate, someone who could speak for the student. And, of course, the argument that you just heard was that's not a fundamental change. That would -- it would be a change, but, you know, in the limited cases like in the case of

plaintiff here, what's the big deal?

*MR. BECK:* Well, Judge, I will say -- I am going to address your question. I will say I do think that opening statement that I made there is sort of a distillation of their argument at bottom. It's not verbatim, but I do think that is essentially what they are asking, Judge. And to your point, UNC should take into consideration Jackson Vollmer's disability, and, in fact, they did during the conduct hearing process. He requested a meeting with the DRC, the Disability Resource Center. He had that meeting. He discussed through the interactive process --

*THE COURT:* We know that every accommodation that he asked for in the first hearing was supplied. And moreover, it was supplied with the input of his mother who is obviously a fabulous advocate for him and a fairly knowledgeable one, too, just because of her job.

*MR. BECK:* Sure.

*THE COURT:* And you are right, too, for the second hearing, not really at issue, but we can infer a few things, the type of accommodation in terms of an advocate, that wasn't even proposed even though by this time the plaintiff and his family have a better idea of what types of -- what these things consist of. But I think that the plaintiff's argument is that the University by the very nature of this GOAL program and by virtue of the fact that the family supplied these IEPs, which

are pretty comprehensive and consist of a lot of actual testing results too, to the University, that the University by the nature of the program should be very sensitive to a person, particularly here of someone who is neurodiverse, and what that would mean in terms of the hearing context, you know, like the tendency of autistic people to perhaps in an effort to please when authority is asking questions, to be more apt to agree to things or accommodate things, which, if you are just an advisor sitting there, how do you really prevent that?

*MR. BECK:* I don't think you -- well, Judge, in terms of the University's perception of that, I think that that's what's important here. To your point about the request that's been sort of floated out there today for an advocate, which would be beyond an advisor, to your point that was never asked for, certainly not during the first conduct hearing, and they asked for a second advisor, not an advocate, for the second one.

*THE COURT:* I guess, do you think it falls within that category of cases where it would be obvious? I mean, how obvious is it that an autistic person, even one who is fairly high functioning -- as you pointed out, in the IEPs he is scoring within average ranges on various things, probably part of the reason that he was admitted into the GOAL program in the first place -- but nonetheless, autistic people may have this tendency to agree with people in an effort for someone who has

got the social level of Jackson Vollmer to be liked and to connect with people.

*MR. BECK:* Well, a couple points on this, Judge. I think, first of all, we heard from three of the four witnesses who engaged directly with Jackson. That is Christina Ruffatti, Miranda Martino and Jala Randolph throughout his time at UNC and particularly related to the conduct hearing. That was not something that they ever perceived, right?

Their perception was that he understood what they were asking him, that he was able to advocate for himself. I believe Dr. Martino even mentioned at one point he asked his mom to stop speaking for him so he could do it himself. And so that was never perceived by the University. So if that's true that Jackson has this tendency as apparently many folks with autism have just to say things to please other people, the University was not aware of that.

*THE COURT:* Ms. Ruffatti testified that she talks to him before -- or in connection with the no-contact order, and then she talks to him several other times after when there have been violations. Would she then understand that this doesn't seem to be the type of order that he is even capable of being able to comply with?

*MR. BECK:* Well, I don't think so, Judge, because he repeatedly told her --

*THE COURT:* So what's the reverse conclusion, then? I

mean, if the conclusion is made that he is capable of understanding this type of a no-contact order, are all the other violations chargeable against him as knowing violations of the order that he had intentionality when these things occur?

*MR. BECK:* Well, yes, Judge. He said that he understood it and he was -- I think the reverse conclusion is that he is intentionally violating --

*THE COURT:* And would that be true even for a student who has got all through high school no examples of violations of the rules? He has no behavioral incidents, which fairly unusual but probably somewhat remarkable.

*MR. BECK:* Sure. I think that cuts both ways, Your Honor. We heard about the IEP and the fact that there were no behavioral modifications and no mode of communication modifications for him during high school. Now, obviously the IEP is not binding on the University. You have already mentioned that, Your Honor. But the point is that there was never anything in high school that said, hey, he needs the rules of our school to be modified for him because he doesn't understand them. He is having trouble complying with them. To your point, Judge, there is no evidence that that ever occurred in Jackson's case.

*THE COURT:* Right. But then that leads -- I go back to the same question. So if with this no-contact order all of

the sudden the student who has not had any problems before is having problems complying with it, and it's a strange and difficult situation. You have got this other student who is making various efforts in part through third-parties to still contact him. Would you suggest that that is the type of rule that a person like him for whatever reason just is unable to comply with?

*MR. BECK:* I don't think so, Judge. I think with respect to that aspect of this, it's pretty clear that at least Jackson's mom through her testimony was putting the blame on the other student for that. I mean, they were mitigating -- attempting to mitigate the conduct violations by saying, well, he was only being responsive to what she said. They never really attacked the no-contact order and his understanding of it.

They attacked the implementation of it in terms of he still had to live in the same dormitory as the other student. They still had a mutual GOAL class together. So that's the stuff that they are alleging he had difficulty implementing. They are not actually alleging he didn't understand the no-contact order. The testimony was that he read through it with the GOAL staff, that he didn't ask questions, that he was repeated asked if he understood it and he said yes, and to the point of you can't respond. It would be a violation if you responded to this other student. That would be a violation of

the no-contact order. And he acknowledged that he understood that.

So I guess to your point, to hold UNC to a standard where they have to -- I think you mentioned read the tea leaves, that they have to read beyond the information that they are getting from the student and from his documentation that's being provided, and even from his mother who was advocating for him and working with him, advising during the accommodations process, what the plaintiff is asking in this case is that you would hold UNC to a standard beyond the information that they are receiving.

So I guess I don't believe that there is any evidence in this case, Judge, that he was incapable because of his disability of understanding the no-contact order or of conforming his behavior to it. But if that were hypothetically true, there hasn't been any evidence presented that UNC was made aware of that, so they can't be held to that standard for giving accommodations.

They were asked about accommodations for the conduct process. They met and conferred with Jackson and his mother for the conduct process accommodations. They postponed the hearing. They reviewed the IEP that had been provided in support, and they granted all of the accommodations that he was requesting.

Now, I understand that the family is frustrated with

the result here, but as you pointed out, the complaint does not address the due process issues that they may take with the severity of the punishment and the sufficiency of the evidence and sort of the equitability of the punishment. That's not what this case is about. This case is about the ADA accommodations that were provided for Jackson.

Now, basically they are making two arguments. No. 1, that this GOAL program creates automatically a different setting for its students. And as we have already kind of gotten into, Judge, there is not any legal support for that. And I believe it was Attorney Raykin's comment that we are in unchartered territory. So he is essentially asking for you to not only order that Jackson be readmitted, but also that UNC change the dynamics of the GOAL program.

So it's not just a modification of the academic curriculum for these students, but it would also be, hey, the BEAR conduct code doesn't apply to you the same as it would for our other students. We are going to totally modify that. And that is not what Jackson signed up for. That's not what was explained to him. And that is not how the accommodations worked.

And their second point is that he was not properly accommodated. And again, we've talked about this, Judge, but just to sort of reiterate, the analysis here is that the accommodations have to be requested. There is an interactive

process for documented disabilities and sort of talking about what would be helpful for the student for accommodations. There is no legal duty beyond that for UNC to ask that additional question, are you sure there is nothing else, or to just assume that there might be something else and grant that without it being requested by the student.

And so, Judge, I think, you know, bringing this back to the preliminary injunction standard that we are working with today, I don't think that they are successful on any of the four steps of that standard, Judge. I mean, as the Court knows, we are dealing with a heightened standard in this case on elements one and three. That is likelihood of success on the merits and the balance of harms between the parties. And, Judge, that's because what they are requesting would fundamentally alter the status quo, as I said, not only ordering that UNC let Jackson back in, but also change their conduct process for students in the GOAL program, which is something that they explicitly do not do.

And, Judge, we heard from the last witness, Ms. Stephens, about how important the conduct code is for maintaining safety and sort of keeping order on campus so that students, thousands of students, can interact in a healthy and sustainable way with one another. So they have to uphold that through their conduct process.

And Jackson indicated that he might need

accommodations for that process. Everything was put on pause while that interactive process took place. He was granted the accommodations he requested. They were implemented, as Ms. Randolph said. So they would not be able to -- they don't have a high likelihood of success on the merits because they haven't demonstrated that there was any discrimination with regard to the accommodations in this case.

And, you know, I think Attorney Raykin in his opening statement said that there is no harm to the University by letting Jackson back in, and that's simply untrue. As I have stated, the University has a duty and an interest in upholding their code of conduct and seeing that disciplinary proceedings are carried forth and that discipline is implemented for violations.

Also we heard from Ms. Ruffatti, the director of GOAL, that this would be a huge burden on the GOAL program to readmit him mid-semester if we were to do it tomorrow, Judge. But also even if you were to say, okay, readmit him in January, he has missed the entire first semester which is critical for building upon for the second semester. And they don't have the proper supports allocated to welcome him back into the program. It would be hugely disruptive to the emotional and social dynamics of the other students who sort of witnessed this play out between Jackson and the other student and understanding that they were violating the code and disciplined for that, Judge.

So again, plaintiff has not met its burden, a heightened standard on prongs one and three for preliminary injunction that would alter the status quo. And as plaintiff acknowledges, they are asking this Court to wade into unchartered testimony and order that UNC not only readmit a student, but also order that they did not properly accommodate the student for things that they were unaware he needed, did not request, and also to change the nature of the GOAL program so that the conduct code wouldn't apply to the students in that program anymore.

And that would be a huge disruption and a huge burden to the University, Judge. So we would ask in conclusion that you deny this motion for a preliminary injunction.

*THE COURT:* Thank you very much, Mr. Beck.

I am going to grant Mr. Raykin a gratuitous two minutes in case you want to make a couple of quick points.

*MR. RAYKIN:* That's okay, Your Honor. We will waive that.

*THE COURT:* Okay. Thank you.

So the matter before the Court is the motion for a preliminary injunction filed by the plaintiff. And the standard by which the Court determines whether or not it's appropriate to grant that motion has been explained by the 10th Circuit in a number of different cases, but the one that I'll cite right now is *RoDa Drilling* Company *v. Siegal*, S-I-E-G-A-L,

a 10th Circuit case from 2009. And those four elements are, first, a likelihood of success on the merits.

You will find a lot of 10th Circuit cases that talk about something like the substantial likelihood of success on the merits, but if you look back at the case that the 10th Circuit cited in the *RoDa Drilling* case, it's *Winter v. Natural Resources*, and that case doesn't use that term. So essentially we can infer that whatever modifier you put to likelihood of success, the 10th Circuit attributes no significance to it at all. So a likelihood of success on the merits; (2), a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3), that the balance of equities tips in the movant's favor; and (4), that the injunction is in the public interest.

"Because a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal," as the 10th Circuit held in 2009 in the *Beltronics USA* case. I agree with Mr. Beck that this particular injunction being requested by Mr. Vollmer is a disfavored injunction. There are three types of preliminary injunctions that are disfavored in the 10th Circuit: (1), injunctions that disturb the status quo; (2), injunctions that are mandatory rather than prohibitory; and (3) injunctions that provide the movant substantially all the relief it could easily attain after a full trial on the merits.

Here the plaintiff variously is seeking reinstatement of the plaintiff to the University. And also there is a request that he be readvised of the no-contact order and start over or at least have a new hearing. Those are I find requests that are mandatory rather than prohibitory; and as a result, I find that because the request is a disfavored injunction, the moving party must make a strong showing on the likelihood of success on the merits factor. And that's from a 10th Circuit case *Fish v. Kobach*, a 10th Circuit case from 2016.

So in terms of likelihood of success on the merits, this is a claim made under -- or the preliminary injunction request is made under the ADA. The ADA states that, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."

And discrimination includes, "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." Those are quotations from the ADA.

As was noted by Mr. Raykin, "Although the burden is generally on the individual to make an entity aware not only of their disability but also their need for accommodation, in certain circumstances the need for accommodation is obvious." And that is a quotation from the *Robertson* case from the 10th Circuit in 2007.

However, the 10th Circuit later, and this is in the *E.E.O.C. v. C.R. England, Inc.*, case from the 10th Circuit in 2011 stated as follows: "To facilitate the reasonable accommodation, the federal regulations implementing the ADA envision an interactive process that requires participation by both parties. However, before an employer's duty to provide reasonable accommodations — or even to participate in the "interactive process" — is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice."

Obviously, here we don't have an employer/employee situation, but rather a university and student situation. So I will talk later about whether or not there was an obvious need for an accommodation, but generally the ADA requires that the person who was the plaintiff had made a request to the defendant for an accommodation.

Also although a failure to accommodate is inherently an unlawful act, plaintiffs must still show that there is a connection between the failure to accommodate and the adverse

action. An example of this is a Second Circuit case, *Natofsky v. City of New York*, reported at 921 F.3d 337 at 352 through 353 where the Second Circuit found that the plaintiff was required to show the connections between the business' failure to accommodate an employee's disability, the employee's performance deficiencies, and the business' adverse employment action.

And the Second Circuit in that case specifically held that, "Natofsky has failed to provide evidence from which a reasonable juror could conclude that (1) the DOI's failure to accommodate his disability by providing secretarial alerts while he was in meetings resulted in the negative performance review he received from Ulon, or (2) Ulon's negative performance review ultimately resulted in Natofsky's demotion. As previously stated, there is no evidence that Ulon was referring to Natofsky's inability to respond to emails during meetings in her performance review. Nor as noted earlier is there any evidence that Pogoda or Peters considered Ulon's review when they decided to demote Natofsky. Accordingly, we find that the district court correctly granted summary judgment for Defendants on this claim."

The reason I mentioned that is just because there is some type of a causation requirement that is part of an ADA claim which factors into the likelihood of success on the merits.

Let me make the following findings of fact, first of all, and then I will note my conclusions of law.

The findings of fact are that the defendant, the University of Northern Colorado, is a place of public accommodation under the ADA. UNC offers the Go On And Learn program known as the GOAL program, which is an inclusive higher education program that allows students with intellectual and developmental disabilities to attend college, not for purposes of obtaining a degree, but rather for purposes of attaining a certificate of higher education.

To participate in the GOAL program, students must have a diagnoseable, intellectual, or developmental disability. And indeed Jackson Vollmer has been diagnosed with Autism Spectrum Disorder. Mr. Vollmer was enrolled at UNC for the 2022 to 2023 school year through the GOAL program.

On March 1st of 2020, UNC issued a no-contact order to the plaintiff. The no-contact order states, "This is a mutual no-contact order which means you are to have no contact with student A nor should they have contact with you. As a reminder, contact includes, but is not limited to, phone calls, e-mails, text messages, communication by on-line social networks (i.e. Facebook, Twitter, et cetera) by you personally or by any person acting on your behalf."

The Court finds that Mr. Vollmer was aware of the no-contact order and he understood that he could be disciplined

for violating it. There is testimony from Ms. Ruffatti that she had gone over that no-contact order with him before there was any type of an alleged violation of it. And she asked him whether he understood it, if he had any questions about it. He did not. There is also testimony from his mother that his mother went over the no-contact order with him as well to make sure that he understood what that meant.

I am not making a finding about whether he could understand the nuances of third-parties going through other -- or, sorry, the other party to the no-contact order going through third-parties to contact him; but nonetheless, I do find that he was aware of the no-contact order and understood that he was not to have any in-person contact with the other party to the no-contact order.

Later UNC did receive a report that the defendant had allegedly violated the no-contact order, and as a result, a notice was provided to the plaintiff. And a disciplinary hearing took place on March 29th of 2023 in order to consider whether or not plaintiff had indeed violated the no-contact order.

On July 17th of 2023 UNC sent plaintiff a letter summarizing the disciplinary hearing and finding that he had violated the no-contact order in ordering that he be suspended through spring of 2024. The hearing officer specifically determined that it was more likely than not that the plaintiff

failed to comply with the no-contact order in that he spoke to the other party to the no-contact order in person and via text messages between March 1st of 2023 and March 26 of 2023. The plaintiff did appeal his suspension on July 31st of 2023.

There was testimony that was presented at the hearing today, and let me make findings of fact regarding that testimony. The Court heard the testimony of Dr. Clio Pitula, who was a child adolescent psychologist. She testified that autism is a developmental disability that is frequently characterized by differences in social communication and often involves repetitive behaviors and the autistic person having limited interests.

She believes that the plaintiff in this case requires more support with new information or concepts. She also believes that he has diminished ability to process information. She also testified that he has been diagnosed with ADHD, and he has a tendency to struggle with impulsivity and has a challenge in self-regulation based on some social interactions. She did admit that he has some advocacy skills and that he benefits from having assistance from his parents.

The Court also heard the testimony of Ms. Annesa Vollmer who is the plaintiff's mother. By profession she is a speech pathologist who has worked with autistic children other than her son. She, as part of the various IEPs that her son has received over the years, in particular while he was in high

school, she attended all of those different meetings. And she is familiar with the IEP evaluation report which was Exhibit 1 and also the IEPs that were issued by the -- I believe it would be the Denver Public Schools as well.

In particular, she testified about the harm that he has experienced after having been expelled from UNC. She indicated that while he was at UNC, he was part of a fraternity that gave him the ability to feel part of a community for the first time really in his life. He was able to develop some deep friendships. Since leaving UNC he has been less independent. He relies more upon his parents. He has essentially lost all of the relationships that he had while he was at UNC.

He doesn't really have an opportunity to connect with the fraternity. Part of that is because he doesn't drive as part of his disability. And also he testified that his friends from the university are busy with school. His mother described him as having complete social isolation. He has some depressive symptoms. He is more prone to self-doubt now. He is more anxious and agitated. He suffered some regressions. For instance, there were some things that used to agitate him in the past like dogs barking that he had gotten over. Now he is regressing and having some symptomatology where those types of things are agitating him.

His mother mentioned a history of some self-harm.

Essentially when the plaintiff testified, he denied that he is really experiencing that type of thing. His mother testified that he is having some nightmares primarily related to the harassment that he experienced from the other party to the no-contact order. His mother testified that the plaintiff is very interested in peer socialization, but he has certain types of limitations in his ability to have those types of interactions.

Back on the subject of what social interactions he has now, both his mother and plaintiff testified that the plaintiff's siblings are now off to college. His best friend is in college at UNC. And as a result, he doesn't really have any social peers now. His mother testified that by the time the family learned of his expulsion on July 17 of this year, it was too late to enroll him even if it was just a community college, but also not in any type of similar program to the GOAL program at UNC.

In terms of the no-contact order, his mother indicated that Mr. Vollmer called her immediately after he had learned of it and that he understood no contact, but he still had some questions about other aspects of it. As I mentioned earlier, his mother testified that they talked to him about the no-contact order. They tried to keep their advice simplistic like don't talk to her, but nonetheless, he seemed to be somewhat confused.

She also testified about the confusing situation of the University having both subjects of the no-contact order in the same class and in the same dorm.  His mother also testified that she had supplied IEPs to the University which other witnesses that testified today acknowledged having received on behalf of the University.

In terms of the hearing, his mother testified that the plaintiff was really not prepared to defend himself at the hearing.  They believed that this was going to be an educational process, and indeed the letters that they received regarding that hearing talked about that proceeding in those terms.  She essentially said that they were naive and thought it might be an opportunity for the family to present the plaintiff's case to the University, in particular the type of harassment that he had experienced by the other party to the no-contact order.

In regard to the hearing itself, she didn't believe that the University really recognized his various disabilities, although she acknowledged that the application materials by the family to the University didn't mention anything other than Autism Spectrum Disorder.  She testified that at the hearing they were very kind but did not give him time to process the questions that were asked of him.

After and perhaps during the hearing, his mother testified that her son radiated pure confusion and fear.  He

had never been in a hearing like that before. She also testified that she had -- the mother provided pages and pages of text messages to -- I think she testified to Ms. Stephens, although Ms. Randolph, when I asked her some questions, testified that in the course of conducting the hearing, in fact, Mrs. Vollmer did present text messages to her and that she accepted those and Ms. Randolph did review that material.

Mrs. Vollmer also testified that the plaintiff had no behavioral issues in high school. In terms of the hearing that took place at the end of March, she testified that the plaintiff received the following accommodations: 50 percent more time; an outline of the basics of the hearing, not the questions that would be asked of him, but just an outline of the structure of the hearing that would be provided 24 hours in advance of the hearing; a summary and next steps to take place in written form after the hearing; and also the ability of her son to have an advisor, which turned out to be his mother, although the advisor was not able to do anything more than advise the student. The advisor in particular could not speak for the student.

Jackson Vollmer testified. He testified about his lack of social interactions now that he has been expelled from the University. He testified about the fact that he feels a little bit anxious about things right now. He did acknowledge that he had violated the no-contact order.

Christina Ruffatti testified. In particular -- and she is the executive director of the GOAL program. She testified that a student has to be his or her own legal guardian to be accepted into the GOAL program. And the materials, some of the materials, exhibits admitted, mention that as well. Because a student in the GOAL program has to have the ability to sign his or her own binding legal contracts, students who are part of the GOAL program get academic modifications that make sense for each student. On cross-examination she admitted that those would mean that those modifications would be tailored to the individual student.

However, in terms of accommodations, and these are really accommodations under the ADA, those would be provided by a different office, namely the DRC. She also identified that the student code of conduct and the BEAR code, Exhibits L and M, have been modified to be in easier to understand language, and that is Exhibits L and M. I think that Exhibit A is what I recall is the actual code of conduct, and L and M are modifications so they are easier to understand.

Ms. Ruffatti explained -- actually Ruffatti explained that those particular materials at L and M are reviewed with each of the students and they were reviewed with the plaintiff too. Ms. Ruffatti also explained how she sat down with the plaintiff and explained the no-contact order with him and did so on March 1st. In particular, they reviewed what behaviors

were prohibited by the order. And as I mentioned before, the plaintiff had no questions, although Ms. Ruffatti asked whether he did have any questions.

Ms. Ruffatti was asked about the possibility of letting plaintiff back into the University either right away or in January. And she testified that that would be a fundamental alteration of the GOAL program in part because there would be no way for the plaintiff as a practical matter to make up his classes. The classes are staged in a way that a person in the fall takes one class, and then there is a follow-on class in the spring. And it just -- it would not be practical for someone such as the plaintiff to be able to somehow make up the fall classes at the same time that he is taking the spring classes.

She also mentioned that there are people at the University in the GOAL program who are familiar with the dispute that went on in the spring of this year might be impacted by the plaintiff's readmission as well.

Dr. Martino, who is the assistant director at UNC's Disability Resource Center, also testified about the disability accommodation process that the University offers, how it's an interactive process, how she is familiar with the plaintiff. She has met with him. She set up accommodations, but the only accommodations that were requested before March of this year were academic accommodations, not behavioral ones. And he was

allowed to have various accommodations, five of them, in fact, that she testified about in regard to his academic work.

Later she met with the plaintiff in order to go over accommodations for the disciplinary hearing that took place on March 29th. In particular, March 13th of this year the plaintiff's mother called about accommodations. Dr. Martino mentioned that the mother indicated that they weren't sure exactly what this disciplinary hearing was going to be like. They discussed an accommodation of additional time. And no other accommodations than the ones that were provided at the actual hearing were requested.

For a second conduct hearing that occurred in April, additional accommodations were made. Namely, in addition to the same accommodations that were provided for the March hearing, breaks were allowed when plaintiff needed them. Any new allegations that might be brought up at the hearing were required to be provided a day in advance.

Two accommodations were denied. There was a request for an additional "participant" that apparently was a request for someone who would be acting as an additional advisor. The University denied that because it did not believe that that was really disability related. There was no self-report that that was a necessary accommodation. Dr. Martino testified that that was not a request for someone who would act as an advocate for the plaintiff and speak in his stead or supplement his speaking

on his own behalf during that hearing.

Another request that was denied was to have the hearing results within seven days after the hearing. Dr. Martino testified hypothetically that although if such a request was made, there would have to be an interactive process because that's legally required. Nevertheless, she thought that requiring an advocate at the hearing would cause a fundamental alteration to the nature of a disciplinary hearing.

She also believed, once again, hypothetically that if a request was made that a certain University rule shouldn't apply to a student, that after the interactive process it nonetheless would sound like a fundamental alteration to the University's rule system.

The testimony of Ms. Jala Randolph who was also heard today, she conducted the March 29th disciplinary hearing. She knew that the plaintiff was part of the GOAL program before that hearing took place. She testified that all accommodations requested by the student were allowed, and that she witnessed the plaintiff conferring with his mother during the course of the hearing. And she testified that at one point in time the plaintiff and his mother actually left the room which she allowed them to do.

She testified that the plaintiff answered the questions that were asked of him and that he appeared to understand the questions. He seemed a little anxious and

nervous, although she testified that that's normal, even for students who are neuronormal or who don't have any type of a disability.

The Court also heard the testimony of Stephanie Stephens, who is the Assistant Dean of Student Development at UNC. She testified about the BEAR code and the fact that it applies to all students. And she also testified about the fact that the University has a duty to provide a safe environment for the people on campus; and as a result, it's necessary to have rules of conduct and hearings in order to enforce the rules of conduct that the University has.

So those are the Court's findings of fact. Now I will make the following findings of law.

First of all, as I said before, because the requested injunction is a disfavored injunction, the moving party must make a strong showing on the likelihood of success on the merits question. It's a little bit unclear, but it seems to be that plaintiff is identifying the following failures to accommodate: No. 1, not adequately explaining to plaintiff the terms of the no-contact order or provide him the help that he would need in implementing those terms; and second, not providing him with a disability advocate or some type of an advocate at the disciplinary hearing that took place in late March.

I think it's important to recognize that what the

University decided in the -- on July 17 was that there were two violations and they are both in-person violations. There is the violation on March 6th, and then there was a violation, I believe it was March 20th. Those are both in person. So the fact that there was no finding of a violation based upon the plaintiff responding to text messages that were sent through third-parties, there may have been a kind of general reference to the fact that there was contact between them, but in particular the findings focused on the two in-person activities. And those are both in person and those are things which the plaintiff has admitted occurred.

So first of all, in terms of not adequately explaining to him the terms of the no-contact order or providing him help in implementing those terms, I find that the plaintiff has failed to make a strong showing that there has been a violation of the ADA in that respect. For one thing, there was no request for any type of additional accommodation in terms of him being able to understand the no-contact order.

Not only did the University sit down with him through Ms. Ruffatti and walk him through it and ask him questions about it, and he didn't have any questions or request any additional accommodations to be able to comply with that order, but there is also testimony from the plaintiff's mother that she went over the no-contact order with him as well and that he seemed to understand no contact, although there were some more

subtle aspects of it that perhaps there was some confusion over. And once again, no evidence that the family asked for any additional accommodations in terms of his ability to understand that particular no-contact order, and as a result, I find that there has been a failure to show -- to make a strong showing of likelihood of success on the merits as to that failure to accommodate.

In terms of not providing him with a disciplinary advocate at his disciplinary hearing, I once again find that plaintiff has failed to show -- make a strong showing of likelihood of success on the merits. Several things in regard to that. One, I think that there is a causation issue. And I don't think that plaintiff has made not only a strong showing, but any showing of a likelihood of success on the causation issue.

Although there was testimony from the plaintiff's mother that she thought that having an advocate may have altered the outcome of the hearing, that does not seem to be the case at all. The focus, and even if it wasn't the focus, one thing that the University found as part of the disciplinary hearing was the in-person contact. There is no evidence that the plaintiff failed to understand that aspect of the no-contact order. And other than -- I am not sure that an advocate would have possibly gotten around that fact.

There certainly would have been -- and there has been

no showing that there could have been some objection to him answering that question. There has been no showing that he wouldn't have answered that question the way he answered it at the hearing. There wouldn't have been any reason, even if he didn't say anything, that there wasn't any other evidence of it, so there has been no showing that at least that aspect of the hearing would have come out any differently if he actually had an advocate at the hearing.

Mr. Raykin has made the argument that we really shouldn't look down the road the way that I just did, but rather we really wouldn't know, and as a result, we shouldn't presume that the outcome of the hearing would be different. But I reject that particular view of the law. I think as the Second Circuit opinion held in the case that I just mentioned, it is appropriate to ask whether there has been a connection drawn to the harm and connect it up to the accommodation. And here I just don't think that having an advocate would have altered the nature of that hearing because the plaintiff during the course of the hearing admitted to the contact.

Once again, I am not going to presume what the testimony was in the earlier part of the hearing, we didn't have any evidence about that, but there has been no showing by plaintiffs that with an advocate that testimony at the hearing by the plaintiff would have come out any differently. So I find in that regard that there has been a failure to make a

strong showing of a likelihood of success on the merits.

Moreover, I think that the only reasonable relief that would be appropriate in any event would not be the reinstatement of the student, but simply ordering the University to conduct a new disciplinary hearing, a new hearing for him that would have the accommodations that were requested for the hearing, in other words, an advocate. Reinstatement I don't think is appropriately connected to the nature of that particular failure of accommodation.

Because it's a requirement, especially for a disfavored form of injunction, that the plaintiff make a strong showing on likelihood of success which I find has not been done and even if this were not a disfavored injunction, the failure of a plaintiff to succeed on any prong of the four-prong test that I mentioned from *RoDa Drilling* means that the Court cannot issue an injunction. As a result, the Court will not make findings of law regarding any of the other prongs, but rather will deny plaintiff's motion for a preliminary injunction.

Mr. Raykin, anything else on behalf of Mr. Vollmer?

*MR. RAYKIN:* No, sir.

*THE COURT:* Anything else, Mr. Beck, on behalf of the University?

*MR. BECK:* No, Your Honor.

*THE COURT:* All right. Let me just make the following comment, and that is, No. 1, you know, if we want to proceed

with this case and file dispositive motions and have a trial, that's what I do. No problem with that. And I am not going to decide this case based upon a motion, but rather just on the law and the facts. But I would urge the parties to keep an open mind about this case. You know, don't get bunkered in on the legal aspects of it. Of course, attorneys have to do it. It's part of their jobs. You have to get ready once the case has been filed.

But something that strikes me about this case is like who are the bad guys in this case? I don't know who the bad guys are. You've got this great program at UNC, and the plaintiff seems to be the perfect student for the program. This seems to be a great match. Of course, you had this strange thing happen with the other student, but, you know, I wouldn't let something that may be an unusual event prevent the parties from thinking broadly about this case and maybe trying to, you know, figure out a way not to bunker in, but see if there couldn't be some type of a way to accommodate both sides.

The Court then will be in recess. Thank you.

(Recess at 3:49 p.m.)

INDEX

Item Page

WITNESSES

Clio Pitula

Direct Examination By The Court 7

Cross-examination By Mr. Beck 26
Voir Dire Examination By The Court 31
Annesa Vollmer
Direct Examination By Mr. Raykin 35
Cross-examination By Mr. Beck 69
Redirect Examination By Mr. Raykin 91
Jackson Vollmer
Direct Examination By Mr. Raykin 99
Cross-examination By Ms. Zippin 103
Redirect Examination By Mr. Raykin 107
Christina Ruffatti
Direct Examination By Ms. Zippin 108
Cross-examination By Mr. O'Donnell 121
Redirect Examination By Ms. Zippin 130
Miranda Martino
Direct Examination By Mr. Beck 134
Cross-examination By Mr. Raykin 159
Jala Randolph
Direct Examination By Mr. Beck 174
Voir Dire Examination By The Court 185
Cross-examination By Mr. Raykin 187
Redirect Examination By Mr. Beck 187
Stephanie Stephens
Direct Examination By Mr. Beck 188

INDEX (Continued)


| Item | | | | | Page |
|---|---|---|---|---|---|

EXHIBITS

| Exhibit | Offered | Received | Refused | Reserved | Withdrawn |
|---|---|---|---|---|---|
| C | | 65 | | | |
| J | | 104 | | | |
| L | | 115 | | | |
| M | | 130 | | | |
| N | | 140 | | | |
| B | | 144 | | | |
| O | | 177 | | | |
| P | | 180 | | | |
| E | | 182 | | | |
| D | | 182 | | | |
| F | | 185 | | | |
| A | | 190 | | | |
| 1 | | 53 | | | |
| 2 | | 53 | | | |
| 3 | | 54 | | | |
| 4 | | 55 | | | |
| 17 | | 196 | | | |
| 19 | | 58 | | | |
| 21 | | 98 | | | |
| 23 | | 11 | | | |

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. Dated at Denver, Colorado, this 6th day of March, 2024.

S/Janet M. Coppock